BC

Case No. _____________

RECEIVED MPV
11/12/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

| | | |
|---|---|---|
| **REBEKAH KATHERINE BREWIS,** on behalf of herself and all others similarly situated, | ) | 1:26-cv-14122 Judge Sara L. Ellis Magistrate Judge Daniel P. McLaughlin |
| | ) | **Case No.** Direct/ Cat. 1 |
| Plaintiff, Pro Se, | ) | |
| v. | ) | |
| **DONALD J. TRUMP; MARKWAYNE MULLIN; KRISTI NOEM; TODD BLANCHE; PAMELA BONDI; LINDA McMAHON; RUSSELL VOUGHT; STEPHEN MILLER; MARK PINI; ROBERT F. KENNEDY, JR.; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; HOWARD LUTNICK; GRETCHEN WHITMER; PETERSON FARMS, INC.; PETERSON FARMS FRESH, LLC; AARON LEROY PETERSON, a/k/a R.J. ELLIOT; EARL PETERSON; LINDA PETERSON; MARK V. PETERSON; GABRIELA PETERSON; SARAH SCHLUKEBAR; RICHARD RAFFAELLI; PETERSON FARMS FRESH, INC.; OCEANA COUNTY FREEZER STORAGE, LLC, f/k/a OCEANA COUNTY FREEZER STORAGE, INC.; PETERSON BRANDS, LLC, f/k/a VRSH-2-2022, LLC; PETERSON TECHNOLOGIES, LLC;** | ) | |

**LAKEWOOD ORGANICS, LLC;** )
**JVC LOGISTICS, LLC;** )
**JVC ENTERPRISES, LLC;** )
**FFL LOGISTICS, LLC;** )
**PFI LEVERAGE LENDER, LLC;** )
**COUNTRY PURE FOODS;** )
**KING BRANDS, LLC;** )
**TROPICAL PARADISE, d/b/a** )
**COOL TROPICS;** )
**CHERRY TECHNOLOGIES;** )
**WORLDWIDE TROPHY ADVENTURES,** )
**LLC;** )
**PFI HOLDCO, LLC;** )
**PFI UPPER MIDCO, LLC;** )
**PFI LOWER MIDCO, LLC;** )
**PETERSON FAMILY HOLDINGS, LLC;** )
**MIC CP PETERSON AGGREGATOR LP;** )
**AC FRESH BUYER, LLC;** )
**OCEANA ACRES LLC;** )
**GDS HOLDINGS LLC;** )
**NORTHERN JET MANAGEMENT, INC.;** )
**PFC HOLDINGS LLC;** )
**MUBADALA INVESTMENT COMPANY;** )
**MIC CAPITAL PARTNERS III;** )
**MUBADALA CAPITAL;** )
**BLACKROCK, INC.;** )
**LAURENCE D. FINK;** )
**APOLLO GLOBAL MANAGEMENT,** )
**INC.;** )
**LEON BLACK;** )
**ADIB MATTAR, a/k/a** )
**ADIB MARTIN MATTAR;** )
**ADNAN AZAM;** )
**MGX;** )
**ABU DHABI INVESTMENT** )
**AUTHORITY;** )
**LEONARD GREEN & PARTNERS, L.P.;** )
**JEFFREY SUER;** )
**JARED KUSHNER;** )
**VARNUM LLP;** )
**BRION B. DOYLE;** )
**RONALD G. DEWAARD;** )
**MARK J. CHASTEEN;** )
**NEIL E. YOUNGDAHL;** )
**JACOB DROPPERS;** )
**NICHOLAS MISSAD;** )

**KATHERINE K. ROSKAM, a/k/a KATIE ROSKAM;** )
**JOSEPH LEVAN;** )
**JEFFREY W. BESWICK;** )
**KIRKLAND & ELLIS LLP;** )
**COVINGTON & BURLING LLP;** )
**MICHAEL J. GRANT;** )
**JOHN H. ANDREASEN;** )
**TABET DIVITO & ROTHSTEIN LLC;** )
**GAVIN LAW OFFICES PLC;** )
**TKO GROUP HOLDINGS, INC.;** )
**ENDEAVOR GROUP HOLDINGS, INC.;** )
**WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC;** )
**VINCE McMAHON;** )
**ARES MANAGEMENT CORPORATION;** )
**ANTONY RESSLER;** )
**MICHAEL AROUGHETI;** )
**MILLER, JOHNSON, SNELL & CUMMISKEY, P.L.C., d/b/a MILLER JOHNSON;** )
**TIMOTHY K. KRONINGER;** )
**MIKE AGOSTA;** )
**DAVID AZZATO;** )
**BYRON R. MAYO;** )
**CASSANDRA TOPLIN, a/k/a CASSANDRA DOVED SIMON;** )
**GREG HULING;** )
**ALAN ROSS ETKIN;** )
**EMMY BODROGI HACKETT;** )
**SERKEI PAPAIAN;** )
**DARKSIDE PRODUCTIONS, INC.;** )
**GROUP KAITU LLC;** )
**WIRETECH SERVICES LTD.;** )
**ERICIUS INVESTMENTS;** )
**KUIL LIMITED;** )
**INTERCORP LIMITED;** )
**SHL GROUP LIMITED;** )
**BOLMA STAR SERVICES;** )
**BBH MEDIA LIMITED;** )
**CFS SAGL;** )
**DASLURSERVICES AG;** )
**SHABEL SERVICES GMBH;** )
**INDIGO NETHERLANDS B.V.;** )
**CAPITAL FINANCIAL SERVICES S.A.,** )

**d/b/a XMONEY;** )
**OCEANA COUNTY DEVELOPMENT** )
**CORPORATION;** )
**CURTIS BURDETTE;** )
**OCEANA COUNTY ECONOMIC** )
**ALLIANCE;** )
**THE RIGHT PLACE, INC.;** )
**RANDY THELEN;** )
**JON BUMSTEAD;** )
**CURT VANDERWALL;** )
**SHELBY TOWNSHIP, OCEANA** )
**COUNTY, MICHIGAN;** )
**FADWA HAMMOUD;** )
**MICHIGAN BANKERS ASSOCIATION;** )
**MELISSA PALEPU;** )
**DANA NESSEL;** )
**CHRIS BECKER;** )
**KENT COUNTY PROSECUTOR'S** )
**OFFICE;** )
**CITY OF GRAND RAPIDS;** )
**GRAND RAPIDS POLICE** )
**DEPARTMENT;** )
**MAX BATTLE;** )
**ZACH BINGEL;** )
**MICHELLE LAJOYE-YOUNG;** )
**AL VANDERBERG;** )
**MARK WASHINGTON;** )
**STATE OF ILLINOIS;** )
**TODD ROKITA;** )
**WADE MITCHELL USYAK;** )
**GENERAL MOTORS LLC;** )
**KATHLEEN ANN MURPHY;** )
**PHILLIP J. LERNER, M.D., MPH;** )
**AETNA BETTER HEALTH OF** )
**ILLINOIS;** )
**CVS HEALTH CORPORATION;** )
**ILLINOIS DEPARTMENT OF** )
**HEALTHCARE AND FAMILY** )
**SERVICES;** )
**SARAH LEICHER;** )
**CLAYTON RESIDENTIAL HOMES, INC.;** )
**JPMORGAN CHASE & CO.;** )
**JAMIE DIMON;** )
**VISA INC.;** )
**MASTERCARD INCORPORATED;** )
**HUNTINGTON BANCSHARES** )

| | |
|---|---|
| **INCORPORATED, d/b/a** | ) |
| **HUNTINGTON BANK;** | ) |
| **LAUREN DAVIS;** | ) |
| **CONSTELLIS HOLDINGS, LLC;** | ) |
| **OMNIPLEX WORLD SERVICES** | ) |
| **CORPORATION;** | ) |
| **CHEXSYSTEMS;** | ) |
| **ALLY BANK;** | ) |
| **TRANSUNION LLC;** | ) |
| **NAVY FEDERAL CREDIT UNION;** | ) |
| **JPMORGAN CHASE BANK, N.A.;** | ) |
| **ESTATE OF JEFFREY EPSTEIN;** | ) |
| **BENJAMIN BLACK;** | ) |
| **JES STALEY;** | ) |
| **BARCLAYS PLC;** | ) |
| **CANTOR FITZGERALD, L.P.;** | ) |
| **ELYSIUM MANAGEMENT LLC;** | ) |
| **SCIMITAR;** | ) |
| **UNITED STATES DEPARTMENT OF** | ) |
| **HOMELAND SECURITY;** | ) |
| **UNITED STATES DEPARTMENT OF** | ) |
| **JUSTICE;** | ) |
| **UNITED STATES IMMIGRATION** | ) |
| **AND CUSTOMS ENFORCEMENT;** | ) |
| **UNITED STATES DEPARTMENT OF** | ) |
| **COMMERCE;** | ) |
| **CONSUMER FINANCIAL PROTECTION** | ) |
| **BUREAU;** | ) |
| **AIRBNB, INC.;** | ) |
| **META PLATFORMS, INC.;** | ) |
| **SUBSTACK INC.;** | ) |
| **FORTRESS INVESTMENT GROUP LLC;** | ) |
| **ENTERPRISE HOLDINGS, INC.,** | ) |
| **d/b/a ENTERPRISE RENT-A-CAR;** | ) |
| **ENTERPRISE LEASING COMPANY OF** | ) |
| **CHICAGO, LLC;** | ) |
| **and DOES 1 THROUGH 100,** | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Rebekah Katherine Brewis, appearing pro se, complains of Defendants as follows.

## PRELIMINARY STATEMENT

1. This is a survivor's action under the Trafficking Victims Protection Act, 18 U.S.C. §§ 1589, 1591, and 1595, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) and (d), against the man who trafficked Plaintiff; the enterprise that financed, concealed, and profited from his conduct; and the officials and institutions that, when Plaintiff reported what had been done to her, turned the machinery of enforcement against her rather than him.

2. The caption is long. Plaintiff asks the Court to look first at Exhibit 1, the one-page chart filed with this Complaint, before reading further. Its center strip sets out six days in February and March 2024, by date and by timestamp: a joint account co-signed, her bank account number obtained by text message at 11:42 a.m. and her online banking login at 11:56 a.m., a wire announced at 10:26 a.m. followed six minutes later by his message that he needed to "take a step back," and then March 13, on which Plaintiff sent zero messages and on which one consumer-reporting inquiry executed against her at a bank where she had never applied. The rest of the chart shows the three parts of this action — the trafficking, the enterprise, and what followed when Plaintiff reported — and where in this Complaint each is pleaded. Exhibit 1 is a demonstrative summary of the allegations of this Complaint, offered for the Court's orientation; it is not offered as evidence.

3. The 170 named defendants are not a list; they are a structure. Section I pleads them, and the seven non-parties named with them, in nineteen tiers, and each tier is a layer of one enterprise: the trafficker and his family; the operating companies he controls; the holding entities, some of which do not appear in the affiliate disclosures filed in a prior action in this Court; the sovereign-wealth and private-equity capital above them; the lawyers who built and defended that

structure; the economic-development, banking, and law-enforcement institutions whose officers sit on one another's boards; the platforms through which Plaintiff was surveilled and excluded; and the federal officials whose enforcement decisions protected the whole.

4. Plaintiff does not allege that these defendants met in a room and agreed. RICO does not require it. Section 1962(c) requires an enterprise, a pattern of racketeering activity, and each defendant's participation in the conduct of the enterprise's affairs, and Section 1962(d) reaches those who agreed to facilitate it. The pattern pleaded here is drawn from public records: corporate filings, court dockets, Freedom of Information Act responses, financial records, and the defendants' own filings against Plaintiff in two courts.

5. Defendants and their counsel have done everything possible to avoid discovery and accountability, seeking suppression rather than the truth: the Agreement's destruction and law-enforcement terms of October 10, 2025; the June 16, 2026 motion to seal; the July 20, 2026 dismissal; and the July 22, 2026 Cook County suit. Plaintiff alleges that procuring those terms was an act indictable under federal criminal law, 18 U.S.C. §§ 1503 and 1512, a predicate act of racketeering under 18 U.S.C. § 1961(1)(B), and that the later filings are part of the same course of conduct.

6. The Complaint is written to be read in order. Sections I and II identify the parties and establish jurisdiction and venue. Section III pleads the Peterson track and stands on its own: the trafficking, the settlement extracted from Plaintiff and then breached, and the two actions Peterson filed against her in this District and in the Circuit Court of Cook County. The institutional tiers that follow are reached with that structure already in view. Plaintiff respectfully asks the Court to read it that way.

# I. PARTIES

### *A. Plaintiff*

7. Plaintiff Rebekah Katherine Brewis is a natural person and a survivor of human trafficking within the meaning of 18 U.S.C. § 1595. Plaintiff maintains her address of record at 1001 Wilshire Boulevard, PMB 2107, Los Angeles, California 90017, and appears pro se. Plaintiff is a person with disabilities within the meaning of 42 U.S.C. § 12102 and 29 U.S.C. § 705(20).

### *B. Defendants and Non-Parties*

8. The defendants and non-parties identified below are named in the tiers by which the enterprise described in this Complaint is organized. Tier designations are descriptive and are pleaded to aid the Court and the parties; they are not elements of any claim. Allegations of capacity are made in the alternative where a defendant acted in more than one capacity. Persons and entities who are not identified below as a Defendant are named for their role in the facts alleged; they are not sued in this Complaint.

#### *Tier 1 — Federal Officials*

9. Defendant Donald J. Trump is sued in his official capacity as President of the United States, in connection with Executive Order 14168 and the federal conduct alleged herein.

10. Defendant Markwayne Mullin is sued in his official capacity as Secretary of Homeland Security, an office he has held since March 24, 2026.

11. Defendant Kristi Noem is sued in her individual capacity for conduct during her tenure as Secretary of Homeland Security from January 2025 to March 2026.

12. Defendant Todd Blanche is sued in his official capacity as Attorney General of the United States. He became Acting Attorney General on April 2, 2026, when Defendant Pamela Bondi left that office, and the Senate confirmed him as Attorney General on August 8, 2026.

13. Defendant Pamela Bondi is sued in her individual capacity for conduct during her tenure as Attorney General of the United States, which ended April 2, 2026 (¶ 12), including the acts of the Department of Justice alleged in ¶¶ 591–594.

14. Defendant Linda McMahon is sued in her official and individual capacities as Secretary of Education. The Senate confirmed her on March 3, 2025. She was a co-chair of the 2024 presidential transition; upon information and belief, that transition selected Defendant Vought for the offices alleged in ¶ 15. She is the spouse of Defendant Vince McMahon (¶ 89), who was a defendant in *Grant v. World Wrestling Entertainment, Inc.*, No. 3:24-cv-00090 (D. Conn.), an action under the Trafficking Victims Protection Act that was filed January 25, 2024 and closed July 27, 2026.

15. Defendant Russell Vought is the Director of the Office of Management and Budget, an office he has held since February 7, 2025. From February 7, 2025 to August 1, 2026 he was also the Acting Director of Defendant Consumer Financial Protection Bureau. He is sued in his official capacity as Director of the Office of Management and Budget and in his individual capacity, in connection with the agency-wide stop-work order of February 2025 and the dismissal or rollback of enforcement actions alleged in ¶¶ 575 through 575B.

15A. Defendant Stephen Miller is the White House Chief of Staff. The President announced on November 6, 2026 that he would take that office on November 9, 2026. From January 2025 until then he was the White House Deputy Chief of Staff for Policy and Homeland Security Adviser. He is sued in his official and individual capacities.

16. Defendant Mark Pini is sued in his individual and official capacities as an employee of the United States Department of Homeland Security assigned to the Blue Campaign, in connection with the surveillance of Plaintiff alleged in Section IV.

17. Defendant Robert F. Kennedy, Jr. is sued in his official capacity as Secretary of Health and Human Services.

18. Defendant United States Department of Health and Human Services is an agency of the United States within the meaning of 5 U.S.C. § 701(b)(1).

19. Defendant Howard Lutnick is the Secretary of Commerce and is sued in his individual capacity.

20. Defendant Gretchen Whitmer is sued in her official capacity as Governor of the State of Michigan. On February 25, 2025, she announced that the Michigan Strategic Fund had approved, for a $32.2 million expansion of the Peterson enterprise in Shelby Township, a fifteen-year exemption from the State Essential Services Assessment valued at up to $576,970 (¶ 304), and in February 2025 she made an investment mission to the United Arab Emirates (¶ 419).

***Tier 2 — Primary Trafficking Entities***

21. Defendant Peterson Farms, Inc. is a Michigan corporation established in 1984.

22. Defendant Peterson Farms Fresh, LLC is a Michigan limited liability company.

***Tier 3 — Individual Trafficker and Peterson Family***

23. Defendant Aaron Leroy Peterson, also known as R.J. Elliot ("A. Peterson"), is a natural person and the chief executive officer of the Peterson entities named herein, and is the subject of Grand Rapids Police Department Case No. 24-063052.

24. Jennifer Lamb Peterson is a natural person residing in Spring Lake, Michigan.

25. Defendant Earl Peterson is a natural person, a founder of the Peterson entities, and an officer of Defendant Oceana County Development Corporation. He is the father of Defendant A. Peterson and Defendant Mark V. Peterson. His visits to Plaintiff's Facebook profile are alleged in ¶ 334A.

26. Defendant Linda Peterson is a natural person, a co-founder of the Peterson entities, and their chief financial officer. Upon information and belief, in that office she had charge, with Defendant Agosta (¶ 95), of the corporate accounts and funds through which the payments alleged in ¶ 301 were made.

27. Defendant Mark V. Peterson is a natural person and a principal of Defendant Worldwide Trophy Adventures, LLC.

28. Defendants Earl Peterson, Linda Peterson, and Mark V. Peterson are also, respectively, the resident agent, an organizing member, and a manager of Peterson Land Management, L.L.C., a Michigan limited liability company organized in December 2002 at the Shelby, Michigan address of the Peterson enterprise.

29. Defendant Gabriela Peterson is a natural person and, upon information and belief, the spouse of Defendant Mark V. Peterson. Her visits to Plaintiff's Facebook profile are alleged in ¶ 334A.

30. Defendant Sarah Schlukebar is a natural person and Vice President of Sales and Marketing for the Peterson entities. Upon information and belief, she is a daughter of Defendants Earl Peterson and Linda Peterson, holds an ownership interest in Defendant Peterson Farms, Inc., and took part in the harassment of Plaintiff alleged in Section IV.

31. Defendant Richard Raffaelli is a natural person, chief operating officer of the Peterson entities, and Supervisor of Shelby Township, Michigan. His recusal from the Township's March 20, 2024 vote is alleged in ¶ 126, and his visits to Plaintiff's Facebook profile are alleged in ¶ 334A.

***Tier 4 — Peterson Operating Entities***

32. Defendant Peterson Farms Fresh, Inc. is a Michigan corporation.

33. Defendant Oceana County Freezer Storage, LLC, formerly known as Oceana County Freezer Storage, Inc., is a Michigan limited liability company operating cold-storage capacity of approximately 180 million pounds. Upon information and belief, Defendant A. Peterson is its registered agent. It was a defendant in the 2025 Action, where it appeared on April 18, 2025 through the same counsel as Defendant A. Peterson and filed a notification of affiliates. 2025 Action, Dkts. 7–10, 14.

34. Defendant Peterson Brands, LLC is a Michigan limited liability company organized on December 14, 2021 as VRSH-2-2022, LLC by Defendant Joseph Levan of Varnum LLP, held without operations, and renamed Peterson Brands, LLC on May 13, 2024. In August 2024 it acquired King Brands, and on December 2, 2025 it acquired Defendant Country Pure Foods. Defendant Richard Raffaelli is its chief operating officer.

35. Fresh Innovations, LLC is a California limited liability company acquired in December 2022 through Defendant AC Fresh Buyer, LLC.

36. Defendant Peterson Technologies, LLC is a Michigan limited liability company and, upon information and belief, the technology and quality-control division of the enterprise alleged in ¶ 303A.

37. Defendant Lakewood Organics, LLC is a limited liability company operating in Miami, Florida.

38. Defendant JVC Logistics, LLC is a Michigan limited liability company located in Byron Center, Michigan.

39. Defendant JVC Enterprises, LLC is a Michigan limited liability company located in Byron Center, Michigan that operates temperature-controlled trucking. The Peterson enterprise acquired it in December 2022. It was a defendant in the 2025 Action, where it appeared on April 18, 2025 through the same counsel as Defendant A. Peterson and filed a notification of affiliates. 2025 Action, Dkts. 7–10, 20. Plaintiff's observation of delivery trucks bearing the markings of JVC at Clayton House is alleged in ¶ 496.

39A. Defendant FFL Logistics, LLC is a limited liability company based in Commerce Township, Michigan and, upon information and belief, is registered with the Federal Motor Carrier Safety Administration as a shipper and broker (USDOT No. 3913515). Upon information and belief, Defendant Peterson Brands, LLC acquired it together with Defendant King Brands, LLC in 2024. Its website redirects to the website of Defendant JVC Enterprises, LLC (¶ 497).

40. Defendant PFI Leverage Lender, LLC is a limited liability company. Upon information and belief, it is the lender within the ownership structure alleged in ¶ 303A, and its members are members of the Peterson family. The April 18, 2025 motion to dismiss in the 2025 Action was signed on its behalf by the same counsel as Defendant A. Peterson. 2025 Action, Dkt. 11-1 at 22.

41. Defendant Country Pure Foods is a business entity headquartered in Akron, Ohio that supplies juices and other beverages to kindergarten-through-twelfth-grade schools, healthcare

facilities, restaurants, and retailers. Defendant Peterson Brands, LLC acquired it from Blue Point Capital Partners on December 2, 2025, in a transaction on which Varnum LLP acted as counsel to Peterson Brands, LLC and Defendant Jacob Droppers was the closing attorney of record. On December 8, 2025, counsel for the lenders announced an $875 million senior secured term loan and revolving facility for Defendant Peterson Brands, LLC to finance that acquisition and to pay existing indebtedness. Upon information and belief, the acquisition was under negotiation while Defendants negotiated the Agreement with Plaintiff in September and October 2025.

42. Defendant King Brands, LLC is a Michigan limited liability company. Defendant Peterson Brands, LLC acquired it in August 2024 (¶¶ 34, 48).

43. Defendant Tropical Paradise, doing business as Cool Tropics, is a business entity supplying beverages to kindergarten-through-twelfth-grade institutions. Defendant Peterson Brands, LLC announced its acquisition of Cool Tropics on or about April 9, 2025, about a week after Plaintiff filed the 2025 Action (¶ 267).

44. Defendant Cherry Technologies is a business entity formed by Defendants Earl Peterson and Linda Peterson in 1989 and, upon information and belief, holds patent rights in the electronic detection of pits in processed cherries.

45. Defendant Worldwide Trophy Adventures, LLC is a Michigan limited liability company owned and chaired by Defendant Mark V. Peterson (¶ 311). Its sponsorship of the April 13, 2023 award ceremony for Defendant Noem, the hunt she booked through it in fall 2024, and its use of that hunt in its marketing are alleged in ¶¶ 312 and 321. Defendant Huntington Bancshares Incorporated, whose acts toward Plaintiff are alleged in Section IX, has published a client profile of Defendant Mark V. Peterson and Worldwide Trophy Adventures, in which he states that he started his business accounts at Huntington.

### *Tier 4A — Private Equity, Holding, and Concealment Structure*

46. Defendant PFI Holdco, LLC is a Delaware limited liability company identified at Docket 21 in Case No. 1:25-cv-03513. It was a defendant in the 2025 Action, where it appeared on April 18, 2025 through the same counsel as Defendant A. Peterson. Its notification of affiliates identifies Defendant MIC CP Peterson Aggregator LP and Defendant Peterson Family Holdings, LLC as its owners of five percent or more. 2025 Action, Dkts. 7–10, 21.

47. Defendant PFI Upper Midco, LLC is a Delaware limited liability company identified as an owner of five percent or more of each Peterson operating company in the notifications of affiliates alleged in ¶ 303A. Upon information and belief, it has no employees and no business of its own, and it holds debt and equity between Defendant PFI Holdco, LLC and the operating companies.

48. Defendant PFI Lower Midco, LLC is a Delaware limited liability company identified as an owner of five percent or more of each Peterson operating company in the notifications of affiliates alleged in ¶ 303A. Upon information and belief, it has no employees and no business of its own, and it was the borrower on the credit facility that financed, through Defendant Peterson Brands, LLC, the August 2024 acquisition of Defendant King Brands, LLC and Defendant FFL Logistics, LLC.

49. Defendant Peterson Family Holdings, LLC is a Michigan limited liability company, identification number 802393125, organized on December 11, 2019, two months before the February 2020 acquisition of the Peterson Farms enterprise by MIC Capital Partners III, and identified in Plaintiff's investigation of the ownership chain of that enterprise. Defendant A. Peterson signed its 2021 annual statement as manager, and the filing fee for that statement was paid by check of Defendant Peterson Farms, Inc. Its 2025 annual statement was signed by an

accounting manager of the Peterson enterprise, and its January 20, 2026 statement lists Defendant A. Peterson as its resident agent at the Shelby, Michigan registered office. It is identified in the notifications of affiliates alleged in ¶ 303A as an owner of Defendant PFI Holdco, LLC and of five percent or more of each Peterson operating company.

50. Defendant MIC CP Peterson Aggregator LP is a limited partnership holding five percent or more of Defendant PFI Holdco, LLC and, through it, of each Peterson operating company (¶ 303A). Upon information and belief, it is the vehicle through which Defendant MIC Capital Partners III and Defendant Mubadala Capital hold the interest in the Peterson enterprise acquired in February 2020 (¶ 585).

51. Defendant AC Fresh Buyer, LLC is a limited liability company through which, upon information and belief, the Peterson enterprise acquired Fresh Innovations, LLC in December 2022 (¶ 35). It is identified as an owner of five percent or more of Fresh Innovations, LLC in that company's notification of affiliates. 2025 Action, Dkt. 13.

52. Defendant Oceana Acres LLC is a Michigan limited liability company that does not appear in any notification of affiliates filed in the 2025 Action. Upon information and belief, it is a subsidiary of Defendant Peterson Farms, Inc. and owns a 56-unit housing complex, built in 2018 and 2019 a quarter mile from the Peterson Farms campus in Shelby, Michigan, that can house up to 280 people, including employees of the Peterson enterprise, who are offered transportation to and from work.

53. Defendant GDS Holdings LLC is a limited liability company that does not appear in any notification of affiliates filed in the 2025 Action. The Peterson enterprise named it as one of its companies in its December 2022 announcement (¶ 303A).

54. Defendant Northern Jet Management, Inc. is a Michigan corporation operating from Gerald R. Ford International Airport. Upon information and belief, it manages the Gulfstream G150 aircraft, tail number N285GA, owned by Defendant PFC Holdings LLC (¶ 55), and operates it for charter on its air carrier certificate.

***Tier 4B — Aviation***

55. Defendant PFC Holdings LLC is a Michigan limited liability company, identification number 802353499, located in Spring Lake, Michigan, holding a Gulfstream G150 aircraft bearing tail number N285GA, and does not appear in any notification of affiliates filed in the 2025 Action. PFC Holdings LLC's February 10, 2026 filing with the Michigan Department of Licensing and Regulatory Affairs lists Defendant A. Peterson at 1780 Hammond Court, Bloomfield Hills, Michigan 48304, and the Federal Aviation Administration's registry lists PFC Holdings LLC, the aircraft's registered owner, at that same address. Upon information and belief, it was organized on or about August 14, 2019 by Defendant Jeffrey W. Beswick, a partner of Varnum LLP. The Federal Aviation Administration issued the aircraft's certificate of registration to it on November 4, 2019, three months before the February 2020 acquisition alleged in ¶ 585. As Plaintiff alleged in the 2025 Action, Defendant A. Peterson told her that he owned a "Gulfstream Jet" and cited future vacations with him on it when he encouraged her to part with her service animals (¶ 246), and that statement influenced her to obtain a passport. 2025 Action, Dkt. 39 ¶¶ 181, 198.

***Tier 5 — Sovereign Wealth, Private Equity, and Institutional Investors***

56. Defendant Mubadala Investment Company is a sovereign wealth entity of the Emirate of Abu Dhabi with assets under management of approximately $330 billion.

57. Defendant MIC Capital Partners III is a 2019-vintage investment fund of approximately $1.6 billion organized in the Cayman Islands and the United Arab Emirates.

58. Defendant Mubadala Capital is an investment management entity.

59. Defendant BlackRock, Inc. is a Delaware corporation and a limited partner in MIC Capital Partners III.

60. Defendant Laurence D. Fink is a natural person and the chairman and chief executive officer of Defendant BlackRock, Inc. During his tenure, a consortium led by BlackRock committed $400 million to MIC Capital Partners III in August 2021 (¶ 585A), eighteen months after that fund acquired the Peterson Farms enterprise (¶ 585), and BlackRock holds the positions in TransUnion and FIS alleged in ¶ 567. He is also the chairman of the AI Infrastructure Partnership, which BlackRock launched in September 2024 with Global Infrastructure Partners, Microsoft, and Defendant MGX (¶ 66). On March 27, 2025, twenty days after Plaintiff's written notice of March 7, 2025 to Defendant A. Peterson (¶ 266), BlackRock announced that it had nominated Defendant Kathleen Ann Murphy (¶¶ 149, 514), formerly General Counsel and Chief Compliance Officer of Aetna Financial Services, to its board of directors, and Defendant Fink stated in that announcement that she "will add immediate value to the BlackRock Board."

61. Defendant Apollo Global Management, Inc. is a Delaware corporation.

62. Defendant Leon Black is a natural person and the former chief executive officer of Apollo Global Management, Inc.

63. Defendant Adib Mattar, also known as Adib Martin Mattar, is a natural person and, at the times alleged, the Head of Private Equity of Defendant Mubadala Capital and a member of its investment committee. A filing with the Securities and Exchange Commission identifies him

as a member of the board of Peterson Farms (¶ 585A). Upon information and belief, he held that seat when the acts alleged in Section III took place.

64. Defendant Adnan Azam is a natural person and an Executive Director of Defendant Mubadala Capital.

65. Upon information and belief, he led Mubadala Capital's investment in the Peterson Farms enterprise (¶ 585); Mubadala Capital has described him as having "led direct investments in the consumer sector such as Peterson Farms."

66. Defendant MGX is a technology investment company whose creation the Government of Abu Dhabi announced on March 11, 2024, with Defendant Mubadala Investment Company and G42 as its foundational partners. Its vice chairman is the managing director and group chief executive officer of Defendant Mubadala Investment Company. In September 2024 it joined Defendant BlackRock, Inc. in the partnership alleged in ¶ 60. On May 1, 2025, a co-founder of World Liberty Financial, which lists Defendant Trump and three of his sons as members of its team, announced in Dubai that MGX's $2 billion investment in Binance would be completed in USD1, World Liberty Financial's stablecoin.

67. Defendant Abu Dhabi Investment Authority is a sovereign wealth entity of the Emirate of Abu Dhabi.

68. Defendant Leonard Green & Partners, L.P. is a Delaware limited partnership with approximately $85 billion under management, located at 11111 Santa Monica Boulevard, Suite 2000, Los Angeles, California. Its partner Defendant Jeffrey Suer previously worked in the Los Angeles office of Defendant Apollo Global Management, Inc. (¶ 69), and its operations and compliance manager previously worked at Defendant Cantor Fitzgerald, L.P. (¶ 173). Gary A.

Barnett, who trafficked Plaintiff from about May through November 2017, kept the office of his professional corporation at 11111 Santa Monica Boulevard, Suite 100, in the same building as Leonard Green's headquarters, and used an e-mail address at Leonard Green's domain, gary@leonardgreen.com. Kara Hollis, a principal of Leonard Green, sits on the board of directors of the Downtown Women's Center in Los Angeles. On October 7, 2026, after Plaintiff had identified herself there as a survivor of trafficking and had twice declined tracked programs, the Downtown Women's Center referred her to a general homeless-services program and, upon information and belief, entered her identifying information into the Homeless Management Information System of the Los Angeles Continuum of Care.

69. Defendant Jeffrey Suer is a natural person, a partner of Defendant Leonard Green & Partners, L.P., and a member of its investment committee. He worked in private equity in the Los Angeles office of Defendant Apollo Global Management, Inc. from 2009 to 2011 and joined Leonard Green in 2013.

69A. Defendant Jared Kushner is a natural person and the son-in-law of Defendant Trump. He is sued in his individual capacity. On January 16, 2026, the White House named him to the founding executive board of the Board of Peace, which Defendant Trump chairs, together with Marc Rowan, the chief executive officer of Defendant Apollo Global Management, Inc. (¶ 583). His meeting at the Kremlin on January 22, 2026 is alleged in ¶ 599. He was among about fifty guests at the celebration in the Bahamas in May 2026 of the wedding of Donald Trump Jr. ProPublica reported in September 2026 that the Russian boxing official Umar Kremlev paid part of the cost of that celebration through a company in Dubai. In December 2024, the Qatar Investment Authority and Lunate, an asset manager based in Abu Dhabi, invested a further $1.5 billion in his investment firm, Affinity Partners.

***Tier 6 — Legal Representation***

70. Defendant Varnum LLP is a Michigan limited liability partnership.

71. Defendant Brion B. Doyle is a natural person and an attorney licensed in Michigan, bar number P67870.

72. Defendant Ronald G. DeWaard is a natural person, an attorney, a former Assistant United States Attorney for the Southern District of Florida, and a member of the board of The Right Place, Inc.

73. Defendant Mark J. Chasteen is a natural person, an attorney, and a former Assistant United States Attorney for the Eastern District of Michigan, where he served for seventeen years and as Chief of the Child Exploitation Unit.

74. Defendant Neil E. Youngdahl is a natural person and an attorney licensed in Michigan, bar number P82452, who appeared in Case No. 1:25-cv-03513 on April 18, 2025.

75. Defendant Jacob Droppers is a natural person and an attorney with Varnum LLP. He co-drafted the March 2024 Prior Agreement for Defendant A. Peterson and was the attorney of record on the closing of Peterson Brands, LLC's December 2, 2025 acquisition of Defendant Country Pure Foods.

76. Defendant Nicholas Missad is a natural person and an attorney.

77. Defendant Katherine K. Roskam, also known as Katie Roskam, is a natural person and an attorney with Varnum LLP whose practice is in international tax, trade, and sanctions compliance. Plaintiff's investigation identified her as involved in the structuring of the Agreement.

78. Defendant Joseph Levan is a natural person and an attorney, a partner of Varnum LLP, where he has practiced since 1993 in corporate matters and mergers and acquisitions. On December 14, 2021 he organized VRSH-2-2022, LLC, which was held without operations until it was renamed Peterson Brands, LLC on May 13, 2024 (¶ 34) and through which the Peterson enterprise then made the acquisitions alleged in ¶¶ 34 and 41.

79. Defendant Jeffrey W. Beswick is a natural person and an attorney, a partner of Varnum LLP, whose practice includes aircraft transactions. Upon information and belief, on or about August 14, 2019 he organized Defendant PFC Holdings LLC, which holds the Gulfstream aircraft alleged in ¶ 55 and does not appear in any notification of affiliates filed in the 2025 Action.

80. Defendant Kirkland & Ellis LLP is an Illinois limited liability partnership with its principal office in Chicago, Illinois. Its lawyers, including Jay P. Lefkowitz and Kenneth W. Starr, represented Epstein in the federal investigation in Florida and secured the non-prosecution agreement alleged in ¶ 578; the United States Attorney who made that agreement had himself practiced at Kirkland & Ellis. In July 2019 the Department of Justice stated that the Attorney General, who had joined Kirkland & Ellis in 2009, was recused from the Department's review of that agreement because of his association with the firm. Kirkland & Ellis represented The Corporate Executive Board Company in its 2012 acquisition of the SHL Group (¶¶ 109, 172). In October 2025 it represented the partnership alleged in ¶ 60, Defendant MGX, and Global Infrastructure Partners, a part of Defendant BlackRock, Inc., in their agreement to acquire Aligned Data Centers. On April 11, 2025, Defendant Trump announced that Kirkland & Ellis had agreed to provide $125 million in free legal services to causes that he and the firm support.

81. Defendant Covington & Burling LLP is a District of Columbia limited liability partnership. Eric H. Holder Jr. left Covington to serve as Attorney General of the United States

from 2009 to 2015 and rejoined it as a partner in July 2015. Lanny A. Breuer left Covington in 2009 to head the Criminal Division of the Department of Justice and returned to Covington as its vice chair in March 2013. Throughout those terms the challenge that Epstein's victims brought to the non-prosecution agreement (¶ 578) under the Crime Victims' Rights Act was pending against the United States, and the Department did not set that agreement aside. *Doe v. United States*, No. 9:08-cv-80736 (S.D. Fla.).

82. Defendant Michael J. Grant is a natural person and an attorney who filed the actions described herein in Case No. 1:26-cv-08239 and in the Circuit Court of Cook County.

83. Defendant John H. Andreasen is a natural person and an attorney, ARDC number 6332408.

84. Defendant Tabet DiVito & Rothstein LLC is an Illinois limited liability company.

85. Defendant Gavin Law Offices PLC is a Virginia professional limited liability company organized on September 17, 2004, with its office in Henrico County, Virginia. It has represented the Eros entities since February 2005: on February 5, 2005 it filed, for Defendant Group Kaitu LLC and its licensee Defendant Darkside Productions, Inc., the complaint before the World Intellectual Property Organization that won the transfer of twenty-eight internet domain names built on the EROS marks, and its founder, Pamela C. Gavin, was the correspondent attorney before the United States Patent and Trademark Office on those marks (¶¶ 538, 546). When Defendant Etkin joined the firm in February 2018 (¶ 538), Ms. Gavin said publicly that the two had "worked together for years" while he "was in house with a big client."

***Tier 7 — Institutional and Enterprise Coordinating Actors***

86. Defendant TKO Group Holdings, Inc. is a Delaware corporation listed on the New York Stock Exchange under the symbol TKO and the parent of World Wrestling Entertainment and the Ultimate Fighting Championship. Defendant Endeavor Group Holdings, Inc. and its subsidiaries control a majority of its voting interests (¶ 87), and Defendant Vince McMahon was a director of TKO until January 2024 and remains one of its shareholders (¶ 89). World Wrestling Entertainment was a defendant with Defendant Vince McMahon in *Grant v. World Wrestling Entertainment, Inc.*, No. 3:24-cv-00090 (D. Conn.), the action under the Trafficking Victims Protection Act alleged in ¶ 14.

87. Defendant Endeavor Group Holdings, Inc. is a Delaware corporation that, with its subsidiaries, controlled 63.9 percent of the voting interests in Defendant TKO Group Holdings, Inc. as of March 31, 2026 (¶ 86). On March 24, 2025 it announced the completion of its acquisition by Silver Lake at a combined enterprise value of $25 billion. The equity for that acquisition included capital from Defendant Mubadala Investment Company, the sovereign fund that acquired the Peterson Farms enterprise (¶ 585), and Defendant Kirkland & Ellis LLP was counsel to Silver Lake (¶ 80). On June 3, 2025 it agreed to buy approximately 1.58 million shares of TKO from Defendant Vince McMahon for approximately $250 million (¶ 89).

88. Defendant William Morris Endeavor Entertainment, LLC is a Delaware limited liability company and the talent agency within the business of Defendant Endeavor Group Holdings, Inc. On the completion of the acquisition alleged in ¶ 87, Endeavor's representation businesses, including this agency, took the name WME Group, with Ariel Emanuel as executive chairman.

89. Defendant Vince McMahon is a natural person, the spouse of Defendant Linda McMahon (¶ 14), the former chief executive officer of World Wrestling Entertainment, and a shareholder of Defendant TKO Group Holdings, Inc. In an order of January 10, 2025, to which he consented without admitting or denying its findings, the Securities and Exchange Commission found that he had signed two settlement agreements for himself and World Wrestling Entertainment, one in 2019 that obligated him to pay a former employee $3 million and one in 2022 that obligated him to pay a former independent contractor $7.5 million; that in exchange the first woman agreed not to disclose her relationship with him and the second agreed not to disclose her allegations against him; and that he did not disclose either agreement to the company's board, legal department, or auditor. He agreed to pay a civil penalty of $400,000 and to reimburse the company $1,330,915.90. He resigned as a director of TKO in January 2024, after the action alleged in ¶ 14 was filed against him, and on June 3, 2025 he agreed to sell approximately 1.58 million shares of TKO to Defendant Endeavor Group Holdings, Inc. for approximately $250 million.

90. Defendant Ares Management Corporation is a Delaware corporation whose business was founded in 1997. Defendant Antony Ressler, one of its founders, earlier co-founded the business now carried on by Defendant Apollo Global Management, Inc. (¶ 91). Ares Management Limited, upon information and belief its subsidiary in the United Kingdom, is the security agent under the charge created on August 8, 2024 over the assets of Defendant SHL Group Limited (¶ 109), a company registered in the United Kingdom under number 01328744, and that charge remains outstanding on the register at Companies House. The position of the Michigan State Retirement System in Ares is alleged in ¶ 586.

91. Defendant Antony Ressler is a natural person, a co-founder of Defendant Ares Management Corporation, and its executive chairman. In 1990 he co-founded Apollo

Management, L.P., the business now carried on by Defendant Apollo Global Management, Inc. Upon information and belief, he is the brother-in-law of Defendant Leon Black.

92. Defendant Michael Arougheti is a natural person and has been the chief executive officer of Defendant Ares Management Corporation since January 1, 2018. He held that office when its affiliate took the charge alleged in ¶ 90.

93. Defendant Miller, Johnson, Snell & Cummiskey, P.L.C., which does business as Miller Johnson, is a Michigan professional limited liability company with offices in Grand Rapids and Detroit, Michigan. On February 22, 2024 it announced that Defendant Fadwa Hammoud (¶ 127), then the Chief Deputy Attorney General of Michigan, had been named the managing member of its Detroit office; her resignation from the Department of Attorney General took effect on March 8, 2024 (¶ 419). Its chief executive officer, Rich Sorota, sits on the board of Defendant The Right Place, Inc. with Defendant DeWaard (¶ 428).

94. Defendant Timothy K. Kroninger is a natural person and an attorney at Varnum LLP who practices intellectual property and franchise law and, upon information and belief, served as in-house counsel to General Motors from 1984 to 1993. He filed for Defendant Worldwide Trophy Adventures, LLC (¶ 45), the company of Defendant Mark V. Peterson (¶ 311), the application to register the trademark WTA TAGS, Serial No. 99010981, which was filed with the United States Patent and Trademark Office on January 17, 2025 and registered on January 20, 2026, a period in which Varnum LLP was also appearing for Defendant A. Peterson against Plaintiff (¶ 270).

95. Defendant Mike Agosta is a natural person and the chief financial officer of the Peterson entities, installed in October 2022. Corporate credit cards of the Peterson enterprise, issued on the network of Defendant Mastercard Incorporated, paid for the Airbnb bookings alleged

in Section III under a pseudonym; those accounts were within his charge. Upon information and belief, he reviewed and approved those charges, and from 2014 to 2018 he was chief financial officer of Ford Motor Company's Middle East and Africa operations, based in Dubai.

***Tier 8 — Eros Network***

96. Defendant David Azzato is a natural person. Upon information and belief, he moved his residence to Romania in 2014. Swiss commercial-register notices gave his residence as Dubai and as Ajman, United Arab Emirates, in August 2020, and as Bucharest, Romania, where Defendant Capital Financial Services S.A. has its headquarters (¶ 116), in January 2021. Upon information and belief, he was last known to be harboring in the United Arab Emirates.

97. Defendant Byron R. Mayo, also known as Byron Robert Mayo, is a natural person residing in California and the founder of the Eros platform. Doing business as Darkside Productions in Alameda, California, he registered the domain names eros-guide.com and erosguide.com on April 22, 1997, began using the mark EROS GUIDE in commerce on October 30, 1997, and obtained U.S. Service Mark Registration No. 2,549,369 for it on March 19, 2002. He enforced that mark in *Byron R. Mayo d/b/a Darkside Productions v. Michael Crowder*, Claim No. FA0206000114592 (Nat. Arb. Forum July 30, 2002), in which he was represented by Paul J. Cambria, whom the PBS program Frontline described as "a longtime attorney for the porn industry" and as involved in preparing the industry guidelines reported in January 2001 as the "Cambria List." He was a director of Defendant BBH Media Limited from August 17, 2006 to August 1, 2008 (¶ 111), and on the website of Defendant Etkin's law firm he endorses Defendant Etkin over the signature "Founder | Marketing Adventure Media," one of the companies named in the report alleged in ¶ 111. Upon information and belief, he is the son of Byron W. Mayo (1922–2012), a senior vice-president of the advertising agency Foote, Cone & Belding, whose thirty-

seven-year association with that agency included its Los Angeles and San Francisco offices and who was named "Marketing Man of the Year" by the American Marketing Association in 1969. Plaintiff alleges that Defendant Mayo bridged the old with the new: raised in national brand advertising, he carried its methods — a registered brand, a portfolio of domain names, and the enforcement of both — from the San Francisco Bay Area onto the commercial internet as it emerged, and built with them the platform Defendant A. Peterson used to find and track Plaintiff (¶ 524). When his father died in October 2012 he lived in Beverly Hills, California, a few miles from the building at 11111 Santa Monica Boulevard in which Gary A. Barnett kept the office alleged in ¶ 68; whether the two knew each other is a matter for discovery. His part in the network's structure is alleged in ¶¶ 103, 518, and 546, and Plaintiff's allegations connecting the Eros network to Defendant Trump are set out in ¶¶ 553A–553G.

98. Defendant Cassandra Toplin, also known as Cassandra Doved Simon, is a natural person. She was the secretary of Defendant BBH Media Limited from August 17, 2006 to August 1, 2008 and, under the name Cassandra Simon, a director of it from August 1, 2008 (¶ 111), and, upon information and belief, she signed as a director the certificate that dissolved Defendant Darkside Productions, Inc. in December 2016 (¶ 103). The Offshore Leaks database of the International Consortium of Investigative Journalists lists, from the Nevis corporate registry records in the Paradise Papers, The Cassandra Doved Simon (Nevis) Irrevocable Trust, formed on December 2, 2011, with Meridian Trust Company Ltd. as its intermediary. Upon information and belief, she is the beneficiary of that trust, and she is connected through the nominee director Defendant Papaian to Defendant Ericius Investments, the same nominee who connects the entities of Defendant Azzato (¶¶ 518, 547).

99. Defendant Greg Huling is a natural person residing in California.

100. Defendant Alan Ross Etkin is a natural person and an attorney admitted in North Carolina and Texas.

101. Defendant Emmy Bodrogi Hackett is a natural person and a lawyer. From March 12, 2009 to June 30, 2015 she was a director of Defendant BBH Media Limited (¶ 111), where she served with Defendant Toplin. Upon information and belief, she became the head of legal of the SHL Group in 2012, while she held that directorship, and later its general counsel, chief compliance officer, and data protection officer. She was a director of Defendant SHL Group Limited (¶ 109) from January 31, 2023 to May 16, 2025.

102. Defendant Serkei Papaian is a natural person.

103. Defendant Darkside Productions, Inc. is a California corporation founded by Defendant Mayo, of which Defendant Etkin was president (¶¶ 546, 549). As the licensee of Defendant Group Kaitu LLC, it operated the websites erosguide.com, eros-guide.com, and eros.com, which advertise the services of adult entertainment providers (¶ 85). Upon information and belief, it was dissolved in December 2016 by a certificate that Defendant Toplin signed as a director (¶ 518). It remains subject to suit: under section 2010 of the California Corporations Code, a dissolved corporation "continues to exist for the purpose of winding up its affairs, prosecuting and defending actions by or against it."

104. Defendant Group Kaitu LLC is a limited liability company organized in California and Delaware.

105. Defendant Wiretech Services Ltd. is a Maltese company incorporated July 13, 2015.

106. Defendant Ericius Investments is an entity bearing registration number HE328785.

107. Defendant Kuil Limited is a foreign entity.

108. Defendant Intercorp Limited is a company registered in Cyprus under number HE391719 and, upon information and belief, the corporate secretary of Ericius Investments Limited (¶¶ 518, 553G). On March 10, 2023 Ukraine imposed sanctions on 109 companies registered in Cyprus, among them Intercorp Limited and Ericius Investments.

109. Defendant SHL Group Limited is a company registered in England and Wales under number 01328744 whose business is the psychometric assessment of job candidates and employees. Upon information and belief, Defendant Hackett was its head of legal and then its general counsel while she was a director of Defendant BBH Media Limited (¶ 101), and she sat on its board from January 31, 2023 to May 16, 2025. Its acquisition in 2012, the financing of that acquisition, and the charge over its assets are alleged in ¶¶ 80, 172, and 90.

110. Defendant Bolma Star Services is an entity located in Youngsville, North Carolina.

111. Defendant BBH Media Limited is a private limited company registered in England and Wales under number 05908865, incorporated on August 17, 2006 and dissolved on January 14, 2020. Its officers were Defendant Mayo, a director from August 17, 2006 to August 1, 2008; Defendant Toplin, its secretary over the same period and, under the name Cassandra Simon, a director from August 1, 2008; and Defendant Hackett, a director from March 12, 2009 to June 30, 2015. On November 14, 2017, a week after the raid alleged in ¶ 536, the television station ABC11 reported that its sources connected Defendant Bolma Star Services, Eros Guide,

and "other shell companies including BBH Media, Marketing Adventure Media, and Darkside Productions."

*Tier 8A — Eros Affiliates Following Migration*

112. Defendant CFS Sagl is, upon information and belief, a limited liability company located in Lugano, Switzerland, to which operations of the Eros platform moved after 2017 (¶ 534).

113. Defendant DaslurServices AG is a Swiss corporation, identification number CHE-281.436.276, located at Abendweg 18, Lucerne, and, upon information and belief, incorporated on August 7, 2019. As Plaintiff has observed, the footer of the Eros website names it as the operator of that website.

114. Defendant Shabel Services GmbH is a company located at Teinfaltstrasse 5/4, Vienna, Austria. It is the owner of record at the United States Patent and Trademark Office of the marks EROS and EROS.COM.

115. Defendant Indigo Netherlands B.V. is a company located in Amsterdam, the Netherlands. Upon information and belief, on November 7, 2007 it applied to the United States Patent and Trademark Office to register the marks EROS ESCORTS and EROS-GUIDE.COM.

116. Defendant Capital Financial Services S.A., which does business as xMoney and formerly did business as Twispay, is an electronic money institution licensed by the National Bank of Romania on April 25, 2013, with its headquarters in Bucharest, Romania. Upon information and belief, Defendant Azzato was one of its founders, and it processed card payments for the Eros platform and for other companies of his network (¶ 545), approximately €4.8 million of them in 2023.

117. In October 2021 the blockchain company now known as MultiversX agreed to acquire it.

118. Under the name xMoney it has announced a United States dollar stablecoin called USDXM.

***Tier 9 — Economic Development and Institutional Actors***

119. Defendant Oceana County Development Corporation is a Michigan nonprofit corporation, formed in or about 2022 and located in Shelby, Michigan, whose stated purpose is to build single-family homes for low- and moderate-income residents of Oceana County. Upon information and belief, Defendant Earl Peterson is its president and treasurer (¶ 25), and Defendants Bumstead and VanderWall are among its directors (¶¶ 124, 125).

120. Defendant Curtis Burdette is a natural person and the Executive Director of Defendant Oceana County Economic Alliance, a post he carries out from an e-mail address of Defendant The Right Place, Inc. On February 25, 2025, announcing the expansion alleged in ¶ 304, he stated: "Peterson Farms is synonymous with Oceana County, so we are happy to support their growth." His visits to Plaintiff's Facebook profile are alleged in ¶ 334A.

121. Defendant Oceana County Economic Alliance is a Michigan nonprofit corporation organized in 2018. In 2018 it entered a multi-year partnership with Defendant The Right Place, Inc., under which The Right Place provides its business retention and expansion services, and on February 25, 2025 the two jointly announced the expansion alleged in ¶ 304. Upon information and belief, Defendant Raffaelli has served on its board (¶ 31).

122. Defendant The Right Place, Inc. is a Michigan nonprofit corporation administering a $50 million SOAR Fund award.

123. Defendant Randy Thelen is a natural person and the president and chief executive officer of Defendant The Right Place, Inc. On April 27, 2023, Defendant Whitmer appointed him to the board of the Michigan Strategic Fund. On February 25, 2025, that board approved the tax exemption alleged in ¶ 304 for the project of Defendant Peterson Farms, Inc. that his own organization had assisted and announced.

124. Defendant Jon Bumstead is a natural person and a Michigan State Senator whose district includes Oceana County. In Defendant Whitmer's announcement of February 25, 2025 (¶ 304), he stated that Peterson Farms "is Oceana County's largest employer." Upon information and belief, he is a director of Defendant Oceana County Development Corporation (¶ 119), and his leadership fund received contributions from Defendants Earl Peterson and Mark V. Peterson in 2020 and 2025.

125. Defendant Curt VanderWall is a natural person and a Michigan State Representative. In Defendant Whitmer's announcement of February 25, 2025 (¶ 304), he stated: "This will be a great benefit for the area." Upon information and belief, he is a director of Defendant Oceana County Development Corporation (¶ 119), and he received campaign contributions from Defendant Earl Peterson in 2022, 2024, and 2025.

126. Defendant Shelby Township, Oceana County, Michigan is a Michigan municipal corporation and the recipient of $3.2 million in Community Development Block Grant funds and $800,000 in funds of the Michigan Economic Development Corporation. On March 20, 2024, the day before the Prior Agreement alleged in Section III, the Shelby Township board approved a promissory note between Peterson Farms and the Township and the deposit of a $700,000 Peterson Farms check to fund the Township's water pipeline project; Defendant Raffaelli, the Township Supervisor and chief operating officer of the Peterson entities, recused himself from that vote.

127. Defendant Fadwa Hammoud is a natural person, a former Solicitor General of Michigan, and, from 2022 until her resignation took effect on March 8, 2024, the Chief Deputy Attorney General (¶ 423). She is now the managing member of the Detroit office of Defendant Miller, Johnson, Snell & Cummiskey, P.L.C. (¶ 93), and the Michigan Economic Development Corporation lists her among the members of its Executive Committee. The Department of Attorney General has certified that it possesses no records of exit protocols, debriefing, or conflict screening for her departure (¶ 423). Upon information and belief, she took part in Defendant Whitmer's February 2025 investment mission to the United Arab Emirates (¶ 419).

128. Michigan Economic Development Corporation, a non-party, is a Michigan public body corporate. Its part in the public support for the Peterson enterprise is alleged in ¶¶ 126 and 304. PitchBook lists "Michigan Economic Development" among the investors in Peterson Farms, and Defendant Hammoud sits on its Executive Committee (¶ 127).

129. Defendant Michigan Bankers Association is a Michigan nonprofit corporation and the trade association of Michigan's banks. Upon information and belief, it has contributed more than $2 million to 529 Michigan officeholders, including every Attorney General of Michigan since 1999 and Defendant Whitmer, and its associate members include Varnum LLP, Defendant Miller, Johnson, Snell & Cummiskey, P.L.C., and the Michigan Economic Development Corporation.

130. Defendant Melissa Palepu is an attorney of the Michigan Department of Attorney General who oversees its human trafficking prosecutions and chairs the Michigan Human Trafficking Commission. She is sued in her official capacity for prospective relief. The Department has certified that it possesses no record of any review or awareness by her of Plaintiff's criminal complaint of March 31, 2025 (¶¶ 390, 423).

131. Michigan Human Trafficking Commission, a non-party, is a body created in 2014 within the Michigan Department of Attorney General, MCL 752.973, and chaired by Defendant Palepu. No member or employee of the Commission contacted Plaintiff at any time after her criminal complaint of March 31, 2025 (¶¶ 390, 423).

132. Defendant Dana Nessel is a natural person and the Attorney General of the State of Michigan, sued in her official capacity for prospective relief.

133. Defendant Chris Becker is a natural person and the Prosecuting Attorney of Kent County, Michigan, sued in his official capacity for prospective relief.

134. Defendant Kent County Prosecutor's Office is a Michigan governmental entity.

***Tier 10 — Law Enforcement and Municipal Defendants***

135. Defendant City of Grand Rapids is a Michigan municipal corporation subject to liability under Monell v. Department of Social Services, 436 U.S. 658 (1978).

136. Defendant Grand Rapids Police Department is a department of the City of Grand Rapids.

137. Defendant Detective Max Battle, Badge No. 141, is a natural person and an officer of the Grand Rapids Police Department assigned to Case No. 24-063052, sued in his official and individual capacities.

138. Defendant Zach Bingel is a natural person and the Freedom of Information Act coordinator of the Grand Rapids Police Department, sued in his official and individual capacities.

139. Defendant Michelle LaJoye-Young is a natural person and the Sheriff of Kent County, Michigan, the county in which the assault alleged in ¶ 386 took place and whose prosecutor declined charges (¶ 428). She is sued in her official capacity for prospective relief.

140. Defendant Al Vanderberg is a natural person and the Administrator and Controller of Kent County, Michigan. He sits on the board of Defendant The Right Place, Inc. with Defendant DeWaard, while his county's prosecutor declined charges in Case No. 24-063052 (¶ 428).

141. Defendant Mark Washington is a natural person and the City Manager of Defendant City of Grand Rapids, to whom Defendant Grand Rapids Police Department reports. He sits on the board of Defendant The Right Place, Inc. with Defendant DeWaard (¶ 428).

***Tier 11 — State Actors***

142. Michigan Department of Attorney General, a non-party, is a department of the State of Michigan and the office through which Defendant Nessel acts (¶ 660). It received Plaintiff's criminal complaint on March 31, 2025, closed it on September 16, 2025, and has certified that it possesses no record of any review, referral, or reason for that closure (¶¶ 390, 422, 423).

143. Michigan Department of Treasury, a non-party, is a department of the State of Michigan whose Bureau of Investments manages the State's public retirement systems. PitchBook lists it among the investors in Peterson Farms, and the retirement systems it manages hold the positions in Apollo and Ares alleged in ¶ 586.

144. Defendant State of Illinois is a sovereign state, named in connection with the denial of medication and the housing conduct alleged herein.

145. Indiana Department of Homeland Security, a non-party, is a department of the State of Indiana. Upon information and belief, the Indiana law-enforcement personnel whose viewing of Plaintiff's LinkedIn account is alleged in ¶ 474 included its employees.

146. Defendant Todd Rokita is a natural person and the Attorney General of the State of Indiana, sued in his official capacity for prospective relief in connection with the conduct alleged in ¶ 474.

147. Defendant Wade Mitchell Usyak is a natural person.

148. Defendant General Motors LLC is a Delaware limited liability company. Varnum LLP represents General Motors; Defendant DeWaard served on the team of the independent monitor appointed under its 2015 deferred prosecution agreement, and Defendant Kroninger was its in-house counsel (¶¶ 94, 569). Defendant Ally Bank, whose acts toward Plaintiff are alleged in Section IX, is the former General Motors Acceptance Corporation (¶ 569). Upon information and belief, the General Motors pension fund was an investor in Apollo Investment Fund III in 1995.

***Tier 12 — Healthcare and Surveillance***

149. Defendant Kathleen Ann Murphy is a natural person. She served at Aetna, Inc. from approximately 1985 to approximately 2000 in positions that included General Counsel and Chief Compliance Officer of Aetna Financial Services, and she was the president of personal investing at Fidelity Investments from 2009 to 2021. On March 27, 2025, twenty days after Plaintiff's written notice to Defendant A. Peterson (¶ 266), Defendant BlackRock, Inc. announced her nomination to its board of directors, which she has since joined (¶¶ 60, 514). She also sits on the board of Prudential Financial, Inc.

150. Defendant Phillip J. Lerner, M.D., MPH, is a natural person and a Vice President and National Medical Director of Aetna.

151. Defendant Aetna Better Health of Illinois is a managed care organization operating in Illinois.

152. Defendant CVS Health Corporation is a Delaware corporation.

153. Defendant Illinois Department of Healthcare and Family Services is a department of the State of Illinois.

154. Defendant Sarah Leicher is a natural person.

155. Defendant Clayton Residential Homes, Inc. is a residential housing entity.

***Tier 13 — Financial Infrastructure and Debanking***

156. Defendant JPMorgan Chase & Co. is a Delaware corporation and the parent of Defendant JPMorgan Chase Bank, N.A. (¶ 168). It was a defendant in the class action that Epstein's victims brought over its banking relationship with him, *Doe 1 v. JP Morgan Chase & Co.*, No. 1:22-cv-10019 (S.D.N.Y.), which was resolved by the payments alleged in ¶ 589. Its positions in FIS and in Early Warning Services, LLC are alleged in ¶ 568. The Financial Times reported in December 2020 that it was among the investors in the 2011 financing alleged in ¶ 182.

157. Defendant Jamie Dimon is a natural person and has been the chief executive officer of Defendant JPMorgan Chase & Co. since 2005, including years in which Epstein was its client and the year in which it resolved the claims alleged in ¶ 589. He testified by deposition in that litigation in May 2023.

158. Defendant Visa Inc. is a Delaware corporation that operates a payment-card network. Upon information and belief, card payments for the Eros platform were made on its network through the processors alleged in ¶¶ 116 and 521, and in 2023 it flagged one merchant of Defendant Azzato's network for failing to verify the minimum age of the people it advertised (¶ 521). In 2015 it stopped processing payments for Backpage (¶ 531). On July 9, 2026, the court in *Fleites v. MindGeek S.a.r.l.*, No. 2:21-cv-04920 (C.D. Cal.), denied Visa's motion to dismiss the claim that it conspired to violate the Trafficking Victims Protection Act by processing payments for a pornography website, and that claim is pending against it.

159. Defendant Mastercard Incorporated is a Delaware corporation that operates a payment-card network. The corporate cards of the Peterson enterprise that paid for the Airbnb bookings alleged in Section III were issued on its network (¶ 95). Upon information and belief, card payments for the Eros platform were also made on its network through the processor alleged in ¶ 116, and in 2015 it stopped processing payments for Backpage (¶ 531).

160. Defendant Huntington Bancshares Incorporated, doing business as Huntington Bank, is a Maryland corporation.

161. Defendant Lauren Davis is a natural person, the president of the Greater Michigan region of Huntington Bank, and a member of the Executive Committee of Defendant The Right Place, Inc., on whose board she sits with Defendant DeWaard (¶ 428). Defendant Huntington Bancshares Incorporated closed Plaintiff's accounts on January 15, 2025 (¶ 561), and it has published a profile of Defendant Mark V. Peterson as its client (¶ 45).

162. Defendant Constellis Holdings, LLC is a security contractor formed in 2014 by the merger of Academi, the company formerly known as Blackwater, and Triple Canopy. Upon information and belief, funds managed by Defendant Apollo Global Management, Inc. owned it

from 2016 until a restructuring in March 2020. Its subsidiary, Defendant Omniplex World Services Corporation, holds the contract alleged in ¶ 163.

163. Defendant Omniplex World Services Corporation is a subsidiary of Defendant Constellis Holdings, LLC. On December 15, 2025, Defendant United States Immigration and Customs Enforcement signed a contract with it, worth up to more than $113 million through 2027, to locate people for that agency by skip tracing.

164. Defendant ChexSystems is a consumer reporting agency within the meaning of 15 U.S.C. § 1681a(f).

165. Defendant Ally Bank is a Utah-chartered bank.

166. Defendant TransUnion LLC is a Delaware limited liability company and a consumer reporting agency within the meaning of 15 U.S.C. § 1681a(f).

167. Defendant Navy Federal Credit Union is a federally chartered credit union.

168. Defendant JPMorgan Chase Bank, N.A. is a national banking association.

***Tier 14 — Epstein Estate and Associates***

169. Defendant Estate of Jeffrey Epstein is the estate of a deceased natural person, administered in the United States Virgin Islands.

170. Defendant Benjamin Black is a natural person, a son of Defendant Leon Black, and the chief executive officer of the United States International Development Finance Corporation, an office to which the Senate confirmed him on October 7, 2025. He is sued in his individual capacity. He previously worked in private equity at Defendant Apollo Global Management, Inc. On January 25, 2011, a group of majority shareholders that included Defendant

Leon Black and the Black Family 1997 Trust elected him a director of Environmental Solutions Worldwide, Inc. Upon information and belief, he signed that company's annual reports filed with the Securities and Exchange Commission on March 30, 2012 and March 19, 2013, each of which listed Financial Trust Company, Inc. (¶ 578) among its principal shareholders (¶ 582). As the Abu Dhabi Global Market announced on September 9, 2024, he was then building the credit platform Fortinbras with Asad Hussaini of Defendant Scimitar (¶ 175).

171. Defendant Jes Staley is a natural person and a former chief executive officer of Defendant Barclays PLC.

172. Defendant Barclays PLC is a public limited company registered in England and Wales. Defendant Staley (¶ 171) became its chief executive officer in December 2015. Barclays sent the Financial Conduct Authority of the United Kingdom a letter, approved by Defendant Staley, stating that he "did not have a close relationship with Mr Epstein." The Authority found that statement misleading, and on June 26, 2025 the Upper Tribunal upheld the Authority's decision to bar him from senior management in financial services (¶ 588). Barclays Bank PLC, its subsidiary, was the syndication agent under the credit agreement of July 2, 2012 that provided $625 million of senior secured credit facilities for the acquisition of the SHL Group (¶ 109) by The Corporate Executive Board Company, completed on August 2, 2012. On May 28, 2026, a class action under the Trafficking Victims Protection Act was filed against Barclays and Defendant Staley in the Central District of California, where it is pending. *Doe v. Barclays PLC*, No. 8:26-cv-01377 (C.D. Cal.).

173. Defendant Cantor Fitzgerald, L.P. is a Delaware limited partnership. Defendant Lutnick was its chairman and chief executive officer when the Senate confirmed him as Secretary of Commerce on February 18, 2025 (¶¶ 19, 596). Cantor Fitzgerald has provided custody services

for Tether, the issuer of the stablecoin USDT. The operations and compliance manager of Defendant Leonard Green & Partners, L.P. previously worked at Cantor Fitzgerald (¶ 68).

174. Defendant Elysium Management LLC is the family office of Defendant Leon Black. On September 9, 2024, the Abu Dhabi Global Market announced that Elysium had opened there its first office outside the United States, under the name Scimitar (¶¶ 175, 587). Records released by the Department of Justice reflect that on November 21, 2014 Elysium's chief financial officer sent Epstein the financial statements of the Black family trusts, and that on December 3, 2014 he asked Epstein whether a $5.5 million distribution should be used to cover a shortfall, to which Epstein answered "ok."

175. Defendant Scimitar is the office that Defendant Elysium Management LLC opened in the Abu Dhabi Global Market in September 2024 (¶ 174). Asad Hussaini, a financier based in Abu Dhabi, joined it to build the credit platform Fortinbras with Defendant Benjamin Black (¶ 170).

***Tier 15 — Federal Agency Defendants***

176. Defendant United States Department of Homeland Security is an agency of the United States within the meaning of 5 U.S.C. § 701(b)(1), and operates the Blue Campaign.

177. Defendant United States Department of Justice is an agency of the United States within the meaning of 5 U.S.C. § 701(b)(1).

178. Defendant United States Immigration and Customs Enforcement is a component of the United States Department of Homeland Security.

179. Defendant United States Department of Commerce is an agency of the United States within the meaning of 5 U.S.C. § 701(b)(1), headed by Defendant Lutnick (¶ 19). The

United States Patent and Trademark Office, which registered the marks alleged in ¶¶ 114 and 546 and keeps them on its register, is established within it. 35 U.S.C. § 1(a).

179A. Defendant Consumer Financial Protection Bureau is an agency of the United States within the meaning of 5 U.S.C. § 701(b)(1). It issued, and is charged with enforcing, the rule alleged in ¶ 575A.

***Tier 16 — Platform Defendants***

180. Defendant Airbnb, Inc. is a Delaware corporation.

181. Defendant Meta Platforms, Inc. is a Delaware corporation.

181A. Defendant Substack Inc. is the company that operates the platform on which Plaintiff publishes FAFO Files. Its removal of Plaintiff's note on October 20, 2026, its warning that further reports would lead to the permanent removal of her publication, and its denial of her appeal on November 3, 2026 are alleged in ¶¶ 477 and 478.

182. Defendant Fortress Investment Group LLC is a Delaware limited liability company. On May 15, 2024, Defendant Mubadala Capital and Fortress's management announced that they had completed the purchase of the 90.01 percent of Fortress that SoftBank Group Corp. had held. A consortium led by Mubadala Capital owns 68 percent of Fortress, and Mubadala Capital's chief executive officer has sat on Fortress's board since 2019. The Financial Times reported in December 2020 that Fortress was among the investors in the $362 million of debt raised in 2011 for Manwin, the company later known as MindGeek, which owns Pornhub.

182A. Defendant Enterprise Holdings, Inc. is a Missouri corporation that does business as Enterprise Rent-A-Car and Enterprise Mobility. Defendant Enterprise Leasing Company of Chicago, LLC is one of its operating subsidiaries. Upon information and belief, it operates the

Enterprise Rent-A-Car branch at 2801 Washington Street, Waukegan, Illinois, in this District, within the "Chicago Group" whose managers wrote the messages alleged in Count XXX. Together they are "Enterprise." Plaintiff rented vehicles from that branch beginning June 20, 2026. Enterprise's conduct toward her in August and September 2026 is alleged in Counts XXX and XXXI.

***Does 1 through 100***

183. Defendants Does 1 through 100 are natural persons and entities whose identities are presently unknown to Plaintiff and who participated in, facilitated, or benefitted from the conduct alleged herein. Plaintiff will seek leave to amend to name these defendants when their identities are ascertained through discovery.

## II. JURISDICTION AND VENUE

### *A. Subject-Matter Jurisdiction*

184. This Court has original jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including:

(a) the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1589, 1591, and 1595(a);

(b) the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), 1962(d), and 1964(c);

(c) 42 U.S.C. § 1983;

(d) the Fifth Amendment to the Constitution of the United States, as to claims for declaratory and injunctive relief against officers of the United States in their official capacities;

(e) the Administrative Procedure Act, 5 U.S.C. §§ 702 and 706;

(f) the Driver's Privacy Protection Act, 18 U.S.C. §§ 2722 and 2724;

(g) Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134;

(h) 42 U.S.C. § 1985(2) and (3);

(i) the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693f and 1693m, as to which 15 U.S.C. § 1693m(g) also confers jurisdiction;

(j) the Wiretap Act, 18 U.S.C. §§ 2511(1)(a) and 2520;

(k) the Fair Credit Reporting Act, 15 U.S.C. §§ 1681n, 1681o, and 1681p; and

(l) Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

185. This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and (4) because Plaintiff seeks redress for the deprivation, under color of state law, of rights secured by the Constitution and laws of the United States, and seeks relief under Acts of Congress providing for the protection of civil rights.

186. Congress has expressly conferred on the district courts of the United States the causes of action pleaded in this Complaint. Section 1595(a) of Title 18 authorizes a victim of a violation of Chapter 77 to bring a civil action against the perpetrator, and against whoever knowingly benefits, or attempts or conspires to benefit, from participation in a venture that the person knew or should have known engaged in such a violation, in an appropriate district court of

the United States. Section 1964(c) of Title 18 authorizes any person injured in her business or property by reason of a violation of § 1962 to sue in any appropriate United States district court. Section 2724(a) of Title 18 provides that a person who knowingly obtains, discloses, or uses personal information from a motor vehicle record for a purpose not permitted by Chapter 123 is liable to the individual to whom the information pertains, who may bring a civil action in a United States district court.

187. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's claims arising under state law, including her claims concerning the validity and enforceability of the Settlement Agreement and Amended and Restated Mutual Confidentiality Agreement effective October 10, 2025 (the "Agreement"), because those claims are so related to her federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

188. The Court may grant declaratory relief, and further necessary or proper relief, under 28 U.S.C. §§ 2201 and 2202.

***B. Sovereign Immunity***

189. As to the agencies of the United States, and the officers of the United States named in their official capacities, Plaintiff seeks relief other than money damages, for which the United States has waived sovereign immunity under 5 U.S.C. § 702. Plaintiff's claims for damages against federal officers are brought against them in their individual capacities.

190. As to officers of any State named in their official capacities, Plaintiff seeks prospective declaratory and injunctive relief against ongoing violations of federal law, which the Eleventh Amendment does not bar. *Ex parte Young*, 209 U.S. 123 (1908). Plaintiff's claims for damages against state officers are brought against them in their individual capacities.

190A. Plaintiff elects, under 9 U.S.C. § 402(a), that no predispute arbitration agreement or joint-action waiver be enforced with respect to this case, which relates to the sexual assault dispute alleged in Section III and Count XXII. The Terms of Use of Defendant Substack Inc. also reserve to each party an action in court for injunctive or other equitable relief.

191. As to Defendants Mubadala Investment Company and Abu Dhabi Investment Authority, each an agency or instrumentality of a foreign state within the meaning of 28 U.S.C. § 1603(b), this Court has jurisdiction under 28 U.S.C. § 1330(a). Those Defendants are not immune under 28 U.S.C. § 1605(a)(2) because this action is based upon commercial activity carried on in the United States by them, and upon acts in connection with their commercial activity elsewhere that cause a direct effect in the United States, including the February 2020 acquisition of the Peterson Farms enterprise through MIC Capital Partners III and the 2007 purchase of an interest in Apollo Global Management, each alleged in Section X. Service on those Defendants will be made under 28 U.S.C. § 1608(b). To the extent Defendant MGX is an agency or instrumentality of a foreign state, the same provisions apply to it, on the basis of its commercial activity in the United States alleged in ¶¶ 60, 66, and 80.

***C. Venue***

192. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred here, including the following:

(a) From February 26 through February 28, 2024, Defendant Aaron Leroy Peterson transported Plaintiff to the Viceroy Chicago hotel, 1118 North State Street, Chicago, Cook County, Illinois, and sexually assaulted her there.

(b) In the spring of 2024, Plaintiff took up residence in this District at a lakeside short-term rental in Fox Lake, Lake County, Illinois, for which Defendant A. Peterson paid. Plaintiff's Illinois driver's license, automobile insurance, voter registration, and post office box each bore the Fox Lake address. Apart from a trip of approximately two days to Los Angeles, California, in or about May 2024, during which Defendant A. Peterson paid for an attempted change of Plaintiff's legal name, Plaintiff remained at the Fox Lake rental until June 2024, when she was forced out of it, and in or about August 2024 she moved to DuPage County, Illinois.

(c) While Plaintiff resided in this District during 2024, Defendant A. Peterson sent her electronic messages, which she received here, concerning the Fox Lake rental, his offer to help her find a house, and new and changing terms of their arrangements.

(d) Plaintiff sustained a substantial part of the injuries alleged in this Complaint while residing in this District.

193. As to the Defendants that are agencies or officers of the United States, venue is also proper under 28 U.S.C. § 1391(e)(1)(B), because a substantial part of the events and omissions giving rise to the claims occurred in this District.

194. As to Plaintiff's claims under 18 U.S.C. § 1964(c), venue is also proper under 18 U.S.C. § 1965(a) as to each Defendant who resides, is found, has an agent, or transacts his affairs in this District. The ends of justice require that the remaining participants in the enterprise alleged in Count III, who reside in other districts, be brought before this Court under 18 U.S.C. § 1965(b), because no other single district could exercise jurisdiction over all of them.

195. This action is properly brought in the Eastern Division. Under 28 U.S.C. § 93(a)(1), the Eastern Division comprises, among other counties, Cook, DuPage, and Lake Counties, in which the events described in Paragraph 192 occurred.

***D. Personal Jurisdiction***

196. This Court has personal jurisdiction over each Defendant under Federal Rule of Civil Procedure 4(k)(1)(A) and the Illinois long-arm statute, 735 ILCS 5/2-209(c), which extends to the limits of due process; under Rule 4(k)(1)(C) and 18 U.S.C. § 1965(b) and (d), as to Plaintiff's RICO claims; and, as to any Defendant not subject to jurisdiction in the courts of general jurisdiction of any State, under Rule 4(k)(2), as to claims arising under federal law.

197. Defendants that are the State of Illinois or its agencies, or that are organized under the laws of Illinois or maintain their principal places of business in Illinois, as identified in Section I, are at home in this State and subject to its general jurisdiction.

198. Defendant Aaron Leroy Peterson is subject to specific jurisdiction in Illinois because Plaintiff's claims arise out of and relate to conduct he purposefully directed at this State, including:

(a) transporting Plaintiff to the Viceroy Chicago in February 2024 and sexually assaulting her there;

(b) paying for Plaintiff's residence at the Fox Lake rental in Lake County, Illinois, during 2024;

(c) sending Plaintiff, while she resided in this District, the electronic messages described in Paragraph 192(c); and

(d) invoking courts located in Illinois to enforce the Agreement against Plaintiff, in *Peterson v. Brewis*, No. 1:26-cv-08239, which he filed in this Court on July 13, 2026, alleging that venue was proper in this District, and in *Peterson v. Brewis*, No. 2026 CH 06988, which he filed in the Circuit Court of Cook County, Chancery Division, on July 22, 2026, alleging that venue was proper in that court.

199. Each Defendant alleged in Counts III and IV to have conducted or participated in, or conspired to conduct or participate in, the affairs of the enterprise is subject to this Court's jurisdiction on Plaintiff's RICO claims under 18 U.S.C. § 1965(b) and (d), and each has sufficient contacts with the United States as a whole to satisfy the Due Process Clause of the Fifth Amendment.

200. The agencies of the United States, and the officers of the United States named in their official capacities, are subject to this Court's jurisdiction and will be served under Federal Rule of Civil Procedure 4(i).

201. Officers of States other than Illinois are subject to specific jurisdiction in Illinois to the extent the conduct alleged against them was purposefully directed at Plaintiff in this State and, to the extent they are named in their individual capacities on Plaintiff's RICO claims, under 18 U.S.C. § 1965(b).

202. Defendants organized or residing outside the United States are subject to this Court's jurisdiction on Plaintiff's federal claims under Federal Rule of Civil Procedure 4(k)(2).

203. Plaintiff will plead the basis for venue and personal jurisdiction as to each of Defendants Does 1 through 100 upon amendment identifying that Defendant.

### *E. The Agreement's Forum Clause Does Not Govern This Action*

204. Section 13 of the Agreement provides that actions "concerning any dispute arising hereunder" are to be filed in the Circuit Court of Kent County, Michigan, or the United States District Court for the Western District of Michigan.

205. Defendant A. Peterson has himself twice disregarded that clause by choosing Illinois forums for disputes arising under the Agreement. On July 13, 2026, through his counsel Varnum LLP, he filed *Peterson v. Brewis*, No. 1:26-cv-08239, in this Court, Eastern Division, as an action to enforce the Agreement, and alleged that venue was proper in this District under 28 U.S.C. § 1391(b). On July 22, 2026, he filed *Peterson v. Brewis*, No. 2026 CH 06988, in the Circuit Court of Cook County, Chancery Division, again to enforce the Agreement, and alleged that venue was proper there under 735 ILCS 5/2-101. Neither forum is one designated in Section 13.

206. Having elected to litigate disputes arising under the Agreement in Illinois, and having affirmatively alleged that venue lies in this District, Defendant A. Peterson has waived any right to enforce Section 13 against Plaintiff and is estopped from contending that this District is an improper or inconvenient forum.

207. Section 13 does not reach Plaintiff's claims in any event. Those claims arise under the Constitution and statutes of the United States and rest on conduct that began in November 2023, more than twenty-two months before the Agreement's stated effective date of October 10, 2025; they do not arise under the Agreement. The Agreement, including Section 13, is also void or voidable for the reasons alleged in Count XV.

### *F. Joinder*

207A. Each Defendant is properly joined under Fed. R. Civ. P. 20(a)(2). Plaintiff's right to relief against each arises out of the same series of transactions and occurrences — the trafficking pleaded in Section III, its concealment, and the retaliation that followed her reports of it — and questions of law and fact common to all Defendants will arise, including the existence of the enterprise pleaded in Count III. If the Court finds any claim misjoined, Plaintiff asks that it be severed under Fed. R. Civ. P. 21 rather than dismissed, so that its filing date is preserved.

## III. STATEMENT OF FACTS — PETERSON TRACK

### *A. Background and Initial Contact*

208. Plaintiff Rebekah Katherine Brewis is a qualified individual with disabilities as defined by the Americans with Disabilities Act, 42 U.S.C. § 12102. Plaintiff experiences substantial limitations in multiple major life activities and requires reasonable accommodations, which Defendants were aware of and deliberately exploited. Plaintiff's disabilities include, but are not limited to, Ehlers-Danlos Syndrome, autism spectrum disorder, complex post-traumatic stress disorder (C-PTSD), attention deficit hyperactivity disorder (ADHD), and HIV. These conditions directly impacted Plaintiff's vulnerability to the coercive control and trafficking conduct described herein.

209. In late 2023, Plaintiff began online communications with Defendant Aaron Leroy Peterson. Defendant A. Peterson initiated contact through online platforms, engaging Plaintiff in communications designed to assess her vulnerabilities, establish rapport, and begin the grooming process characteristic of trafficking operations.

210. Defendant A. Peterson first saw Plaintiff in person in early November 2023, as he later wrote on February 10, 2024: "I saw you in early November first." After that first time, Plaintiff was bedridden for three days because of his aggressiveness. He injured her sexually, and he trauma-bonded her.

211. It was a tightrope walk for Plaintiff. She was badly hurt and angry, and she intended to sue him for it; she was pursuing it herself. She asked to speak with him in person. When they spoke, she told him she was legally trained. He sensed her intent. Before she could put a claim to him, he positioned her: he told her he was known to be a very generous person, and he set up the arrangement that followed.

212. On Tuesday, January 16, 2024, at 10:25 a.m., Defendant A. Peterson wrote to Plaintiff: "You offered me an exclusive, nsa arrangement and I wanted to help get you through this rough patch in life... I like doing what I can to take care of you and I would love to keep seeing you." His message reversed the order. Before Plaintiff ever tried to make an "nsa" arrangement, he had told her he wanted to see her again and to keep seeing her; and after she told him she was legally trained, he set the arrangement up himself.

213. In December 2023, Defendant A. Peterson pressured Plaintiff to reveal her complete identity, placing her under considerable distress. Peterson pressured Plaintiff to "go bare" and to "provide test results" to meet his standards for what he characterized as "earned income." Had Plaintiff refused, Peterson would have withdrawn his financial support—support he provided under the pretense that Plaintiff was a "legal consultant."

214. Defendant A. Peterson stated that his "New Year's resolution" was to learn "everything possible" about Plaintiff. Within one month, through coercion and deception, Defendant A. Peterson had obtained all of Plaintiff's personal information and data, including her

parents' names, her driver's license information, social security number, date of birth, place of birth, access to her entire family tree, and her complete medical history, including detailed test results from both past and present.

215. Defendant A. Peterson fraudulently misrepresented his marital status to Plaintiff, claiming he was "getting a divorce" from Jennifer Lamb Peterson and that he intended to marry Plaintiff. In reality, no divorce proceedings had been initiated, and Defendant A. Peterson remained legally married throughout the period of his interactions with Plaintiff. This fraudulent misrepresentation of marital status was discovered by Plaintiff in December 2024 when Ottawa County Family Services confirmed no divorce was pending.

***B. Housing Control Scheme***

216. On Friday, January 19, 2024, at 2:22 PM, Defendant A. Peterson solicited Plaintiff for "free housing," asking Plaintiff, "Okay...would you like me to find you an apartment?"

217. On the same date, at 3:08 PM, Defendant A. Peterson messaged Plaintiff: "When you get settled in and relaxed a bit, take a look at this one. Multiple units open and all kind of lease length options: https://www.renewwoodlandranch.com/".

218. Plaintiff was shocked to be offered an apartment, as no one had ever offered her housing assistance before. However, Plaintiff was also afraid it was a trap, not knowing who owned Renew Woodland Ranch, why she was directed to live there, or what Peterson's terms were for offering housing assistance.

219. On January 24, 2024, at 9:27 AM, Defendant A. Peterson, utilizing fraudulent misrepresentation, wrote to Airbnb hosts "Mason & Holly" of "Living Water Corporate Housing" via Airbnb messages: "Hi, Mason! I'm Aaron, and I book business trips for Karissa. Your place

looks like a good fit for this extended business assignment. I think they'd love your place!" Defendant A. Peterson further stated: "Karissa is a consultant working on a special project." Defendant A. Peterson addressed Plaintiff as "Karissa."

220. On January 24, 2024, Defendant A. Peterson booked housing for Plaintiff via Defendant Airbnb. Using his "Airbnb for Work" business account and the e-mail address aaron@petersonfarmsinc.com, on the corporate domain associated with Defendant Peterson Farms Fresh, Inc., he was listed as an authorized travel booker on Plaintiff's Airbnb account under Airbnb's "Travel for Work" program, and he paid with his personal and work credit cards. Airbnb's payment records show $42,120.56 in housing paid through his payment instruments. Plaintiff pleads in the alternative, under Fed. R. Civ. P. 8(d)(2), that the work credit cards and the business-travel arrangement were those of Defendant Peterson Farms Fresh, Inc. or of Defendant Peterson Farms Fresh, LLC.

221. Defendant A. Peterson booked a 6-month reservation for Plaintiff in Grand Rapids, Michigan, at Cityscape, located at 1556 Michigan St NE #4, Grand Rapids, MI 49503, for $12,186, from January 24, 2024, to July 31, 2024. This reservation was terminated by approximately March 1, 2024, when Defendant A. Peterson moved Plaintiff to another Airbnb condominium in Grand Haven, Michigan. Plaintiff was required to leave that location by approximately April 1, 2024.

222. Defendant A. Peterson identified Plaintiff to Airbnb hosts as his "legal consultant," which did not accurately reflect the true nature of the arrangement. The housing was managed, paid for, and controlled by Defendant Aaron Peterson and Peterson Farms Fresh, LLC through his booker access to her Airbnb account and the Peterson Farms work credit cards. In

actuality, Plaintiff was being coerced into sexual servitude through Defendant A. Peterson's coercive control over her housing.

223. This housing control scheme constituted a means of coercion and control prohibited under 18 U.S.C. § 1591 and constituted a form of forced labor and human trafficking as defined by federal law, including violations of the Trafficking Victims Protection Act. The scheme created conditions of forced labor and debt bondage as defined by 22 U.S.C. § 7102.

### *C. Transportation Control and Financial Dependency*

224. Defendant A. Peterson systematically sought to establish control over Plaintiff's basic needs, including both housing and transportation. On Sunday, January 21, 2024, at 3:03 PM, Defendant A. Peterson offered to co-sign for Plaintiff's vehicle, stating: "Now I'm curious what the price would have been with a co-signer. Let me know the next time you find one, and we'll add my information." This offer was made without Plaintiff's request and represented an attempt to create financial dependency.

225. Plaintiff became privately concerned that Defendant A. Peterson would use the co-signature as a way to compel her to conform her behavior to his sexual requirements. Plaintiff recognized this as an emerging pattern of coercion, dominance, and control, but felt helpless in her situation. Plaintiff attempted to determine ways to escape a co-signed car arrangement with Defendant while still maintaining her vehicle and freedom of movement.

226. Defendant A. Peterson "invested" in Plaintiff in direct proportion to the degree to which Plaintiff surrendered control sexually or in any other area of her life, creating a dependency of learned helplessness and an expectation of easily accessible sex through financial exploitation and control over housing and transportation access.

227. On February 26–28, 2024, Defendant A. Peterson knowingly engaged in interstate transportation for purposes of commercial sexual activity in violation of 18 U.S.C. § 2421, constituting sex trafficking by force, fraud, or coercion under 18 U.S.C. § 1591, as evidenced by a pattern of payments and transportation arrangements made by Defendant A. Peterson.

228. Defendant A. Peterson made the following "Cash App" payments to Plaintiff, characterizing them as "reassurance": February 8, 2024, $2,000 (with message "Reassurance [kisses]"); February 10, 2024, $2,500; February 13, 2024, $2,000; February 20, 2024, $500; February 21, 2024, $1,500; and February 25, 2024, $1,500.

228A. Plaintiff's Cash App account record shows sixteen payments from Defendant A. Peterson between November 5, 2023 and March 10, 2024, totaling $27,650; the five alleged in ¶ 228 are among them. Cash App charged Plaintiff a fee of 2.75 percent on each of those payments, $760.38 in all. He attached notes to the payments: "Can't wait [kisses]" on November 5, 2023; "Just being You [kisses]" on December 10, 2023; "Merry Christmas [kisses]" on December 25, 2023; "Happy New Year" on December 31, 2023; "Just thinking of you [kisses]" on January 6, 2024; "Rest of January [kisses]" on January 15, 2024; "[car] Down Payment," with $4,450, on January 17, 2024; and "Reassurance [kisses]" on February 8, 2024. On March 10, 2024, after the last payment, Plaintiff wrote to him about the fee: "They seriously take $28."

229. Defendant A. Peterson also made the following Zelle payments using his Huntington Bank account to Plaintiff's Credit Union One account: February 16, 2024, $3,000; February 18, 2024, $3,000; February 21, 2024, $3,000; March 1, 2024, $3,000; and March 5, 2024, $3,000. On March 5, 2024, at 2:38 PM, he wrote to her: "I just sent a Zelle payment. That maxed out the amount (15k) they will let me send during a 30 day period."

230. Defendant A. Peterson was a multimillionaire who could have paid off any vehicle outright for Plaintiff but instead chose to co-sign, thereby purposefully creating a dependency and subsequently co-owning a vehicle, exerting coercive control over Plaintiff's property using his corporate resources.

### *D. The Grand Rapids Incident*

231. In February 2024, while Plaintiff was housed in Grand Rapids, Kent County, Michigan, under the arrangement described in Paragraphs 220 through 222, a separate incident involving Defendant A. Peterson occurred in Grand Rapids. That incident is the subject of Grand Rapids Police Department Case No. 24-063052, in which a charge of Criminal Sexual Conduct in the First Degree (CSC-1) was submitted to prosecutors.

### *E. Sexual Assault at the Viceroy Chicago*

232. On February 26–28, 2024, Defendant A. Peterson transported Plaintiff to the Viceroy Chicago hotel, located at 1118 N. State Street, Chicago, Illinois, in the Gold Coast neighborhood of the Northern District of Illinois.

233. During the period of February 26–28, 2024, Defendant A. Peterson subjected Plaintiff to sexual assault at the Viceroy Chicago property.

234. Upon information and belief, Defendant A. Peterson directed Viceroy Chicago hotel staff to identify Plaintiff and specifically address her as "Mrs. Peterson," without verifying her identity using her Illinois driver's license or U.S. Passport. This tactic was used as psychological manipulation to further the sexual exploitation of Plaintiff, leveraging her naiveté and autism spectrum disorder vulnerabilities.

235. Plaintiff felt apprehensive about traveling to Chicago because she feared that Defendant A. Peterson was setting her up. This concern proved well-founded when Plaintiff later experienced the sexual assault described herein.

235A. While she was at the Viceroy, Plaintiff was truly scared. Upon information and belief, Defendant A. Peterson staged seeing her in front of the hotel: when she came, he thanked her as if she had done something for him; he had driven there with someone with him; and Plaintiff had the unsettling feeling that the two of them were not there alone. Plaintiff believes that she may have been a pawn in his game, for someone who had demanded to see her in person, as if to scrutinize her. She was always afraid to know who he was really with, and she feared a setup. His own messages show that he was not in Chicago alone: on February 27, 2024, at 10:29 AM, he wrote to her, "Just finished meeting #1," and at 7:23 PM, "We walked to the restaurant, so it's close....I'll be safe." On February 29, 2024, the day after she drove back, Plaintiff wrote to him that she had had "a small insecurity about the trip thinking something weird was up."

236. Defendant A. Peterson employed trickery, coercion, enticement, and deception to involve Plaintiff in commercial sexual activity in Chicago, Illinois. He deliberately misrepresented the nature of his relationship with Plaintiff, promising her that he would divorce his wife ("So my timeframe has always been late spring to file") while engaging in a pattern of emotional manipulation and control. Although fully married with no initiated divorce proceedings, he verbalized fantasy plans to Plaintiff about marriage and a future together.

237. The extent of this deception, aimed at Plaintiff due to her autism, constituted narcissistic "love bombing" that Plaintiff was not psychologically or emotionally equipped to recognize or resist, given her complete loss of control over her life and her total forced reliance on Defendant A. Peterson, which robbed her of her bodily autonomy and self-determination.

238. Plaintiff has limited recollection of events during certain nights spent with Defendant A. Peterson at the Viceroy Chicago. On information and belief, Defendant A. Peterson administered intoxicating substances to Plaintiff to facilitate the sexual assaults.

### *F. Grand Haven Sexual Assault and Continued Coercion*

239. On Wednesday, March 6, 2024, Defendant A. Peterson subjected Plaintiff to additional sexual assault at an Airbnb residence on Miller Avenue, Room 211, Grand Haven, Michigan, in Ottawa County. Plaintiff's preserved messages fix the time. The evening before, he wrote to her: "Yes, I'll be there at 10:45." On March 6, at 10:44 a.m. Eastern time, he wrote: "On my way." No message passed between them from 10:58 a.m. until 4:46 p.m. This location was controlled by Defendant A. Peterson, with Defendant Peterson Farms Fresh, LLC and Defendant Peterson Farms Fresh, Inc., through the same booker access to Plaintiff's Airbnb account (¶¶ 220, 222).

240. The Miller Avenue property was located approximately 4.9 miles from the Peterson family residence, facilitating Defendant A. Peterson's ability to access and control Plaintiff while maintaining proximity to his own home and family.

241. Plaintiff's complete psychiatric support was estranged immediately due to the degree of trauma and isolation created by Defendant A. Peterson following the "discard" of Plaintiff in March 2024 in Grand Haven, Michigan.

242. Plaintiff was not only "trauma bonded" with Defendant A. Peterson due to the sexual assaults but was also subjected to coercive control through both psychological manipulation and economic dependency, specifically through housing controlled and paid for by Defendant

Aaron Peterson and Peterson Farms Fresh, LLC, along with transportation through the co-signed vehicle.

243. Plaintiff is frail: six feet one inch tall and 135 pounds. Defendant A. Peterson told her she had the body of a fourteen-year-old girl; he first declared it in November 2023, when they first met (¶ 210). Emotionally, Plaintiff is about twelve years old, though her IQ is at a genius level, except when she is dissociated, and his presence alone often put her in a trance. During sex he totally controlled her, the whole time: he made her lie down and do nothing at all. He used her like a rag doll. He did this numerous times, beyond what is pleaded here: there were the missing nights of sex at the Viceroy, with drink at night (¶ 238), and there was another occasion in February 2024, after a lunch date, when she was drunk. It goes on and on. Before he raped her on March 6, 2024 (¶ 239), his last words to her were: "We're both adults... AREN'T we?" At the time, Plaintiff did not know what he meant. It took her a year to realize why he had said it; but she innately knew that he was seeing her like an underage girl, with her skinny body.

244. As an autistic child, Plaintiff was severely abused, physically and emotionally, by her domineering father. Defendant A. Peterson had the same build and the same intimidating demeanor, and his abuse of Plaintiff repeated that pattern.

245. Plaintiff wrote to Defendant A. Peterson at the time. On March 21, 2024, at 11:08 a.m., she wrote: "I was seduced to attain a degree of emotional vulnerability that was violated and turned on its head literally overnight[.]" At 2:10 p.m. the same day she wrote: "I hate you for basically raping me, faking you were someone to get access to my body[.]" Fourteen minutes later, at 2:24 p.m., he wrote: "Revised agreement in your inbox. I turned the extra into a housing allowance for the next 6 months." On April 12, 2024, she wrote: "and by the way, I did not give

you permission last time we had sex to enter me. You just force yourself onto me before I even was ready." His reply that morning did not address consent.

### *G. Isolation and Destruction of Support Networks*

246. From the middle of November 2023 until the middle of February 2024, Defendant A. Peterson's actions led Plaintiff to sever ties with all her social support systems, including: (a) her trauma therapist and therapy at the Michigan Center for Stress; (b) her college education at Oakland Community College; (c) her former best friend J. Morey; (d) her two service animals, Luna and Oliver (excluding Bellah, whom she was forced to surrender on or about March 8, 2025); and (e) potential legal counsel, attorney Sheldon L. Kay of Sheldon L. Kay & Associates, whom Plaintiff had befriended during her Business Law classes at Oakland Community College.

247. This isolation was primarily due to a coercive arrangement in which Defendant A. Peterson exercised complete control over Plaintiff's housing and financial security, compelling her to submit to his sexual demands at any time and location of his choosing. This constituted sex trafficking under 18 U.S.C. § 1591 while also requiring Plaintiff to remain silent about the abuse and not disclose anything, facing immediate punishment through the withholding of financial support and housing.

### *H. The Prior Agreement*

248. In March 2024, Defendant A. Peterson proposed a mutual confidentiality agreement. On Sunday, March 17, 2024, at 10:08 a.m., he wrote to Plaintiff offering a "Mutual NDA, including destruction of all electronic communication, video, etc." in exchange for the payoff of her GMC vehicle loan, a lump sum, and Airbnb housing in Grand Haven until June 15,

2024. At 11:18 a.m. he raised the lump sum "from $60k to $100k." His offer came to approximately $120,000: the payoff of the GMC loan ($20,899.88) and $100,000.

249. Plaintiff pushed back for more before her birthday. On March 18, 2024, she asked Defendant A. Peterson to increase her monthly amount to $7,500 and asked that the agreement keep her housing opportunities "as open as possible." He refused. On March 19, 2024, at 8:15 a.m., he wrote that the agreement was "being setup to what we agreed to originally: 1. payoff of GMC ($21k) 2. Lump sum payment of $100k 3. Ability to stay in Grand Haven apartment, at no cost, until June 15." He added: "This won't be in the agreement, but if necessary, I will assist you in obtaining another Airbnb rental, in the city of your choice." At 10:46 a.m. he wrote that the agreement was in her e-mail and that he had "a Docusign version sent for execution." At 11:01 a.m. he wrote that he had given an unnamed person "the go ahead to send out the docusign." Plaintiff signed that day, without counsel. Her bank statement records the $100,000 that day as an "INTERNAL WIRE TRANSFER CREDIT." The next day, March 20, 2024, he paid off the loan on her vehicle, $20,757.40. On March 18, 2024, at 2:20 p.m., Defendant A. Peterson had written to Plaintiff: "As I said earlier today, I'm going to recommit to my marriage. That also means for now, I'm not planning on being intimate with anyone but her." On her birthday, March 20, 2024, the day after she signed and was paid, Plaintiff wrote to him at 9:05 a.m. that she was going out for a birthday drink and that he could join her "for just one." At 9:16 a.m. he answered that he "would love to have a drink with you," and at 11:04 a.m. he sent "3 options for tonight," the third of them "The third floor deck of your building (around 9pm)." That night he met her at a bar to try to intoxicate her, and he attempted to seduce her, touching her and kissing her on the lips multiple times and telling her that they would be "kissing friends." At 9:33 p.m. he wrote to her: "I love you[.]" On March 21, 2024, at 11:12 a.m., Plaintiff asked him why he was "kissing me and saying

that friends can kiss." At 11:13 a.m. he answered: "Because I'm trying to be nice to you in the transition." At 11:17 a.m. he wrote: "A non-intimate friendship[.]" Upon information and belief, the Prior Agreement was co-drafted by Jacob Droppers and Nicholas B. Missad of Varnum LLP, at the direction of Defendant A. Peterson.

249A. Defendant A. Peterson had Plaintiff confused; he was playing her like a yo-yo. Two days after he wrote that he was recommitting to his marriage, and one day after she signed, he was kissing her (¶ 249), and he wanted to see her again. On March 20, 2024, at 7:58 p.m., he wrote: "We can do a drink tonight or I can see you on Friday?" On March 21, 2024, at 6:28 a.m., he wrote: "I'm recommitting to my marriage...so I do not want a poly relationship or a mistress situation." At 2:01 p.m. that day, Plaintiff wrote to him that it was best they not "kiss, hug, plan on a date for 12:30 pm tomorrow like you were wanting to set, nor using terms of endearment," and that "I felt gaslighted[.]" At 2:03 p.m. he answered: "I think it would be best to not meet tomorrow." Plaintiff understood the date he wanted to set to be for a fling.

249B. Defendant A. Peterson knew whom he was doing this to. Plaintiff is autistic (¶ 208), and from January through March 2024 she told him so, in writing, again and again. On January 30, 2024, at 3:54 p.m., she wrote to him that her clinical psychologist had told her that she "was a psychological age emotionally of about a 12-year-old to 14[.]" On February 3, 2024, she sent him "tips for loving someone with Asperger's syndrome[.]" On February 8, 2024, she sent him what she called "a very long email I've been writing for the last hour out of my heart[.]" In it she told him that she had been given counseling "to work on dating scenarios to help protect me, because it was clinically known that I was highly vulnerable[.]" At 11:23 a.m. that morning he quoted her e-mail back to her: "it is harder for me to stabilize unless I have a life that's good in all respects, and that I am not being exploited, abused, manipulated, or coerced[.]" At 11:34 a.m. he wrote: "I

have read your email a few times now and I will do everything I can to communicate properly based upon some of the very unfortunate life experiences you've had to endure." The same day he sent her $2,000 with the note "Reassurance [kisses]" (¶ 228). On February 18, 2024, she wrote to him of "2 weeks without any social support from anyone" as "an autistic person with Asperger's[.]" On February 24, 2024, at 3:25 p.m., he wrote to her: "I'm the first person that you've truly let your guard down with....it's always been inside of you. I'm the lucky one that gets to experience all of that pent up love and emotion." On March 12, 2024, at 9:39 a.m., she wrote to him, "I have disabilities you know and needs," and told him what had come of "me reading between the lines having autism[.]" On March 6, 2024, before he raped her, his last words to her were: "We're both adults... AREN'T we?" (¶ 243).

249C. The psychology and the psychiatry of this conduct are well described, and they bear with particular force on an autistic woman. Among the diagnostic criteria for autism spectrum disorder are "[p]ersistent deficits in social communication and social interaction across multiple contexts," including deficits in "developing, maintaining, and understanding relationships" (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), criterion A). Controlled research finds that lie detection is "significantly impaired" in adults with that diagnosis, who "may be particularly vulnerable to manipulation" (David M. Williams et al., *Can You Spot a Liar? Deception, Mindreading, and the Case of Autism Spectrum Disorder*, 11 Autism Research 1129 (2018)). Sexual violence reaches autistic women at two to three times the rate for women generally; a 2022 study of 225 autistic women, citing the World Health Organization, reports that "vulnerable individuals are preferably targeted by offenders," and it describes autism as "a vulnerability factor" (Fabienne Cazalis et al., *Evidence That Nine Autistic Women Out of Ten Have Been Victims of Sexual Violence*, 16 Frontiers in

Behavioral Neuroscience 852203 (2022)). The method used on Plaintiff had three parts. The first was "love bombing" (¶ 237): a flood of attention, money, gifts and long-term promises, by which Defendant A. Peterson made himself the sole focus of her life. The second was intermittent reinforcement: warmth and withdrawal by turns, from the one person on whom she depended for her housing, her transportation and her money (¶¶ 222, 230, 242). Research on abusive relationships finds that "strong emotional attachments are formed by intermittent abuse," and that intermittent maltreatment and an imbalance of power strengthen the victim's lasting attachment to the abuser (D.G. Dutton & S. Painter, *Emotional Attachments in Abusive Relationships: A Test of Traumatic Bonding Theory*, 8 Violence and Victims 105 (1993)). That is the trauma bond (¶¶ 210, 242). The third was contradiction between word and act, with the relationship relabeled from one day to the next (¶¶ 249, 249A). A person who relies on the stated word, and who had told him that she misread what he left unsaid (¶ 249B), cannot resolve such contradictions; she is left confused, pulled back and forth like a yo-yo. Plaintiff named it to him at the time: "I felt gaslighted" (¶ 249A). He used this method on a woman who also lives with complex post-traumatic stress disorder (¶ 208), and in whom his conduct repeated the pattern of her childhood (¶ 244). Its effect was the one it is suited to produce: confused, attached, and dependent on him for where she lived, Plaintiff signed what he put in front of her (¶¶ 249–250).

250. On March 21, 2024, at 10:54 a.m., Plaintiff wrote that she would like "another $100,000 to help me find my very place to own long-term." At 10:59 a.m. Defendant A. Peterson answered: "Karissa, I have already been overly generous." At 11:19 a.m. he offered "another 25k for your housing needs going forward" if she left the Grand Haven rental. At 2:31 p.m. he wrote: "No, I will switch it to 30k cash, but no more." At 2:32 p.m. he offered "24k cash." At 5:24 p.m. he wrote: "Wire will be tomorrow during business hours." On March 22, 2024, $24,000 was

credited to Plaintiff's account. The agreement was updated March 21, 2024 (together with the March 19 agreement, the "Prior Agreement").

251. Defendant A. Peterson's own later agreement confirms the Prior Agreement. The Settlement Agreement and Amended and Restated Mutual Confidentiality Agreement effective October 10, 2025 (the "Agreement"), which Defendant A. Peterson filed publicly in this Court and in the Circuit Court of Cook County, recites that the parties "previously entered into that certain Mutual Confidentiality Agreement dated March 21, 2024 (the 'Prior Agreement')," and states that the parties intended to "restate and amend" it. Section 14 of the Agreement, titled "Amended and Restated Agreement," provides that the Agreement supersedes prior agreements between the parties, "including, without limitation, the Prior Agreement."

252. The Prior Agreement contained a provision entitled "Confidentiality Obligations," under which the parties agreed not to disclose each other's "Confidential Information." The Prior Agreement's no-contact covenant bound Plaintiff alone: from its effective date, she was not to contact, directly or indirectly, "any person or entity related to or known by Peterson," and she was to refrain from any disparaging statement about him, "regardless of whether any such communication is or may be true or founded in facts." 2025 Action, Dkt. 39 at PageID 560.

253. Plaintiff did not have legal representation during the negotiation or execution of the Prior Agreement. The stark disparity in sophistication between a pro se individual with autism spectrum disorder and disabilities, and a multimillionaire CEO represented by a major law firm, rendered any purported "meeting of the minds" illusory.

253A. From the beginning and throughout, Defendant A. Peterson and those acting with him have concealed what is alleged in this Complaint, and their motives were more than one. One was his marriage: they feared a divorce and what it would mean for everyone involved. On March

18, 2024, the day before the Prior Agreement was signed, he wrote to Plaintiff that he was going to "recommit to my marriage" (¶ 249), and the agreement he offered her called for the "destruction of all electronic communication, video, etc." (¶ 248). Another motive was to cover up crimes.

253B. A further motive was political. Defendant A. Peterson and his family are public financial supporters of Defendant Trump. Records of the Federal Election Commission show that on October 14, 2020, Defendant Earl Peterson and Defendant Mark V. Peterson each contributed $50,000 to Trump Victory, a joint fundraising committee, and that Defendant A. Peterson contributed $19,805 to the Trump Make America Great Again Committee and the Trump campaign in the 2020 election cycle. Plaintiff is intersex and is perceived as transgender. Exposure of his conduct with a heterosexual woman would have been embarrassing to them; exposure of his conduct with a woman who is intersex, or who is perceived as transgender, was devastating to them, given their public allegiance to a political movement hostile to transgender people (¶¶ 720–722).

### *I. After the Prior Agreement: Continued Control of Housing and Movement*

254. The terms Plaintiff proposed, and Defendant A. Peterson accepted, contemplated that Plaintiff would leave Grand Haven and relocate to another state. While Defendant A. Peterson was arranging Plaintiff's departure from Michigan, after the Prior Agreement had been signed and updated, he acted as though Plaintiff had options for where she would go, and then closed them.

255. Plaintiff selected a residence in California. Defendant A. Peterson represented to Plaintiff that the California booking would not go through, blocking her relocation to California.

256. Illinois was Plaintiff's next choice. In the spring of 2024, Plaintiff moved to a lakeside short-term rental in Fox Lake, Lake County, Illinois, for which Defendant A. Peterson

paid. Plaintiff established her residence there: her Illinois driver's license, automobile insurance, voter registration, and post office box each bore the Fox Lake address.

257. When Plaintiff arrived at 1 Lakeside Lane, Apt 5, Fox Lake, Illinois, she lacked social support and felt too emotionally numb to reach out and establish new positive relationships. Being forced to move by Defendant A. Peterson more than four times in six months caused Plaintiff extreme physical and emotional exhaustion, making emotional regulation impossible due to the numerous unstable living arrangements she faced without any recognized legal rights regarding her housing.

258. Plaintiff had been led to believe that the Fox Lake property was a single house. It was in fact divided into cottages, with a neighbor living downstairs from Plaintiff. After the sexual assaults described above, Plaintiff needed complete privacy and to be left alone, and the arrangement unsettled her. Instead of privacy, Plaintiff was harassed at the property by its manager and its owners.

259. Throughout her time at Fox Lake, Plaintiff remained under Defendant A. Peterson's active constructive confinement. Plaintiff lived in fear for herself and her life, daily.

260. In or about May 2024, Plaintiff traveled to Los Angeles, California, for approximately two days for an attempted change of her legal name, which Defendant A. Peterson paid for, and then returned to the Fox Lake rental.

261. Alongside the written Prior Agreement, Defendant A. Peterson made side agreements with Plaintiff about her housing, by text message, and they kept changing. On March 17, 2024, he wrote: "I will help and assist in the housing search." On March 19, 2024, he told her that his promise to help her obtain another Airbnb rental "won't be in the agreement" (¶ 249). On

March 21, 2024, an hour and a half after he sent her the revised agreement, he wrote: "The Airbnb is as agreed upon between us. Please send me the link for the one you want again." On April 12, 2024, he wrote: "Yes, I can handle the rent at Nathan's place [the Fox Lake rental] for the 6 months, but you have to come up with a plan where the next place is in your name or your RV idea." On May 3, 2024, while she was in Los Angeles preparing to go to court for her name-change petition, he wrote: "We are done Karissa. I will continue to follow the terms of our NDA and our side agreement for the Airbnb in Fox Lake." He did not keep his promise to help her find a house. Plaintiff has preserved her text messages with Defendant A. Peterson from January 10 through September 6, 2024. The times of the text messages quoted in this Complaint are stated as Plaintiff's message archive displays them, in Central time, which is one hour earlier than the time in Michigan; ¶ 239 alone states Eastern time.

262. Plaintiff remained at the Fox Lake rental until June 2024, when she was forced out of it through an illegal self-help eviction. 2025 Action, Dkt. 39 ¶ 192. On June 17, 2024, Defendant A. Peterson, who had undertaken to fund suitable housing for her, sent her $20,000, not the $30,000 she had requested. Id. ¶ 220. In or about August 2024, she moved to DuPage County, Illinois, and established a new address there.

***J. The June 20, 2024 Notice and the Threat Letter***

263. On June 20, 2024, Plaintiff sent an email titled "ANY Former Agreements Are NULL" from kkproductions@pm.me to aaron@pf-corp.com, confronting Defendant A. Peterson formally, for the first time, regarding his violative behaviors. This was the first time Plaintiff was able to express herself after being oppressed during a traumatic period of six months due to Defendant A. Peterson's coercively controlling and manipulative actions that violated Plaintiff's rights.

264. In response to Plaintiff's June 2024 email, Defendants issued an attorney threat letter through Varnum LLP. This threat letter was the first use of the method alleged in Count V, and constitutes witness tampering within the meaning of 18 U.S.C. § 1512, which is racketeering activity under 18 U.S.C. § 1961(1), as it obstructed Plaintiff's constitutional right to access the courts and caused her to fear that false charges would be brought against her. The threat letter also represented an abuse of process.

265. Defendants' actions caused Plaintiff significant emotional distress. Plaintiff suffers from complex chronic PTSD, ADHD, and Autism Spectrum Disorder, and her distress was further exacerbated by her naiveté and emotional vulnerability resulting from these conditions.

***K. The 2025 Action***

266. On March 7, 2025, at 4:40 PM, Plaintiff sent Defendant A. Peterson written notice of her pending federal lawsuit at his business email address, aaron@petersonfarmsinc.com.

267. On April 1, 2025, Plaintiff, proceeding pro se, filed suit in this Court against Defendant Peterson Farms Fresh, LLC, Defendant A. Peterson, and others: *Brewis v. Peterson Farms Fresh, LLC, et al.*, No. 1:25-cv-03513 (N.D. Ill.) (the "2025 Action"), assigned to the Honorable Sara L. Ellis.

267A. With her complaint, Plaintiff filed, under penalty of perjury, an application to proceed without prepaying fees, together with a motion for attorney representation. In her financial affidavit she disclosed, for the preceding twelve months, $40,000 from self-employment and "NDA $100,000," the payment Defendant A. Peterson had made to her under the Prior Agreement, and stated that she was "currently homeless and unemployed due to being disabled." 2025 Action, Dkt. 4. On April 23, 2025, the Court denied both, noting that "Plaintiff has $140,000 in income

over the past 12 months," and ordered her to pay the filing fee. Id., Dkt. 22. Plaintiff had reported the proceeds of her trafficking to the Court, pro se, in her sworn financial affidavit; the denial that followed kept her from being able to serve the Defendants and further broke down her case.

268. On April 17, 2025, Defendant Brion B. Doyle of Varnum LLP, counsel for Defendant A. Peterson, told Plaintiff by telephone that he would be "able to negotiate settlement." He did not follow up.

269. In April 2025, Plaintiff also tried to use this Court's settlement program; Defendant A. Peterson's counsel rebuffed it. Over the following months, Plaintiff made approximately eight descending offers, each ignored or rejected.

270. On April 18, 2025, Varnum LLP, by Defendant Doyle, and Defendant Tabet DiVito & Rothstein LLC, by Defendants Grant and Andreasen, appeared in the 2025 Action for Defendant A. Peterson and for Fresh Innovations, LLC, Oceana County Freezer Storage, LLC, Lakewood Organics, LLC, Peterson Farms Fresh, LLC, Peterson Brands, LLC, Peterson Farms, Inc., JVC Logistics, LLC, JVC Enterprises, LLC, and PFI Holdco, LLC, and filed a notification of affiliates under Local Rule 3.2 for each of those nine companies. 2025 Action, Dkts. 7–10, 13–21. Their motion to dismiss, filed the same day, was signed for those nine companies and for PFI Leverage Lender, LLC. 2025 Action, Dkt. 11-1 at 22. Varnum LLP had earlier defended Defendant Peterson Farms, Inc. in Reid v. Peterson Farms, Inc., No. 1:24-cv-00340 (W.D. Mich.), an action brought on behalf of a worker and others similarly situated, which was dismissed with prejudice by joint stipulation on December 16, 2024.

271. In their April 18, 2025 motion to dismiss, those Defendants argued that Plaintiff's contract claim had to be dismissed because the March 2024 agreement required any action for its breach to be brought in Kent County, Michigan. 2025 Action, Dkt. 11-1 at 10 n.6. The same

counsel, in 2026, brought two actions to enforce the successor Agreement in Illinois, as alleged in Section VI.

272. In the same brief, Defendants stated that under the March 2024 agreement Defendant A. Peterson had agreed to pay Plaintiff $100,000, to pay off her automobile loan of $20,899.88, to pay her rent, and to contribute $25,000 toward future rent — "at least $150,000" in all — and that he had "funded her housing." Id. at 1, 4, 9. Defendants did not dispute that Defendant A. Peterson booked housing for Plaintiff through Airbnb and described her to the host as a "special consultant"; they argued only that the description was not material. Id. at 19–20.

273. On June 12, 2025, at a telephone hearing attended by Defendants' counsel, the Court ruled on Plaintiff's emergency motion, in which she asked for an extension of time and for reasonable accommodations under the Americans with Disabilities Act. The Court's minute entry grants the extension, sets August 15, 2025 as the deadline for any amended complaint, and does not mention the accommodations. 2025 Action, Dkts. 34, 38.

### *L. The October 2025 Agreement*

274. On or about June 25, 2025, through the pathway alleged in Section VII, Plaintiff was placed at Clayton Residential Homes, Inc. ("Clayton House"), a state-certified residential mental health facility, under twenty-four-hour supervised care.

275. The Agreement was presented to Plaintiff at Clayton House as a twenty-four-hour exploding offer. Plaintiff signed it there on or about October 9–10, 2025; each signature line bears the date October 10, 2025. She signed it while confined under twenty-four-hour supervised care, under the Maximus assessment alleged in ¶ 493, without any attorney, without housing or income, while being victimized by a concurrent romance scam, and while her medications were being

withheld. While the negotiations were under way, an Aetna Community Health Director visited Plaintiff at Clayton House and spoke of them, although Plaintiff had disclosed them to no one at Aetna (¶ 499).

276. Rather than deny that the offer was time-limited, Defendant A. Peterson's counsel defended it. In their response to Plaintiff's motion to set aside the judgment in the 2025 Action, filed March 20, 2026, Varnum LLP wrote: "Time-limited settlement offers are a routine and lawful feature of litigation." 2025 Action, Dkt. 71 at 4 (PageID 1731).

277. Before the Agreement was signed, on September 22, 2025, Plaintiff wrote to Defendants' counsel that a $25,000 payment would cost her eligibility for Supplemental Security Income and her supportive housing. Counsel received that warning and proceeded; Defendants themselves quoted it in their March 20, 2026 response. 2025 Action, Dkt. 71 at 7, 10 (PageID 1734, 1737). Every consequence Plaintiff described followed: she lost her eligibility for Supplemental Security Income and her supportive housing, and on November 9, 2025 required emergency medical treatment.

278. The Agreement, titled "Settlement Agreement and Amended and Restated Mutual Confidentiality Agreement," is effective October 10, 2025. Its parties are Plaintiff; Defendant A. Peterson, individually; Defendant Peterson Farms Fresh, LLC; and Defendant Peterson Farms, Inc. It provides for a payment to Plaintiff of $25,000. Defendant A. Peterson signed the Agreement individually and, as chief executive officer, for Defendant Peterson Farms Fresh, LLC and for Defendant Peterson Farms, Inc.

279. Section 1 of the Agreement makes that payment "expressly conditioned upon" Plaintiff's compliance with Sections 2, 4, and 5.

280. Section 1 also required the payment to be made "within three (3) days of the Effective Date." Defendant A. Peterson pleads October 10, 2025 as the Effective Date, and his counsel has stated that the Agreement was executed on October 9, 2025. 2025 Action, Dkt. 71 at 1–2 (PageID 1728–29). The payment was not sent until October 14, 2025. It was late under either date. Defendant A. Peterson nonetheless represented to this Court that the payment had been made "within the time required." Federal Action, Dkt. 6 at 2.

281. Although Defendant A. Peterson describes the release as "mutual" in his complaint in the Circuit Court of Cook County, the release in Section 8 of the Agreement runs in one direction only.

282. The 2025 Action was dismissed with prejudice on October 23, 2025.

283. Within seven weeks of that dismissal, Peterson Brands, LLC acquired Defendant Country Pure Foods, on December 2, 2025, with Varnum LLP as its transaction counsel, and Defendant A. Peterson conveyed his Spring Lake, Michigan residence for $3,000,000 by a deed dated December 9, 2025 and recorded December 10, 2025 (Ottawa County Instrument No. 2025-0035098), which he prepared himself.

284. In the weeks following the Agreement, Plaintiff was pressured to leave Clayton House and was discharged without transition housing and without her medications, into homelessness, as alleged in Section VII.

***M. Defendants' Breaches of the Agreement***

285. Plaintiff alleges that the Agreement is void and unenforceable, as set forth in Count XV. In the alternative, and to the extent any provision of the Agreement is enforceable, see Fed. R. Civ. P. 8(d)(2), Defendant A. Peterson, Defendant Peterson Farms Fresh, LLC, and

Defendant Peterson Farms, Inc. (the latter two, the "Peterson Entities," as the Agreement defines them) breached it as alleged below.

286. The Agreement binds Defendant A. Peterson and the Peterson Entities as well as Plaintiff. Section 3, titled "Mutual Confidentiality Obligations," requires each party, as a "Receiving Party," to treat as strictly confidential, and not to disclose to any other person, the "Confidential Information" of the other, which the Agreement defines to include "any and all information, data, records, statements, specifications related to Disclosing Party." Section 5(e) requires each party to refrain from communicating any "disparaging, damaging, criticizing, or injurious" statement about the other. Section 7 permits disclosure of Confidential Information only to the extent required by law, and requires that any such disclosure be limited to what the law requires.

287. In Section 2 of the Agreement, the parties agreed "that good cause exists to seal the public record" of the 2025 Action.

288. On June 16, 2026, Defendant A. Peterson and the Peterson Entities, through Defendant Varnum LLP and Defendant Tabet DiVito & Rothstein LLC, filed in the 2025 Action a "Motion to Seal Specific Docket Entries," signed by Defendant Brion B. Doyle. 2025 Action, Dkt. 75.

289. Although the motion asked the Court to seal Plaintiff's filings, the motion itself was filed on the public docket. In it, Defendants identified Plaintiff's medical diagnoses by name, quoted from her clinical records, characterized her mental health in disparaging terms, and, in a footnote, accused her of committing benefits fraud — a false accusation of a crime, directed at lawful conduct: on October 24, 2025, Plaintiff had converted part of the settlement payment into

a motorcycle for her transportation, an asset that federal law excludes from Supplemental Security Income resources. 20 C.F.R. § 416.1218(b)(1).

290. No law required Defendants to place Plaintiff's diagnoses and clinical information on the public docket, and the disclosure was not limited to anything a law required. The filing breached Sections 3 and 5(e) of the Agreement.

291. The June 16, 2026 motion argued, in the same filing, that Plaintiff's health information required protection from public view, while placing that information on the public docket. Dkt. 75 ¶¶ 4, 8–10, 12–13. Its first footnote stated that Defendants had e-mailed a sealing request to chambers on November 27, 2025 and were renewing it "[g]iven Plaintiff's renewed activity in this case." In November 2025, Defendant Doyle had e-mailed Plaintiff a revised sealing motion and told her that she was "obligated" to sign it.

292. Defendants' motion to seal also listed Plaintiff's civil cover sheet, ECF 2, and Defendants' own proposed brief, ECF 11-1 — the April 18, 2025 brief in which counsel set out Defendants' characterization of Plaintiff and of the relationship. Dkt. 75 ¶ 14. The June 22, 2026 order names neither ECF 2 nor ECF 11-1. It seals "ECF No. 39, PageID.261-289," as Defendants' motion listed that entry, although ECF 39 is Plaintiff's amended complaint and PageID 261 through 289 are the pages of ECF 11-1. Dkts. 75, 77.

### *N. The Two 2026 Actions*

293. On July 13, 2026, Defendant A. Peterson, through Varnum LLP, filed *Peterson v. Brewis*, No. 1:26-cv-08239, in this Court, and attached the Agreement as an exhibit. Dkt. 1-1. Section 1 of the Agreement sets out Plaintiff's Navy Federal Credit Union account information for the settlement payment, and the exhibit was filed without redacting her account number, contrary

to Federal Rule of Civil Procedure 5.2(a)(4). The unredacted account number remained on the public docket until July 15, 2026, when a redacted copy was filed at the order of the Honorable Jeremy C. Daniel. Dkts. 15, 16.

294. Defendant A. Peterson's civil cover sheet answered "Yes" to the question "Is this a previously dismissed or remanded case?" and named the 2025 Action before Judge Ellis. The action was assigned by random assignment to the Honorable Jeremy C. Daniel.

295. Defendant A. Peterson never served Plaintiff. On July 20, 2026, he filed a notice, Dkt. 17, and on July 21, 2026, the action was terminated, Dkt. 18.

296. The next day, July 22, 2026, Defendant A. Peterson filed a substantially identical complaint against Plaintiff in the Circuit Court of Cook County, Chancery Division, No. 2026 CH 06988, seeking only injunctive relief and alleging that Plaintiff breached Sections 3(a), 3(b), 5(a), 5(c), and 5(e) of the Agreement by publishing a website. He moved for a preliminary injunction on July 30, 2026.

297. Defendant A. Peterson thus sued Plaintiff to enforce the Agreement in two forums within nine days — after he and the Peterson Entities had themselves breached it on the public docket on June 16, 2026, and after he had exposed her bank account number on the public docket on July 13, 2026.

298. On October 16, 2026, Plaintiff gave Defendant A. Peterson and the Peterson Entities written notice of default under Section 10 of the Agreement, by e-mail to Defendant Doyle at the address Section 10 designates and by USPS Priority Mail Express. The notice was given in the alternative and without waiver: it stated that Plaintiff's position is that the Agreement is void and unenforceable, and that nothing in it affirmed, ratified, adopted, or accepted the Agreement or

any of its terms. To the extent any court holds the Agreement to be in force, the notice identified two defaults. Under Section 3: the disclosures of Plaintiff's Confidential Information on the public docket of this Court on June 16, 2026 (2025 Action, Dkt. 75) and July 13, 2026 (Federal Action, Dkt. 1-1), and on the public docket of the Circuit Court of Cook County on October 9, 2026, each outside Sections 6 and 7 and without notice to her. Under Section 13: the filing of the Federal Action, and the filing and continued maintenance of the Cook County Action, outside the forums Section 13 designates. The notice stated the cure Section 10 allows: a motion to remove the June 16 and October 9 filings from the public record and no further disclosure; and ceasing to maintain the Cook County Action.

299. On November 4, 2026, Defendant Doyle responded by letter, sent by e-mail by Defendant Youngdahl at 3:34 p.m. Central time, with Defendants Grant and Andreasen copied, and by overnight mail. The letter rejected, in one sentence and without addressing the public-policy grounds, the position that the Agreement is void; asserted that Plaintiff is in material breach of Sections 3, 5(a), and 5(e) by publishing since about April 2026; characterized the June 16, 2026 motion to seal as performance of Section 2; characterized the July 13, 2026 filing of her account number as content Section 6 permits in enforcement; characterized Section 13 as a venue clause whose breach does not end the term; declared the Agreement "in full force and effect"; stated that treating the term as ended "will itself constitute a further breach"; and renewed the demand that Plaintiff remove from the internet all content referencing Defendant A. Peterson. The letter did not address the late payment under Section 1, and it refused the cure of the Section 13 default: the Cook County Action continues.

300. Section 10 gives thirty days to cure. The cure period had not run when this Complaint was filed. Plaintiff reserves the right to supplement this pleading under Fed. R. Civ. P.

15(d) to allege, in the alternative to Count XV, that the Agreement's term ended under Section 10 for failure to cure.

### *O. Corporate Participation and Venture Liability*

301. Defendant Peterson Farms Fresh, LLC, Defendant Peterson Farms Fresh, Inc., Defendant Peterson Farms, Inc., and related Peterson corporate entities knowingly benefited from participation in a venture with Defendant A. Peterson that they knew or should have known engaged in violations of Chapter 77 of Title 18. They participated in that venture by: (a) furnishing the corporate e-mail address and work credit cards with which Defendant A. Peterson acted as an authorized travel booker on Plaintiff's Airbnb account to book and control her housing; (b) providing corporate email domains (@petersonfarmsinc.com) used to facilitate the trafficking scheme; (c) providing corporate bank accounts used for trafficking-related payments; (d) funding transportation and housing arrangements for trafficking purposes; (e) allowing business credit cards and corporate resources to be used for trafficking operations; (f) maintaining business records documenting trafficking-related payments; and (g) providing corporate legal resources to create the coercive Prior Agreement.

302. The Peterson corporate entities received a financial benefit from Plaintiff's labor while she was maintained in a trafficking situation. The economic benefit flowing to the enterprise from Plaintiff's work satisfies the "benefit" element of 18 U.S.C. § 1595(a).

303. Upon information and belief, the Peterson corporate entities knew or should have known of Defendant A. Peterson's trafficking activities based on: (a) the use of corporate accounts and resources for the scheme; (b) the pattern of payments documented in corporate records; (c) the involvement of corporate legal counsel in drafting the Prior Agreement; and (d) the nature of the relationship between Defendant A. Peterson and the corporate entities as chief executive officer.

303A. The Peterson companies hold themselves out as one enterprise and are owned as one. Their public announcements call them "The Peterson Farms Family of Companies" and identify Defendant A. Peterson as its Chief Executive Officer. The announcement of December 2, 2025 names seven companies, including Defendant Peterson Farms, Inc., Defendant Peterson Farms Fresh, LLC, Defendant Peterson Brands, LLC, Defendant Oceana County Freezer Storage, LLC, and Defendant JVC Enterprises, LLC; the announcement of December 2022 also names Defendant GDS Holdings LLC and Defendant Oceana Acres LLC. On April 18, 2025, the nine Peterson companies then before the Court in the 2025 Action each filed a notification of affiliates. 2025 Action, Dkts. 13–21. Each of the eight operating companies identified the same owners of five percent or more: Defendant PFI Lower Midco, LLC, Defendant PFI Upper Midco, LLC, Defendant PFI Holdco, LLC, Defendant Peterson Family Holdings, LLC, and Defendant MIC CP Peterson Aggregator LP. Defendant PFI Holdco, LLC identified Defendant MIC CP Peterson Aggregator LP and Defendant Peterson Family Holdings, LLC as its own. The same counsel appeared for all nine companies and for Defendant A. Peterson on the same day (¶ 270), and the funds of one company have paid the obligations of another (¶ 49). Upon information and belief, the holding companies in that chain have no employees and no business of their own.

304. Reporting published by Plaintiff between April 7 and June 18, 2026, and public records, identify the public support for the Peterson enterprise's growth. On February 25, 2025, Defendant The Right Place, Inc. and Defendant Oceana County Economic Alliance announced, with the Michigan Economic Development Corporation, a $32.2 million expansion by Defendant Peterson Farms, Inc. in Shelby Township, for which the Michigan Strategic Fund approved a fifteen-year exemption from the State Essential Services Assessment valued at up to $576,970. In 2022 the enterprise's workforce housing there received water infrastructure paid for with $3.2

million in Community Development Block Grant funds and $800,000 in funds of the Michigan Economic Development Corporation (¶ 126).

### *P. Pattern of Prior Conduct*

305. Upon information and belief, Defendant A. Peterson has committed the same acts of luring and then abruptly discarding victims on multiple prior occasions. Defendant A. Peterson mentioned to Plaintiff that he had a previous relationship with another woman for whom he purchased a car on Carvana.com and that "it was a complete mess."

306. Upon information and belief, this prior scenario occurred during Defendant A. Peterson's current marriage to Jennifer Lamb Peterson, and within the two years prior to his conduct toward Plaintiff. Defendant A. Peterson confessed to Plaintiff that Jennifer Lamb Peterson had caught him cheating.

307. This pattern of conduct demonstrates that Defendant A. Peterson's actions toward Plaintiff were not isolated but part of a systematic scheme to exploit vulnerable individuals through promises of financial support, housing, and romantic relationships, followed by sexual coercion and abuse, then abrupt abandonment and legal intimidation to secure silence.

### *Q. Ongoing Harm and Damages*

308. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer: (a) physical injuries from sexual assaults; (b) severe emotional distress, including exacerbation of her C-PTSD and related conditions; (c) housing instability, repeated forced relocations, and homelessness; (d) financial harm including loss of income and career opportunities; (e) destruction of her support networks and therapeutic relationships; (f) medical expenses for treatment of injuries and psychological harm; (g) ongoing fear, anxiety, and

hypervigilance; (h) the disclosure of her medical information, and a false accusation of a crime against her, on the public docket of this Court; (i) the exposure of her bank account number on the public docket of this Court; and (j) the burden and expense of defending two actions brought to enforce the Agreement.

309. Plaintiff's injuries and damages are ongoing and continuing. The full extent of Plaintiff's damages will be proven at trial.

## IV. STATEMENT OF FACTS — INSTITUTIONAL TARGETING AND COORDINATED HARASSMENT

### *A. The Peterson Family's Institutional Power Network*

310. Defendant Mark V. Peterson is not merely a private individual. He functions as a node within multiple overlapping institutional power structures that amplify his capacity to harm Plaintiff beyond ordinary personal harassment.

311. Mark V. Peterson is the Owner and Chairman of Defendant Worldwide Trophy Adventures, LLC ("WTA"), a hunting-trip booking and outfitter company headquartered in Sidney, Nebraska, with operations spanning the United States, Canada, and Mexico.

312. WTA is the official "Outdoor Adventure Partner" of the National Rifle Association ("NRA"), providing exclusive hunting trips to NRA members through nrawta.com.

313. Mark V. Peterson is a member of the NRA Hunters' Leadership Forum President's Founders Club, a top-tier donor recognition level within the NRA's political influence apparatus, indicating significant financial contributions to NRA hunting and conservation initiatives.

314. Mark V. Peterson hosts two nationally broadcast television programs on the Pursuit Channel: "Mark Peterson's Expedition Series" (international big game hunting) and "Mark Peterson's Triple Threat" (North American big game hunting), providing him with a national media platform reaching the hunting and firearms community.

315. Mark V. Peterson owns or controls additional business entities, including: Yukon Peak Outfitters (the sole licensed outfitter in Yukon hunting concession 11, comprising over 3,500 square miles); MVP Outdoor Adventures, LLC; Rusted Rooster Media (video production); Hatch Marketing Group (branding and media); and The Wildlife Gallery Custom Taxidermy Studio in Blanchard, Michigan.

316. Defendant A. Peterson, Mark V. Peterson's brother, is the chief executive officer of Defendant Peterson Farms, Inc., the largest employer in Oceana County, Michigan, with over 640 employees and annual revenues in the tens of millions of dollars.

317. Defendant Varnum LLP, a Grand Rapids, Michigan law firm, represented Defendant A. Peterson in the 2025 Action and filed Case No. 1:26-cv-08239 on his behalf. Varnum LLP has documented connections to the United States Department of Justice, including: Defendant Ronald G. DeWaard (Managing Partner and former Firm Chair; former Assistant United States Attorney for the Southern District of Florida; instructor at the Department of Justice's National Advocacy Center); Defendant Mark J. Chasteen (former Assistant United States Attorney for the Eastern District of Michigan for seventeen years, who joined Varnum LLP in May 2025); and Gary J. Mouw (member of the Independent Monitor team of the United States Attorney's Office for the Southern District of New York).

318. On September 18, 2023, Defendant Doyle entered his appearance in Velasco Rojas v. First Pick Farms (W.D. Mich.), defending agricultural companies against trafficking

claims brought by H-2A workers, and continued in that representation while representing Defendant A. Peterson against Plaintiff's trafficking claims. That representation was not disclosed to Plaintiff or to the Court until Plaintiff filed notice of it on April 2, 2026. 2025 Action, Dkt. 73.

319. In Defendants' March 20, 2026 response, Defendant Doyle "represent[ed] to the Court that Attorneys DeWaard and Chasteen had no involvement in this proceeding whatsoever." 2025 Action, Dkt. 71 at 4 n.1. Plaintiff alleges otherwise.

### *B. The Peterson–Noem Relationship Network*

320. Defendant Kristi Noem was confirmed as United States Secretary of Homeland Security on January 25, 2025, and served in that office until March 2026. In that capacity, she oversaw Defendant United States Immigration and Customs Enforcement ("ICE"), United States Customs and Border Protection ("CBP"), United States Citizenship and Immigration Services ("USCIS"), and all federal immigration enforcement operations of Defendant United States Department of Homeland Security ("DHS").

321. Mark V. Peterson maintains at least four documented relationship types with Defendant Noem, which, during her tenure as Secretary, created multiple potential conduits for information to flow between the Peterson family and the highest levels of federal law enforcement:

> (a) Personal Friendship: Mark V. Peterson and his father, Defendant Earl Peterson (who is also Defendant A. Peterson's father), were "invited by Governor Noem to her annual pheasant hunt," an invitation-only event reserved for political allies and personal friends. This event was filmed for broadcast on the Pursuit Channel, as documented in episode descriptions on pursuituptv.com.

(b) Financial Sponsorship: WTA "sponsored" Defendant Noem's NRA Distinguished Hunters Leadership Award ceremony at the 152nd NRA Annual Meetings in Indianapolis, Indiana, on April 13, 2023, as documented on the NRA Hunters' Leadership Forum website (nrahlf.org).

(c) Business/Client Relationship: "Noem booked her moose hunt through Worldwide Trophy Adventures" in fall 2024, as reported by Grand View Outdoors in March 2025. Such hunts typically cost $25,000 or more. Mark V. Peterson owns Yukon Peak Outfitters, the sole licensed outfitter in the Yukon concession where the hunt occurred, meaning Defendant Noem was Mark V. Peterson's direct or indirect paying customer.

(d) Ongoing Marketing Partnership: WTA actively uses Defendant Noem's hunt as promotional content on its website, displaying: "Watch a Video with This Outfitter: First Day Victory: Governor Noem's Incredible Yukon Moose Hunt." This demonstrates an ongoing commercial relationship in which Defendant Noem's public profile is leveraged for Mark V. Peterson's business benefit.

322. The confluence of personal friendship, financial sponsorship, business/client relationship, and marketing partnership created a relationship network through which information about Plaintiff, including her litigation activity and personal information, could potentially reach Defendant Noem while she was Secretary of Homeland Security, through informal channels that would not appear in official government records.

323. Defendant Peterson Farms, Inc. relies on H-2A temporary agricultural worker visas. Within that program, USCIS adjudicates employers' petitions and CBP admits the workers at ports of entry—both components of DHS, which Defendant Noem headed from January 2025

until March 2026. Oceana County, where Peterson Farms, Inc. is headquartered, has over 1,700 certified H-2A positions annually. This created a mutual-interest relationship in which the Peterson family's agricultural business depended on favorable treatment from agencies Defendant Noem then controlled.

### *C. Cyberstalking by Named Defendant During Pendency of Litigation*

324. Defendant Mark V. Peterson was named as a defendant in the original complaint in the 2025 Action, filed April 1, 2025. (Case No. 1:25-cv-03513, Dkt. 1.)

325. Mark V. Peterson signed, or was a covered party to, the Prior Agreement. (See Section III, ¶¶ 248–253.)

326. Despite being a named defendant in Plaintiff's federal action, Mark V. Peterson continued to surveil Plaintiff's social media accounts.

327. On June 28, 2025, Plaintiff observed that the algorithm of Instagram, a platform of Defendant Meta Platforms, Inc. ("Meta"), had placed Mark V. Peterson's account (@markvpeterson) in Plaintiff's "People you may know" or "Suggested for you" feed. Instagram's algorithm generates such suggestions based in part on accounts that have recently viewed the user's profile.

328. Plaintiff captured a screenshot of this algorithmic suggestion at 8:37 AM on June 28, 2025, preserving contemporaneous evidence of Mark V. Peterson's surveillance activity.

329. At approximately 8:46 AM on June 28, 2025, Plaintiff sent a cease and desist communication to Mark V. Peterson through his personal website (markvpeterson.com), demanding that he stop surveilling her social media accounts.

330. At approximately 8:55 AM on June 28, 2025, Plaintiff sent an email to Defendant A. Peterson at aaron@petersonfarmsinc.com with the subject line "Your Family Stalking me Online," notifying him that his brother Mark V. Peterson had been cyberstalking Plaintiff from his "hunting account" and demanding that the conduct cease.

331. The June 28, 2025 Instagram surveillance was not an isolated incident. During late 2024 and early 2025, Plaintiff observed, and documented through screenshots, similar algorithmic suggestions of Mark V. Peterson's account on Facebook, a platform of Meta, reflecting a pattern of surveillance of Plaintiff's Facebook account.

332. The cross-platform nature of the surveillance (Facebook and Instagram), spanning approximately six months, demonstrates a sustained pattern of monitoring rather than incidental or accidental viewing.

333. Mark V. Peterson's surveillance of Plaintiff while he was a named defendant in her federal action constitutes potential witness intimidation under 18 U.S.C. § 1512, which prohibits conduct intended to intimidate, threaten, or corruptly persuade another person with intent to influence, delay, or prevent testimony or attendance in an official proceeding.

334. Mark V. Peterson's account was not the only one to surface. In the weeks immediately following the April 1, 2025 filing, Plaintiff began receiving a sudden and unusually high volume of Facebook "People You May Know" suggestions from unfamiliar individuals, a pattern Plaintiff recognized as consistent with coordinated surveillance or social media targeting. Plaintiff identified one of those individuals as Defendant Mark Pini, whose surveillance of Plaintiff is alleged below.

334A. From December 2024, Facebook's suggestions feature also presented to Plaintiff the profiles of Defendant Earl Peterson, Defendant Gabriela Peterson, Defendant Richard Raffaelli, and Defendant Curtis Burdette, together with the profile Defendant A. Peterson used under the name R.J. Elliot (¶ 23). Plaintiff alleged those suggestions in the 2025 Action as evidence that members of the Peterson family and their associates were visiting her Facebook profile, 2025 Action, Dkt. 39 ¶ 134, and she preserved screenshots of them.

***D. Pattern of Coordinated Intimidation***

335. Upon information and belief, the harassment of Plaintiff extended beyond digital surveillance to include physical intimidation through third parties.

336. For a period of approximately one year prior to Plaintiff's initial federal court filing, Plaintiff documented unusual and threatening encounters with individuals displaying insignia associated with the Hells Angels and affiliated hunting organizations and churches, as well as gangs and criminal types with numerous tattoos, in and around the Michigan area where Defendants are based. Plaintiff has meticulously preserved all of the screenshots, throughout, as federal evidence.

337. The frequency and intensity of these encounters decreased significantly around the time of Plaintiff's initial federal court filing on April 1, 2025, suggesting that the harassment was coordinated and deliberately scaled back to avoid legal exposure once formal litigation commenced.

338. The temporal correlation between the reduction in physical intimidation and the commencement of federal litigation is circumstantial evidence of coordination, because random or unconnected harassment would not correlate with litigation events.

339. Despite the reduction in physical harassment, Mark V. Peterson's cyberstalking continued until Plaintiff blocked him, demonstrating that the digital surveillance component of the coordinated harassment pattern persisted even after other forms were discontinued.

### *E. Law Enforcement Surveillance in Naperville Before the April 1, 2025 Filing*

340. In the period before the April 1, 2025 filing, Plaintiff stayed for approximately two weeks at the Motel 6 in Naperville, Illinois, one block from the office of an attorney she was consulting about this trafficking case. During that stay, Plaintiff completed the substantial majority of her initial federal filing, including the scanning and digitization of her exhibits and evidence.

341. During that stay, Plaintiff observed law enforcement surveillance on multiple occasions. Police vehicles were parked directly outside her windows, and she could hear radio communications from her room. When Plaintiff left the Motel 6, she observed multiple vehicles consistent with unmarked law enforcement—dark tinted windows, parked in standard surveillance positions—including vehicles bearing what appeared to be federal license plates. The surveillance presence at a motel one block from the office of the attorney Plaintiff was consulting about this federal trafficking case was conspicuous and, in context, alarming.

### *F. Anomalous Search Activity Following Federal Filing*

342. Google Trends data, which tracks the relative popularity of search queries across geographic regions, reveals anomalous search activity for Plaintiff's name following her federal court filings.

343. Between August 24 and August 30, 2025—nine to fifteen days after Plaintiff filed her 189-page First Amended Complaint in the 2025 Action on August 15, 2025—Google Trends

recorded a spike in searches for Plaintiff's name originating from Washington, D.C., reaching a relative score of 100 (the maximum value, indicating peak search interest).

344. The search pattern exhibited characteristics inconsistent with organic public interest: a sharp isolated spike, a flat baseline before and after, and a quick drop-off—a pattern more consistent with targeted research by a small number of actors than with general public curiosity.

345. A second anomalous spike in searches for Plaintiff's name occurred between December 14 and December 20, 2025, this time originating from Ohio, again reaching a relative score of 100.

346. Upon information and belief, the Washington, D.C. search activity following Plaintiff's federal filing is consistent with monitoring of Plaintiff's litigation activity by individuals in the nation's capital, potentially including individuals with access to the Peterson–Noem relationship network or government resources.

347. Plaintiff does not allege that Defendant Noem or any specific government official conducted or directed the searches, as such specific identification is not possible from publicly available Google Trends data. However, the timing, location, and pattern of the searches, combined with the documented Peterson–Noem relationship network, create a reasonable inference that warrants discovery into communications between the Peterson family and Defendant Noem or her staff regarding Plaintiff or her litigation.

***G. DHS Blue Campaign Employee Surveillance***

348. On May 17, 2025, Plaintiff discovered that Defendant Mark Pini, a federal employee of DHS, had been viewing Plaintiff's Facebook profile with sufficient frequency or

recency to cause Facebook's algorithm to suggest him in Plaintiff's "People You May Know" feed.

349. Defendant Pini is a nationally known public figure who appeared on the A&E television series "Live PD" and the television series "COPS" as a K9 handler. He maintains 43,000+ followers on Instagram (@mark_pini), 17,400+ followers on TikTok (@mark_pini), and has an IMDb profile listing his television appearances. He is a combat veteran of Operation Enduring Freedom.

350. According to Defendant Pini's Facebook profile, which Plaintiff documented via screenshots on May 17, 2025, his employment includes: U.S. Department of Homeland Security (September 6, 2023 – Present); U.S. Department of Homeland Security BLUE CAMPAIGN (September 6, 2023 – Present); and Thin Blue Line USA (September 5, 2023 – Present).

351. The DHS Blue Campaign is the Department of Homeland Security's national public awareness campaign against human trafficking. According to the official DHS website (dhs.gov/blue-campaign), the Blue Campaign is "located within the DHS Center for Countering Human Trafficking" and its "educational awareness objectives consist of two foundational elements: prevention of human trafficking and protection of exploited persons."

352. The profound significance of this finding cannot be overstated: a federal employee whose official duties include protecting human trafficking victims was surveilling a human trafficking victim's social media profiles, clothed in the authority of his federal position and operating from within the very infrastructure established to provide that protection.

353. According to his Facebook profile, Defendant Pini's current city is Miami, Florida, and his hometown is Jacksonville, Florida. His profile also shows a "check-in" at the U.S. Department of Homeland Security in Seattle, Washington, on December 16, 2023.

### *H. The Peterson Farms – Miami, Florida Connection*

354. In December 2020, Defendant Peterson Farms, Inc. acquired Defendant Lakewood Organics, LLC (also known as Florida Bottling), a juice company headquartered in Miami, Florida. Defendant A. Peterson, as chief executive officer of Peterson Farms, Inc., announced the acquisition in a letter to growers dated August 2021.

355. The geographic nexus is critical: Defendant Pini, a DHS Blue Campaign employee, resides in Miami, Florida—the same city where the Peterson family operates Lakewood Organics, LLC. This creates a potential physical proximity between DHS personnel and Peterson family business operations in Florida.

356. As alleged in Subsection B above, Mark V. Peterson maintains a documented four-prong relationship with Defendant Noem: personal friendship, financial sponsorship, business/client relationship, and ongoing marketing partnership. During her tenure as Secretary, Defendant Noem oversaw all DHS operations, including the Blue Campaign and the Center for Countering Human Trafficking, where Defendant Pini is employed.

357. The chain connecting the Peterson family to DHS personnel surveilling Plaintiff is therefore: Defendant A. Peterson (chief executive officer of Peterson Farms, Inc., which owns Lakewood Organics, LLC in Miami, Florida) → Mark V. Peterson (Defendant A. Peterson's brother; documented four-prong relationship with Defendant Noem) → Defendant Noem (Secretary of Homeland Security from January 2025 to March 2026; oversaw ICE, CBP, and

USCIS; controlled the DHS Blue Campaign and the Center for Countering Human Trafficking) → Defendant Pini (DHS Blue Campaign employee; resides in Miami, Florida; surveilled Plaintiff's Facebook profile).

### *I. The Documented Surveillance Event*

358. On May 17, 2025, Plaintiff captured the following contemporaneous evidence: at 1:53 PM, a screenshot of Defendant Pini's Facebook profile main page showing his DHS employment, Miami residence, Live PD affiliation, and K9 handler status; at 1:54 PM, a screenshot of his Facebook "About" page showing DHS employment since September 6, 2023, Blue Campaign employment since September 6, 2023, current city Miami, Florida, and the DHS Seattle check-in of December 16, 2023; and at 1:56 PM, a screenshot confirming that Plaintiff blocked Defendant Pini.

359. The discovery that a federal anti-trafficking official was surveilling Plaintiff's social media caused Plaintiff to experience a severe panic attack.

360. That discovery, combined with the extended pattern of online surveillance and cyberstalking Plaintiff had documented by Defendant A. Peterson, executives of Defendant Peterson Farms Fresh, LLC, family members, associates, and identifiable federal personnel, including Defendant Pini, was the direct precipitating event for Plaintiff's plan to contact the Federal Bureau of Investigation's Chicago Field Office and the United States Attorney's Office for the Northern District of Illinois. Plaintiff had been assembling evidence and was preparing to make that approach when the events of May 19, 2025 occurred.

361. On May 19, 2025, two days after the discovery, Plaintiff telephoned her Aetna Better Health case manager, Chanda Mehta, and reported the Pini surveillance: that a DHS

employee assigned to the anti-trafficking program had been watching her Facebook profile from Miami, Florida, the same city in which the Peterson family operates a subsidiary. What followed that same day, including the Naperville Police Department's arrival at Plaintiff's location, is alleged in Section VII.

362. The following records corroborate these events and are subject to production: Plaintiff's three contemporaneous screenshots dated May 17, 2025, documenting Defendant Pini's profile and employment information; Aetna Better Health case management records of Plaintiff's May 19, 2025 report; and the Naperville Police Department records alleged in Section VII.

### *J. Legal Significance of Surveillance Pattern*

363. The Pini surveillance is part of a documented pattern of surveillance by individuals connected to DHS and the Peterson family network, including:

(a) Mark V. Peterson's surveillance of Plaintiff's Instagram account (June 28, 2025), as alleged in ¶¶ 327–333 above;

(b) Mark V. Peterson's surveillance of Plaintiff's Facebook account (late 2024 – early 2025), as alleged in ¶ 331 above;

(c) the law enforcement surveillance of Plaintiff in Naperville before the April 1, 2025 filing, as alleged in ¶¶ 340–341 above;

(d) the surge of Facebook "People You May Know" suggestions from unfamiliar individuals in the weeks after the April 1, 2025 filing, as alleged in ¶ 334 above;

(e) anomalous search activity from Washington, D.C. following Plaintiff's federal filing (August 24–30, 2025), as alleged in ¶¶ 343–347 above; and

(f) surveillance by a DHS Blue Campaign employee residing in the same city as Peterson Farms' Florida operations (May 17, 2025), as alleged in ¶¶ 348–362 above.

364. The Pini surveillance adds a federal dimension to the coordinated harassment pattern. A DHS employee whose mission is to protect trafficking victims was instead surveilling one. This surveillance occurred while the Peterson family maintained documented relationships with Defendant Noem, then Secretary of Homeland Security, and operated business facilities in the same city (Miami, Florida) where Defendant Pini resides.

### *K. Pattern of DHS-Connected Harm: Three Documented Instances*

365. Defendants' conduct is not confined to the core acts of trafficking, coerced settlement, and institutional concealment pleaded above. Since Plaintiff's original complaint in the 2025 Action was filed on April 1, 2025, Plaintiff has experienced three documented instances of harm involving individuals connected to DHS, the federal agency headed by Defendant Noem from January 2025 to March 2026 and now by Defendant Markwayne Mullin. Taken together, these three instances establish a pattern of DHS-connected harm that is concrete and continuing.

366. First: on May 17, 2025, approximately six weeks after the April 1, 2025 filing, Plaintiff documented surveillance of her Facebook profile by Defendant Pini, a DHS Blue Campaign employee residing in Miami, Florida, as alleged in Subsections G through I above.

367. Second: on April 15, 2025—fourteen days after filing her original complaint in the 2025 Action—Plaintiff attempted to cross into Canada through the Windsor International Tunnel Port of Entry in an effort to self-deport from the United States. Plaintiff drove through Michigan—the state where Defendant A. Peterson and his family operate their agricultural

business—to reach the Detroit–Windsor crossing. The Canada Border Services Agency issued Plaintiff an IMM 1282 "Allowed to Leave Canada" form, and Plaintiff returned to the United States involuntarily.

368. The attempted self-deportation of a trafficking-survivor plaintiff who had filed in federal court two weeks earlier, driven by fear of DHS-connected retaliation, constitutes an Article III injury of the highest concreteness and directly corroborates the coercive effect of the Peterson–Noem–DHS nexus pleaded in this Complaint.

369. Third: on January 23–24, 2026, approximately three months after the October 23, 2025 dismissal of the 2025 Action, Plaintiff was sexually assaulted at the WoodSpring Suites hotel in Burbank, Illinois, by Defendant Wade Mitchell Usyak, a retired thirty-three-year veteran federal officer of Homeland Security Investigations ("HSI"). HSI is a component of ICE, which is a component of DHS.

370. Defendant Usyak targeted Plaintiff through the Tinder dating application, initiating contact approximately two months before the assault. Plaintiff did not learn of his federal law-enforcement background until approximately two hours before their in-person meeting. At the time of the contact and the assault, Defendant Usyak resided in Des Plaines, Cook County, Illinois.

371. On March 4, 2026, between 12:30 and 12:59 a.m., Defendant Usyak sent Plaintiff text messages stating that he had sent her $200 "a couple weeks ago," placed a telephone call that she did not answer, wrote "Would you like to get together sometime. I had so much fun with you," and sent two photographs of himself, one shirtless.

372. Plaintiff was homeless, living week to week in an extended-stay hotel, at the time of the assault, having been displaced by the coerced settlement embodied in the Agreement, which Plaintiff had warned Defendants' counsel would produce that specific destabilizing outcome.

373. The persons involved in these instances, and parties connected to Defendants, converge in South Florida in a pattern that cannot be reconciled with coincidence at the pleading stage. Specifically:

(a) Defendant Usyak, who resides in Des Plaines, Illinois, held a residence in Fort Myers, Florida, in 2022 and 2023, upon information and belief;

(b) Defendant Nicholas Missad, a partner at Defendant Varnum LLP and co-counsel of record to Defendant A. Peterson, maintains a professional residence in Fort Myers, Florida, as publicly disclosed on Varnum LLP's firm directory;

(c) Defendant Pini resides in Miami, Florida;

(d) through its December 2020 acquisition of Lakewood Organics, LLC, Peterson Farms, Inc. maintains an operational presence in Miami, Florida; and

(e) the HSI Fort Myers field office operates the Southwest Florida Intercept Task Force, a multi-agency human-trafficking enforcement unit whose personnel necessarily possess professional access to trafficking-victim databases and investigative records.

374. On information and belief, and subject to discovery, the convergence of Varnum defense counsel, DHS Blue Campaign personnel, Peterson Farms subsidiary operations, and the post-dismissal perpetrator of sexual assault in a single geographic region reflects coordinated use of institutional access and is not coincidental.

### *L. Impact on Plaintiff*

375. As a direct and proximate result of the institutional targeting and coordinated harassment described herein, Plaintiff has suffered and continues to suffer significant harm, including but not limited to:

(a) reasonable fear for her physical safety, necessitating changes to her daily routines and heightened vigilance;

(b) the need to relocate and maintain secrecy regarding her physical location;

(c) the need to employ virtual private network (VPN) technology at all times to obscure her digital location;

(d) constant anxiety and hypervigilance regarding the appearance of Mark V. Peterson or other individuals connected to Defendants;

(e) emotional distress arising from the knowledge that she is being monitored by individuals with institutional power and potential access to federal law enforcement leadership; and

(f) the chilling effect on her exercise of First Amendment rights and her right to access the federal courts, arising from the implicit threat that her litigation activity may result in retaliation through institutional channels.

376. By May 19, 2025, every institutional channel that should have protected Plaintiff had been turned against her: the authorities responsible for prosecuting her traffickers had declined to act (Section V); a DHS Blue Campaign employee was surveilling her (Subsections G through I above); and the case manager to whom she reported that surveillance deployed police to locate her

the same day (Section VII). Plaintiff could not distinguish between a law enforcement contact that might help her and one that might be used to surveil, locate, or institutionalize her.

377. This chilling effect on Plaintiff's ability to report to federal law enforcement is a direct, foreseeable, and, Plaintiff believes, intended consequence of Defendants' coordinated retaliation.

378. Plaintiff's behavioral adaptations—including relocation, use of VPN technology, maintenance of location secrecy, and heightened vigilance—are rational responses to documented surveillance and harassment, not manifestations of paranoia or irrational fear. These adaptations themselves constitute evidence of the impact of Defendants' conduct and support Plaintiff's claims for damages.

### *M. DHS Office of Inspector General Complaint*

379. On or about March 4, 2026, Plaintiff submitted a complaint to the DHS Office of Inspector General through hotline.oig.dhs.gov addressing the DHS Blue Campaign's retaliatory surveillance of Plaintiff and violations of the Health Insurance Portability and Accountability Act through unauthorized institutional access to Plaintiff's protected health information. Surveillance of a trafficking survivor by a Blue Campaign employee is contrary to the Blue Campaign's stated mission of "protection of exploited persons."

### *N. Discovery and Reservation of Rights Regarding Additional Parties*

380. Plaintiff intends to pursue discovery specifically directed at: any communications between members of the Peterson family and Defendant Pini; any communications between DHS personnel (including Defendant Noem, her staff, or Blue Campaign personnel) and members of the Peterson family regarding Plaintiff; Defendant Pini's access to any federal databases or

information systems and whether any queries were made regarding Plaintiff; and any relationship between Defendant Pini and Peterson Farms' Miami operations (Lakewood Organics, LLC).

381. Plaintiff further intends to pursue discovery directed at communications between members of the Peterson family and Defendant Noem, her staff, and her office, as well as communications with the NRA or its affiliated entities, regarding Plaintiff, her litigation, or her personal information.

382. Plaintiff expressly reserves the right to seek leave to amend this Complaint to add additional parties, including but not limited to the NRA, should discovery in this matter reveal evidence of their direct participation in, authorization of, or ratification of the conduct alleged herein.

383. The allegations in this section are made upon personal knowledge where so stated, and upon information and belief where so indicated, with the expectation that discovery will confirm and provide additional detail regarding the institutional targeting and coordinated harassment Plaintiff has experienced.

## V. STATEMENT OF FACTS — LAW ENFORCEMENT OBSTRUCTION, VICTIM ABANDONMENT, AND FOIA RETALIATION

### *A. Detective Battle's Investigation and Initial Cooperation*

384. Defendant Detective Max Battle, Badge No. 141, of the Family Services Team of Defendant Grand Rapids Police Department ("GRPD"), was the lead investigator assigned to GRPD Case No. 24-063052, involving Plaintiff's report of sexual assault against Defendant A. Peterson.

384A. Plaintiff first went to the Grand Rapids Police Department in September 2024 and reported the sexual assault by Defendant A. Peterson. That report is Case No. 24-063052.

384B. On or about March 19, 2025, Detective Battle telephoned Plaintiff. In that call, their first by telephone, Plaintiff finally told him of the Prior Agreement. He answered that it was "Damn illegal!" His answer built Plaintiff's initial trust in him, and she cooperated as much as she could at the time, while still seriously traumatized and without counseling.

385. On March 19, 2025, at 7:56 AM, Detective Battle sent Plaintiff his direct email address (mbattle@grand-rapids.mi.us) "to send the documentation to," with his desk phone number (616-456-3423), establishing a direct line of communication for the investigation.

386. On March 19, 2025, at 8:17 AM, Plaintiff answered, thanked Detective Battle for his call, and told him of the video proof from her former service animal's pet camera documenting the sexual assault at the Grand Rapids Airbnb location in February 2024. Plaintiff explained the difficulty of reviewing this evidence due to its triggering effects and her need to prioritize her physical and mental health.

386A. At 8:53 AM the same morning, Plaintiff sent Detective Battle a copy of the Prior Agreement and wrote that it had been "a direct impediment to me cooperating in the past."

387. On March 19, 2025, at 9:02 AM, Plaintiff wrote to Detective Battle that the Prior Agreement was co-drafted by Defendant Jacob Droppers, an associate, and Defendant Nicholas Missad, a partner, of Defendant Varnum LLP, at the direction of Defendant A. Peterson, and that she would forward the June 2024 threat letter described in Section III, issued in response to Plaintiff's June 20, 2024 notice that the Prior Agreement was "null and void."

388. On March 24, 2025, Detective Battle wrote to Plaintiff that he had been out of the office, had received her voicemail, and that she had the right number for his desk. On May 6, 2025, he wrote that "[t]he documents you provided were reviewed" (¶ 393).

### *B. Plaintiff Provides Federal Complaint and Reports Corruption Concerns*

389. On April 17, 2025, at 3:48 PM, Plaintiff provided Detective Battle with a PDF copy of her 241-page original complaint in the 2025 Action (Case No. 1:25-cv-03513), filed April 1, 2025.

390. In that same communication, Plaintiff reported to Detective Battle that: (a) despite the Prior Agreement, the Peterson Defendants continued to cyberstalk Plaintiff rather than engage through counsel; (b) Plaintiff had received a suspiciously timed email reminder approximately one hour after contacting Defendants' counsel, Defendant Brion B. Doyle of Varnum LLP; (c) Plaintiff believed corruption was involved in the handling of her case by GRPD; and (d) Plaintiff had filed a criminal complaint with the Michigan Department of Attorney General on March 31, 2025 (Complaint No. 2025-ne03311713418-A), which was confirmed as received and pending processing. As alleged in ¶ 422, the Department closed that complaint on September 16, 2025.

390A. In the same communication, Plaintiff wrote that she was "frankly dumbfounded and offended that the sexual case had been closed prematurely by you, as you had said, and not even investigated," and that "Mr. Peterson wasn't even interviewed." Detective Battle had by then told Plaintiff that the case was closed.

391. Plaintiff expressly warned Detective Battle that she was "highly likely to be adding the GRPD as defendants" in federal litigation "for failure to follow police procedure," and

that she believed "an apparent legal firewall between the defendants and the GRPD is illusory at best."

392. At 3:58 PM on the same date, Plaintiff sent a follow-up communication confirming that her criminal complaint to the Michigan Department of Attorney General had been verified as received and in process.

### *C. The Criminal Sexual Conduct Declination*

393. On May 6, 2025, at 3:55 PM, Detective Battle notified Plaintiff that the case had been submitted to Defendant Kent County Prosecutor's Office for review on MCL 750.520B1F—Criminal Sexual Conduct, First Degree (Personal Injury)—and that "their office declined to issue charges." Detective Battle further stated that "Aaron was contacted through counsel and opted not to provide a statement."

394. The declination notification was remarkable in its brevity and its omissions. Detective Battle did not: (a) explain the rationale for the Prosecutor's decision; (b) identify which prosecutor reviewed the case; (c) indicate whether the video evidence had been reviewed; (d) consult with Plaintiff before or after the charging decision; (e) inform Plaintiff of any avenue to appeal the declination or seek a review; or (f) offer to refer the case to another jurisdiction or to the Michigan Department of Attorney General for independent review.

395. The reference to Defendant A. Peterson being "contacted through counsel" confirms that his counsel was actively involved in the criminal investigation. Upon information and belief, that counsel was Varnum LLP, and the contact was facilitated by or through Defendant Doyle, the Varnum LLP litigation partner managing Defendant A. Peterson's defense in the 2025

Action, who would have had knowledge of both the criminal investigation and the federal proceedings.

396. Kent County is Varnum LLP's home jurisdiction. The firm is headquartered in Grand Rapids, Michigan, and its attorneys are deeply embedded in the regional legal community through bar associations, the Federal Bar Association (Western District of Michigan chapter), community organizations including the board of Defendant The Right Place, Inc., an economic development organization, and social and professional networks that encompass the local judiciary and prosecutorial offices.

397. Upon information and belief, Defendant Chris Becker, the Prosecuting Attorney of Kent County, received 64% of his total campaign contributions—approximately $66,600 of $104,578—from the DeVos family and affiliated interests. The DeVos family's political influence in Kent County creates an environment in which prosecution decisions involving politically connected defendants are subject to extrajudicial considerations.

***D. Detective Battle's Abandonment of the Victim***

398. On May 9, 2025, at 10:17 AM, Plaintiff formally requested access to all investigation materials and relevant documentation regarding the case, communicating through her generalcounsel@aeroswift.org address.

399. On May 12, 2025, at 9:41 AM, Detective Battle responded by directing Plaintiff to the GRPD Records Unit at 616-456-4177 and the GRPD Records Unit website, effectively redirecting Plaintiff away from investigative channels and into the bureaucratic Freedom of Information Act ("FOIA") process described in Subsection E below.

400. On May 25, 2025, at 6:55 AM, Plaintiff sent Detective Battle a communication of critical importance to the investigation. In this email, Plaintiff:

(a) Informed Detective Battle that she was close to establishing care with a therapist for processing trauma, and had safe housing for the first time in a long time;

(b) Disclosed that she had been released from a mental hospital on April 28, 2025, and was entering a residential mental health nursing home that week, with two social workers assisting her;

(c) Offered to cooperate more fully in the investigation and to share "the actual video proof of what occurred"—direct evidence of the criminal sexual conduct;

(d) Expressed the expectation that this newly introduced evidence "would be inspected for critical purposes of attaining a criminal conviction against Mr. Peterson";

(e) *Disclosed previously unreported rapes* committed by Defendant A. Peterson while Plaintiff resided in Ottawa County, Michigan—crimes in a separate jurisdiction that had not been reported due to Plaintiff's housing and health crises (see Section III);

(f) *Disclosed a previously unreported sexual assault* committed by Defendant A. Peterson in Chicago, Illinois—a crime in yet another jurisdiction that had not been reported (see Section III);

(g) Explained the specific trauma barriers that had prevented earlier reporting: “When I talk about what happened, I dissociate every time and go into remission in a tailspin with my other mental health and health conditions, making it very hard for me to function”; and

(h) Disclosed that she had reapplied for SSI benefits and had broken her ankle the previous week, “making me even more severely disabled.”

401. Detective Battle never responded to this communication. A detective assigned to a criminal sexual conduct case, upon receiving a victim’s offer of direct video evidence of the crime he had submitted for charging, combined with the victim’s disclosure of multiple additional unreported sexual assaults by the same suspect across multiple jurisdictions, took no action whatsoever. He did not acknowledge receipt. He did not request the video evidence. He did not initiate reports for the Ottawa County or Chicago incidents. He did not refer the victim to appropriate agencies in those jurisdictions. He did not follow up in any manner.

402. The timing of Detective Battle’s silence is significant. Between Plaintiff’s April 17, 2025 communication—in which she warned of corruption, warned that she was likely to add GRPD as a defendant, and disclosed her Attorney General complaint—and the May 6, 2025 declination, only nineteen days elapsed. During that period, Defendant A. Peterson was contacted through counsel and declined to provide a statement. Upon information and belief, Plaintiff’s warning of GRPD liability and Attorney General oversight triggered a decision to close down cooperative engagement with Plaintiff and redirect all further contact through bureaucratic channels where it could be managed and delayed.

403. The contrast between Detective Battle’s responsiveness from March 19 through May 12, 2025 (at least five responses over eight weeks) and his complete non-response after May

25, 2025 (zero responses despite disclosure of additional crimes and additional evidence) constitutes circumstantial evidence that external direction was received to cease engagement with Plaintiff.

### *E. The FOIA Obstruction Campaign*

404. On May 20, 2025, Plaintiff submitted a Freedom of Information Act request to GRPD, assigned Request Number PD-2025-1539. The request sought records related to GRPD Case No. 24-063052, specifically: "Any and all work product pertaining to the reporting, investigating, of this case, as well as referral proof submitted to Prosecutor's office, and reasons for declining to prosecute case, if available." The request identified Plaintiff as the involved person and provided the exact case number.

405. Plaintiff's request provided both her identity as the named victim and the specific case number, enabling GRPD to locate the responsive records with no ambiguity whatsoever.

406. Rather than process the clearly sufficient request, Defendant Zach Bingel, GRPD's Freedom of Information Act coordinator, initiated a pattern of delay through repetitive, identical "clarification" demands:

(a) May 28, 2025, 2:02 PM: Bingel sent the first "Clarification Needed" email, restating Plaintiff's original request verbatim and asking: "What exact records are you looking to receive?"

(b) May 29, 2025, 11:35 AM: Bingel sent a second "Clarification Needed" email. The text was *identical word-for-word* to the May 28 email.

(c) June 9, 2025, 9:30 AM: Bingel sent a third "Clarification Needed" email. The text was again *identical word-for-word* to the prior two. Eleven days had elapsed since the second email with no substantive processing.

(d) June 11, 2025, 9:21 AM: Bingel sent a fourth "Clarification Needed" email, again *identical word-for-word* to all three prior emails.

407. Four identical emails over fourteen days, each asking the same question already answered by Plaintiff's original request, served no legitimate administrative purpose. GRPD had the case number. GRPD had Plaintiff's identity as the named victim. GRPD's own Detective Battle had communicated with Plaintiff about this same case number for eight weeks prior. The repetitive "clarification" demands functioned to: (a) consume the statutory response period without producing records; (b) shift the burden of non-production onto Plaintiff; (c) create a paper trail suggesting Plaintiff's request was deficient when it was not; and (d) delay access to records that would reveal the circumstances of the prosecution declination.

408. On June 11, 2025, at 1:52 PM, Plaintiff responded to the fourth identical clarification demand with a detailed, professionally drafted response specifying three categories of requested records: (1) Investigative Files, including all documents, reports, internal notes, memos, and logs; (2) Communications and Correspondence between department personnel and with the Prosecutor's Office regarding the investigation and decision-making processes; and (3) Referral and Decision Documentation reflecting the rationale behind any decision not to pursue prosecution. Plaintiff additionally offered to work with GRPD on narrowing or expanding the request.

### *F. The Choreographed Deposit Demand*

409. On June 12, 2025, at 2:45 PM, about twenty-five hours after receiving Plaintiff's detailed clarification, Bingel issued a formal response that:

(a) Identified the responsive records as: one (1) incident report, one (1) domestic violence report, one (1) CAD event sheet, one (1) daily log, two (2) documents, and two (2) audio files—a total of eight (8) discrete items;

(b) Granted the request in part and denied it in part as to unspecified exemptions;

(c) Demanded a deposit of $218.20, representing 50% of an estimated total fee of $436.40, for production of these eight items;

(d) Estimated a fulfillment period of four to six (4–6) months after deposit payment; and

(e) Imposed a forty-eight (48) day abandonment clock, commencing immediately upon issuance of the correspondence, after which GRPD would consider the request abandoned and cease processing.

410. The timing of this deposit demand is the central fact establishing coordination. On June 12, 2025, Plaintiff appeared at a hearing in the United States District Court for the Northern District of Illinois in the 2025 Action. That hearing occurred from approximately 1:45 PM to 2:15 PM Central Time.

411. Bingel's deposit demand was sent at 2:45 PM—about thirty (30) minutes after Plaintiff's federal court hearing concluded.

412. Bingel is GRPD's Freedom of Information Act coordinator in Grand Rapids, Michigan. He has no independent professional reason to monitor the federal court docket in the Northern District of Illinois. Federal hearing times are available on the public docket, but a municipal records officer in Michigan has no reason to access, track, or respond to scheduling information from an Illinois federal court.

413. For the deposit demand to arrive thirty minutes after the federal hearing concluded, one of two conditions must have existed: (a) the timing was a coincidence—which is improbable given that Bingel had twenty-three (23) days to respond to the original FOIA request (May 20 through June 12) and chose to deliver the deposit demand in the precise thirty-minute window following Plaintiff's court appearance; or (b) someone with knowledge of the federal court schedule communicated timing information to GRPD, enabling the deposit demand to be delivered at a moment calculated to maximize its destabilizing impact on Plaintiff.

414. Upon information and belief, the most likely conduit for this timing coordination was Defendant Doyle of Varnum LLP. As the lead litigation partner managing Defendant A. Peterson's defense in the 2025 Action, Defendant Doyle would have known the exact date and approximate time of Plaintiff's court hearing from the federal docket. Varnum LLP is headquartered in Grand Rapids, Michigan—the same city as GRPD. The firm's attorneys are embedded in the same professional networks as GRPD leadership and the Kent County Prosecutor's Office.

415. The strategic function of the deposit demand's timing was to force a cognitive and emotional disruption. A sexual assault victim appearing in federal court against her assailant's family, upon returning from that proceeding, was immediately confronted with a $218.20 financial

barrier to accessing her own assault records, combined with a 48-day deadline and a 4–6 month production timeline—a bureaucratic assault designed to compound the stress of active litigation.

### *G. 2026 Follow-Up Records Requests and Reports*

416. On March 3, 2026, Plaintiff appealed to GRPD, by email to foiareq@grcity.us, its failure to produce any records in the more than nine months since her request of May 20, 2025, and requested Detective Battle's complete investigation file in GRPD Case No. 24-063052; the authorization records for the deletion of recordings; and all communications between GRPD and the Kent County Prosecutor's Office concerning the declined criminal sexual conduct charges described in Subsection C above.

417. GRPD responded on March 25, 2026, under Request No. PD-2026-808 (Exhibit 2), granting the request in part and denying it in part. The response identified one incident report, one body-worn camera video, one domestic violence report, one CAD event sheet, one daily log, two documents, and two audio files. It stated a required deposit of $0.00 and estimated that fulfillment would take nine to eleven months after receipt of the deposit.

418. By contrast, GRPD's June 12, 2025 response to Plaintiff's earlier request (Request No. PD-2025-1539), described in Subsection F above, identified eight items, none of them a body-worn camera video; demanded a deposit of $218.20; and estimated fulfillment at four to six months.

419. Also on March 3, 2026, Plaintiff submitted a FOIA request by email to the Michigan Department of Attorney General, at FOIA@michigan.gov, for records concerning Complaint No. 2025-ne03311713418-A, described in ¶ 390 above; the departure of Defendant Hammoud to Defendant Miller Johnson; Defendant Whitmer's February 2025 investment mission

to the United Arab Emirates; and the connection between Defendant Mubadala Capital and Peterson Farms.

420. Having received no response of any kind in the 28 days that followed, Plaintiff wrote to the Department again on March 31, 2026, by email to FOIA@michigan.gov and miag@michigan.gov, stating that no response had been received.

421. On April 13, 2026, Plaintiff emailed the Department again, with her request. On April 21, 2026, the Department gave notice that it was extending its time to respond through May 5, 2026. On May 5, 2026, it issued its final determination (Exhibit 3), which states that it responds to Plaintiff's email of April 13, 2026, received April 14, 2026, and that no FOIA request of February 6, 2026, the request her email referred to, was received by the Department; it does not mention her emails of March 3, 2026 and March 31, 2026. Plaintiff had submitted that first request on February 6, 2026. The determination quotes the complaint number as it appears in Plaintiff's email, with the letter "I" where ¶ 390 has the digit "1" before the final "8"; both refer to the same complaint. It granted the request only as to internal communications regarding Plaintiff's complaint and records of contact or attempted contact with her; it withheld one page, which it described as "attorney work product"; and as to every other item, it stated that, to the best of the Department's knowledge, information and belief, it does not possess responsive records.

422. The records the Department produced show what became of Plaintiff's criminal complaint. Every internal file note on it, from intake through closure, carries the entry "No matching data found for list!" in its field for route history. The notes record Plaintiff's telephone calls of May 9 and May 29, 2025, on each of which she was told that the complaint was "still under review." On September 3, 2025, the Division Chief of Criminal Trials signed a form letter advising Plaintiff to "consult private counsel," addressed to a business address that was no longer hers. On

September 16, 2025, a named employee closed the file with the disposition "Short Disposition. Non-Lit — Letter Sent."

423. The Department nonetheless certified that it possesses no records of any intake review, screening or disposition determination on the complaint; of any referral of it to another agency or law-enforcement body; of any documented reason for its closure; of any review or awareness of it by the Chair of the Michigan Human Trafficking Commission; or identifying who was assigned to it, reviewed it, or made its disposition, although its own notes, letter and closing entry record the complaint's receipt, its disposition and the employee who closed it. The Department also produced a CS-301 Employee Departure Report showing that Defendant Hammoud, the former Chief Deputy Attorney General, resigned effective March 8, 2024, and certified that it possesses no records of exit protocols, debriefing or conflict screening for her departure.

424. On November 2, 2026, Plaintiff filed a verified complaint in the Michigan Court of Claims to compel the Department to produce the page it withheld and the records it certified it does not possess. *Brewis v. Michigan Department of Attorney General*, No. 26-000232-MZ (Mich. Ct. Cl.).

425. Plaintiff also submitted a report through the online portal of the Civil Rights Division of Defendant United States Department of Justice ("DOJ"), which assigned Confirmation No. 735370-DBT. The report addressed sex trafficking, racketeering, civil rights violations, and a 27-year pattern of non-prosecution by the Michigan Department of Attorney General.

426. On March 4, 2026, Plaintiff received confirmation of a public-corruption tip she submitted through tips.fbi.gov to the Chicago Field Office of the Federal Bureau of Investigation

("FBI"). The tip named as subjects Defendant A. Peterson; Defendant Peterson Farms Fresh, LLC; Defendant The Right Place, Inc.; Defendant Nessel; and Defendant DeWaard of Varnum LLP.

427. On March 3, 2026, Plaintiff sent a criminal referral to the United States Attorney for the Northern District of Illinois, the Civil Rights Division of the Department of Justice and its Human Trafficking Prosecution Unit, and the Chicago Field Office of the FBI, with copies to federal and state oversight bodies, naming Defendant A. Peterson, the Peterson companies, Defendants Doyle, Youngdahl, Grant, Andreasen, DeWaard, and Chasteen, and Defendant The Right Place, Inc. On March 4, 2026, she filed notice of those submissions in the 2025 Action. 2025 Action, Dkt. 70. Defendants responded on March 20, 2026, Dkt. 71, and on June 16, 2026 moved to seal her filings, citing her "renewed activity." Dkt. 75 n.1.

428. The board of Defendant The Right Place, Inc. includes Defendant DeWaard and the managing partners of Varnum LLP, Warner Norcross + Judd, Defendant Miller Johnson, and Miller Canfield; representatives of nine banking institutions, including Defendant Lauren Davis of Defendant Huntington Bancshares Incorporated on its executive committee; Defendant Al Vanderberg, the Kent County Administrator, whose county's prosecutor declined charges in Case No. 24-063052; and Defendant Mark Washington, the Grand Rapids City Manager, to whom the Grand Rapids Police Department reports.

### *H. The United States Attorney's Office After the March 3, 2026 Referral*

429. The March 3, 2026 referral described in ¶ 427 was addressed by name to Andrew S. Boutros, United States Attorney for the Northern District of Illinois, 219 South Dearborn Street, Chicago, Illinois 60604, and was sent by electronic submission and United States mail. It asked the United States Attorney's Office, the Civil Rights Division, and the FBI's Chicago Field Office

to open a criminal investigation into the trafficking, obstruction of justice, witness tampering, and RICO conspiracy it described.

430. As of the date of this Complaint, the United States Attorney's Office has not responded to the referral in any form, and no investigation known to Plaintiff has followed. Mr. Boutros is identified in this Section as a witness to the referral and to his Office's handling of it; he is not a defendant.

431. The same Office's conduct in a criminal case before this Court during the same months is a matter of public record. In *United States v. Rabbitt, et al.*, No. 1:25-cr-00693 (N.D. Ill.) (Perry, J.), the Office obtained an indictment on October 23, 2025 against six persons arising from a demonstration outside a federal immigration facility in Broadview, Illinois, after grand jury sessions on October 9, 16, and 23, 2025 (Dkt. 273). According to public reporting, the grand jury had declined to indict on October 9, 2025.

432. On May 18, 2026, on the Government's motion, the Court dismissed the indictment, leaving a superseding information (Dkt. 177). On May 20, 2026, the Court ordered every Assistant United States Attorney who had participated in the decision to redact portions of the grand jury transcripts to appear in person (Dkt. 181). On May 21, 2026, the Court ordered the Government to produce both the redacted transcripts first provided to the Court and the unredacted transcripts provided later, lifted the seal on the proceeding, and granted the Government's oral motion to dismiss the superseding information with prejudice (Dkt. 186). According to public reporting of that hearing, the Court found three types of prosecutorial misconduct in the transcripts, including vouching for the case and substantive communications with grand jurors outside the grand jury room, and noted that the misconduct had been redacted from the transcripts first given to the Court; Mr. Boutros appeared in person and took responsibility.

433. On October 1, 2026, the Court granted the former defendants' motions for attorneys' fees and expenses (Dkts. 201, 210), ordered briefing on the constitutionality of Federal Rule of Criminal Procedure 42, appointed an amicus curiae, and stated that it would consider whether sanctions or a special prosecutor are warranted after reviewing additional evidence from the Government (Dkt. 270). The Government has disclosed that the Department of Justice's Office of Professional Responsibility is investigating the prosecutors who appeared before that grand jury (Dkt. 277, citing Dkt. 247 at 48–49).

434. On October 9, 2026, the Court requested that the Government produce by October 30, 2026, for in camera review, all communications from September 26, 2025 through March 30, 2026 with anyone outside the Office concerning investigatory or charging decisions in that case, and "the October 14, 2025 email sent to U.S. Attorney Boutros attaching the October 9, 2025 Grand Jury transcript and any replies to or forwards of that email" (Dkt. 276).

435. The window the Court is examining, September 26, 2025 through March 30, 2026, includes March 3, 2026, the day Plaintiff sent her referral to the Office. In that window the Office pursued, until it collapsed, a case that a grand jury had first declined to indict, while a referral of sex trafficking, obstruction of justice, and racketeering addressed to the United States Attorney by name received no response. Plaintiff alleges that this selective initiation and selective declination is part of the law-enforcement abandonment described in this Section and in Section X.

### *I. Crediting Detective Battle's Investigation*

436. To be clear, Plaintiff credits Detective Battle for the investigative work he did perform. Detective Battle opened GRPD Case No. 24-063052, established communication with Plaintiff, received and reviewed her documentation, contacted Defendant A. Peterson through

counsel, and submitted First Degree Criminal Sexual Conduct charges to the Kent County Prosecutor's Office. The submission of CSC-1 charges—the most serious sexual assault charge under Michigan law—reflects Detective Battle's determination that the evidence supported the most serious charge available.

437. Plaintiff's claims against GRPD and Defendant City of Grand Rapids are not based on the quality of the investigation itself. They are based on: (a) Detective Battle's failure to respond to Plaintiff's disclosure of additional crimes and additional evidence after May 25, 2025; (b) the systematic FOIA obstruction that followed; and (c) the timing patterns that indicate coordination with the Peterson defense network. The same institution that investigated Plaintiff's assault and submitted the most serious available charges then turned around and obstructed Plaintiff's access to the evidence of its own investigation—a fact that is most consistent with external influence reaching into GRPD between the investigation phase and the records-access phase.

***J. Impact on Plaintiff***

438. As a direct and proximate result of the law enforcement obstruction and FOIA retaliation described herein, Plaintiff has suffered and continues to suffer:

(a) Denial of access to her own sexual assault investigation records, impeding her ability to pursue civil remedies and understand the circumstances of the prosecution declination;

(b) Financial injury in the form of the $218.20 deposit demand imposed upon a disabled, institutionalized individual awaiting SSI benefits;

(c) Emotional distress arising from the knowledge that the law enforcement institution that investigated her sexual assault subsequently obstructed her access to that investigation's records;

(d) Chilling effect on her exercise of First Amendment rights, including her right to petition the government through FOIA requests and her right to pursue federal civil rights litigation without fear of coordinated institutional retaliation;

(e) Compounding of the trauma of the underlying sexual assault, as the institutional obstruction reinforced the experience of powerlessness and institutional betrayal that characterizes trafficking and exploitation; and

(f) Reasonable fear that the law enforcement system will not protect her, created by Detective Battle's abandonment of Plaintiff following her disclosure of additional crimes, contributing to ongoing hypervigilance and inability to access institutional support systems.

## VI. STATEMENT OF FACTS — POST-SETTLEMENT RETALIATION AND ABUSE OF LEGAL PROCESS

### *A. The Sealing Campaign*

439. Section 2 of the Agreement provides that the parties "agree that good cause exists to seal the public record" of the 2025 Action. On October 13, 2025, four days before Plaintiff's response to the pending motion to dismiss in the 2025 Action was due, Defendant A. Peterson and the Peterson Entities, through counsel, filed a joint motion to seal, bearing Plaintiff's name "with permission," together with a stipulation of dismissal. Plaintiff was then at Clayton House under twenty-four-hour supervised care, without counsel (¶ 275). 2025 Action, Dkts. 58, 60.

440. On October 23, 2025, the Court granted the joint motion to seal in part and denied it in part, declining to seal the entire docket and directing the parties to submit to the Court's proposed-order e-mail address their requests to seal specific entries, with a justification for each, and dismissed the 2025 Action with prejudice. 2025 Action, Dkt. 61.

441. On February 27, 2026, Plaintiff moved under Federal Rule of Civil Procedure 60(b) to set aside the judgment, supported by a declaration and exhibits, and thereafter filed supplemental declarations and notices through April 2026. 2025 Action, Dkts. 62–69, 72–74. Her sworn account of the circumstances under which the Agreement was signed is set out in those filings. Among those filings were a motion to seal sensitive medical information, Dkt. 62-3, and a motion for a protective order under the Health Insurance Portability and Accountability Act, Dkt. 63-1.

442. On June 16, 2026, Defendant A. Peterson and the Peterson Entities, through Defendant Varnum LLP and Defendant Tabet DiVito & Rothstein LLC, filed a renewed motion to seal, signed by Defendant Doyle, which recited Plaintiff's "renewed activity" as its occasion. 2025 Action, Dkt. 75. As alleged in Section III, the motion was itself filed on the public docket and, in it, Defendants identified Plaintiff's medical diagnoses by name, quoted her clinical records, characterized her mental health in disparaging terms, and accused her of a crime.

443. The motion did not ask the Court to seal the June 16 filing. It asked the Court to seal Plaintiff's filings: her Rule 60(b) motion and every supporting declaration, notice, and exhibit, Dkts. 62 through 74, PageID 810 through 1843, with Defendants' own response, Dkt. 71, among them, together with designated portions of her complaint, her amended complaint, and other papers — more than one thousand pages of her own sworn account.

444. Defendants noticed the motion for presentment on June 23, 2026. 2025 Action, Dkt. 76. On June 22, 2026, the day before the noticed presentment, the Court entered a one-page signed order that denied Plaintiff's motions to reopen, denied her motions to supplement, granted the motion to seal, and terminated the presentment. 2025 Action, Dkt. 77. The order states no findings.

445. The June 22, 2026 order thus sealed Plaintiff's sworn account of how the Agreement came to be signed, while Defendants' June 16, 2026 characterization of her — her diagnoses, her clinical records, and the accusation of a crime — remains on the public docket. Plaintiff's answer to that characterization is under seal; the characterization is not.

446. The Agreement was never kept from the public record. Defendant A. Peterson filed it on the public docket of this Court on July 13, 2026. Federal Action, Dkt. 1-1. Two days later, on his own motion, the Court sealed that filing and directed him to file a redacted version; the version he filed the same day still shows the text of Sections 1 through 15 of the Agreement. Federal Action, Dkts. 15, 16. He filed the Agreement again in the Circuit Court of Cook County on July 22, 2026, as alleged below.

### *B. The Federal Action Before Judge Daniel and Its Abandonment*

447. On July 13, 2026, three weeks after the sealing order, Defendant A. Peterson filed *Peterson v. Brewis*, No. 1:26-cv-08239 (the "Federal Action"), in this Court, through Defendant Varnum LLP, by Defendants Doyle and Youngdahl, and Defendant Tabet DiVito & Rothstein LLC, by Defendants Grant and Andreasen. The complaint was accompanied by a motion for preliminary injunction and an eighteen-page brief. Federal Action, Dkts. 1, 5, 6.

448. Section 13 of the Agreement provides that it is governed by Michigan law and that any action to enforce it shall be brought in the courts of Kent County, Michigan, or in the United States District Court for the Western District of Michigan. The Federal Action was brought in neither.

449. The complaint attached the Agreement, including Plaintiff's account number, unredacted, as alleged in Section III. Federal Action, Dkt. 1-1. As exhibits to the injunction brief, counsel filed on the public docket four of Plaintiff's published articles, each printed on July 8, 2026. Federal Action, Dkts. 6-1 through 6-4.

450. The brief represented to this Court that the June 22, 2026 order had "confirmed" the Agreement and had rejected Plaintiff's contentions that it was procured by fraud, was illegal, and was unconscionable. Federal Action, Dkt. 6 at 1, 4, 9. The order contains no such finding; it denied Plaintiff's motions and granted the motion to seal without stating reasons. 2025 Action, Dkt. 77.

451. The same brief asked this Court to apply Michigan law "pursuant to the choice of law clause in the Agreement," Section 13, Federal Action, Dkt. 6 at 6, while invoking a forum Section 13 does not permit.

452. The relief sought reached beyond the parties to the Agreement. The brief treated as breaches Plaintiff's posts inviting other victims to seek legal recourse and her reporting on Defendant A. Peterson's counsel, Dkt. 6 at 5, and the motion asked the Court to bar any content referring to Defendant A. Peterson or the Peterson Entities "directly or indirectly" and to order the Website removed. Dkt. 5 at 1–2.

453. The civil cover sheet, signed by Defendant Grant, answered "Yes" to the question "Is this a previously dismissed or remanded case?" and gave the case number "25CV03513" and the judge "Honorable Sara L. Ellis." Federal Action, Dkt. 2. The Clerk did not assign the action to Judge Ellis. It was assigned by random assignment to the Honorable Jeremy C. Daniel, with Magistrate Judge Holleb Hotaling.

454. On July 14, 2026, the Court ordered Defendant A. Peterson to review the complaint's compliance with Federal Rule of Civil Procedure 5.2 and to substantiate the amount in controversy on which federal jurisdiction was asserted, by July 21, 2026. Federal Action, Dkt. 12.

455. The same day, Defendant A. Peterson moved to seal the unredacted exhibit, stating that Plaintiff's account information had been "inadvertently included," and noticed that motion for presentment on July 21, 2026. Federal Action, Dkts. 13, 14. On July 15, 2026, the Court granted the motion, ordered the Clerk to seal Dkt. 1-1, directed that a redacted version be filed on or before July 17, 2026, and struck the July 21, 2026 motion hearing. Dkt. 15. A redacted copy of the Agreement was filed on July 15, 2026. Dkt. 16.

456. On July 20, 2026 — one day before the deadline to substantiate jurisdiction — Defendant A. Peterson filed a notice of voluntary dismissal under Federal Rule of Civil Procedure 41(a)(1)(A)(i). Federal Action, Dkt. 17. The notice stated no reason. No submission substantiating the amount in controversy was ever filed. The action was terminated on July 21, 2026. Dkt. 18.

457. The Federal Action was before Judge Daniel for eight days. Defendant A. Peterson never served Plaintiff, never obtained a ruling on his motion for preliminary injunction, and never answered the Court's jurisdictional order.

### *C. The "Personal Service" Certificates*

458. Five filings in the Federal Action — the injunction motion, its supporting brief, the motion to seal, its notice of presentment, and the notice of dismissal — each carried a certificate stating that the filing had been served on Plaintiff by "personal service" at 2751 Ogden Avenue, Room 234, Downers Grove, Illinois 60515. Federal Action, Dkts. 5, 6, 13, 14, 17. The summons was issued to the same address. Dkt. 10.

459. Plaintiff had not lived at, worked at, or received mail at the Downers Grove address for approximately six years.

460. Four weeks earlier, Defendants' own notice of presentment in the 2025 Action, filed June 16, 2026, addressed Plaintiff at 230 E. Ohio Street, PMB 1901, Chicago, Illinois 60611, an address she had replaced on September 10, 2025, by a notice of change of address copied to Defendants Doyle, Youngdahl, Grant, and Andreasen. 2025 Action, Dkts. 49, 76. The same counsel signed the notice of presentment and the Federal Action certificates. Counsel also held Plaintiff's filing e-mail address and telephone number, which appeared on every paper she had filed in the 2025 Action since February 2026.

461. On July 14, 2026, at 2:55 p.m. Central time, Defendant Youngdahl sent an e-mail to Plaintiff at owner@aeroswift.org, copying Defendants Doyle, Grant, and Andreasen, attaching the Federal Action filings, and writing: "Please let me know if you accept service of these documents." No request for waiver of service under Federal Rule of Civil Procedure 4(d) accompanied it. Plaintiff did not accept service.

462. The sequence was: two certificates of "personal service" at Downers Grove on July 13; the e-mail asking whether Plaintiff would accept service on July 14; two further certificates of "personal service" at Downers Grove the same day; and a fifth on July 20. Each

certificate was filed at an address counsel had reason to know was not Plaintiff's, before and after counsel asked her by e-mail whether she would accept service at all.

### *D. The Cook County Action*

463. On July 22, 2026, the morning after the Federal Action was terminated, Defendant A. Peterson filed Peterson v. Brewis, No. 2026 CH 06988, in the Circuit Court of Cook County, Illinois, Chancery Division (the "Cook County Action"), through Defendant Tabet DiVito & Rothstein LLC, by Defendants Grant and Andreasen. The complaint's signature block also listed Defendants Doyle and Youngdahl of Varnum LLP, with the notation that an application for admission pro hac vice was forthcoming.

464. The Cook County complaint was substantially identical to the federal complaint. It sought only injunctive relief, with an ad damnum of zero; alleged that Plaintiff breached Sections 3(a), 3(b), 5(a), 5(c), and 5(e) of the Agreement by publishing "the Website," aeroswiftlegal.substack.com; and again attached the Agreement as an exhibit.

465. The Circuit Court of Cook County is not a forum permitted by Section 13 of the Agreement. Defendant A. Peterson thus brought two actions in nine days to enforce the Agreement, neither in a forum the Agreement allows, each in a jurisdiction where Plaintiff had been, and where her published work could be reached by injunction. Neither action was filed in Michigan, whose Uniform Public Expression Protection Act, 2025 PA 52, MCL 691.1851 et seq., had taken effect on March 24, 2026, less than four months earlier. Both complaints rested jurisdiction and venue on Plaintiff's residence in Illinois — the federal complaint pleading that she is an Illinois citizen residing in Chicago, Dkt. 1 ¶¶ 5, 8–9, and the Cook County complaint pleading her Cook County residence "upon information and belief." Neither was verified, and neither allegation was supported by inquiry: in the same period, counsel were filing certificates of

"personal service" at a Downers Grove address they had reason to know was not Plaintiff's, and asking her by e-mail whether she would accept service at all, as alleged above.

466. Defendant A. Peterson moved for a preliminary injunction on July 30, 2026, noticed it on August 3, 2026, and presented it on August 12, 2026, when it was continued generally.

467. On August 18, 2026, Defendant A. Peterson moved for leave to serve Plaintiff by alternative means. On August 25, 2026, the court entered an order, prepared by Defendant Grant, authorizing service by e-mail, by text message, by posting on social media, and by United States mail to Plaintiff's last known address. The order set no completion date and required no proof of completion. An alias summons issued the same day listed 680 N. Lake Shore Drive, Chicago, as Plaintiff's primary address and 230 E. Ohio Street, PMB 1901, as a second address — neither of them Downers Grove — and stated a claim of "$25,000+" against a complaint whose ad damnum was zero.

468. The telephone number counsel held for Plaintiff, (872) 222-7490, had been disconnected before the order was entered. Service by text message to that number was not possible.

469. On September 1, 2026, an affidavit of service was filed by Rachel D. Klein, an associate of Defendant Tabet DiVito & Rothstein LLC. The matter was set for a case management call on September 21, 2026.

### *E. Service Through the Publication Sought to Be Enjoined*

470. Following the August 25, 2026 order, on August 31, 2026, at 10:37 a.m., Ms. Klein e-mailed Plaintiff under the subject line "Important Information-You Are Being Sued." The e-mail attached three documents — the Cook County complaint, the August 25, 2026 order, and

the alias summons — and nothing else. At 12:47 p.m. the same day, Ms. Klein sent a second e-mail, generated by a Microsoft 365 file-sharing service, stating that she had shared a folder named "Brewis Folder" with Plaintiff; it attached no document.

471. The order's authorization of service "by posting on social media" directed process at Plaintiff's public-facing accounts, so that the act of serving her would itself announce the existence of the action, its allegations, and the Agreement to her readership.

472. Plaintiff did not open the shared folder, because doing so would have required her to identify herself to a third-party system whose contents and origin she could not verify. As of October 1, 2026, the only documents Defendant A. Peterson had transmitted to her in the Cook County Action were the three attached to the 10:37 a.m. e-mail of August 31, 2026. Her appearance in the Cook County Action, filed September 18, 2026, was made without waiver of her objections to service, personal jurisdiction, venue, and forum.

### *F. Surveillance Following the Settlement*

473. The federal Department of Homeland Security contacts — Defendant Pini, Defendant Usyak, and the Naperville surveillance — are alleged in Section IV and are incorporated here.

474. In 2026, Plaintiff's account on the LinkedIn professional networking platform recorded viewing activity by Indiana law-enforcement personnel. Plaintiff has had no residence, employment, client, or legal matter in Indiana for more than two years, and nothing in her published work concerns Indiana.

475. In December 2024, Defendant A. Peterson sent Plaintiff money through a payment account in the name "Ryan Elliott," with the e-mail address bmw_2014alp@outlook.com

and the shipping address 16180 Highland Dr. The transaction record shows a payment of $1,262.55 completed December 23, 2024. Plaintiff filed that record in the 2025 Action as Exhibit AAP (Dkt. 39, PageID 596).

476. The same e-mail address was a free subscriber to Plaintiff's publication, FAFO Files. On October 19, 2026, at 4:25 a.m., Plaintiff published a post disclosing the March 2024 assault, with photographs. At 5:46 a.m. the same morning, eighty-one minutes later, Substack notified Plaintiff that bmw_2014alp@outlook.com had unsubscribed. The address no longer appears in Plaintiff's subscriber list; Plaintiff has preserved the notification.

477. On October 20, 2026, the day after that post, Defendant Substack Inc. removed a note Plaintiff had published on FAFO Files, stating that it exposed "private information, such as a home address private email address and phone number," and warned her: "future reports of this nature will lead to the permanent removal of your publication from the platform." The home address in the note was a former residence of Defendant A. Peterson, which he had sold. Substack has not told Plaintiff who made the report.

478. Plaintiff appealed on November 2, 2026. Substack denied the appeal on November 3, 2026, and acknowledged her request that it preserve its records. On November 5, 2026, Plaintiff reported to Substack in writing that its reporting process had been misused. Upon information and belief, the report that led to the removal was made by or on behalf of Defendant A. Peterson.

479. Plaintiff alleges that Defendant A. Peterson, through the alias account, monitored Plaintiff's journalism about his own conduct and ended the subscription within eighty-one minutes of being named, and that this is part of the post-settlement surveillance and retaliation alleged in this Section. For a long time, Defendant A. Peterson remained a free subscriber to Plaintiff's

publication through the alias e-mail address, while demanding that Plaintiff stop writing about him.

### *G. Plaintiff's Displacement*

480. From June 18 to 19, 2026, two days after the renewed motion to seal was filed, Plaintiff's devices and online accounts were subjected to an intrusion while she was in the middle of performing legal diligence for the upcoming court hearing.

481. Plaintiff began leaving Illinois within two days of the intrusion, taking her belongings with her and living out of a rented truck. She fell ill with food poisoning partway through the trip and returned to Illinois to recover. Her recovery extended into July 2026. She left again approximately one week after recovering, and has not resided in Illinois since. For her safety she remained at undisclosed locations outside Illinois through the remainder of the summer. She relocated to California in August 2026, where she now resides.

482. Neither address on the Cook County alias summons was Plaintiff's residence, and the Downers Grove address on which five certificates of "personal service" were filed in the Federal Action was not Plaintiff's residence at any time during either action.

### *H. Impact on Plaintiff*

483. As a direct and proximate result of the conduct alleged in this Section, Plaintiff has suffered and continues to suffer:

(a) the burden and expense of defending two actions filed in nine days, in forums the Agreement forbids, while displaced and without stable housing;

(b) the sealing of her sworn account of the Agreement's formation while Defendants' public characterization of her health remains on the docket;

(c) the public exposure of her financial account number;

(d) the means of service Defendants sought and obtained, which authorized announcing the Cook County Action and its allegations to her readership;

(e) continued surveillance and the loss of her home, her belongings, and her residence in Illinois; and

(f) severe emotional distress, including exacerbation of her C-PTSD and related conditions.

## VII. STATEMENT OF FACTS — ILLINOIS MEDICAL DISCRIMINATION AND CONSTRUCTIVE CONFINEMENT

### *A. The Managed-Care Gate*

484. Throughout the 2025 Action and after it, Plaintiff's Illinois Medicaid benefits were administered through Defendant Aetna Better Health of Illinois ("Aetna"), a managed care organization under contract with Defendant Illinois Department of Healthcare and Family Services ("HFS"). Aetna is a subsidiary of Aetna Inc., which Defendant CVS Health Corporation ("CVS") acquired in 2018.

485. Every placement, behavioral health service, and benefit Plaintiff received during that period was reached through Aetna case management, and each was conditioned on her disclosure of her current location to Aetna. No independent, stable housing was made available to her at any point in the period.

486. From July 4, 2025 through March 1, 2026, the benefit notices the State of Illinois sent Plaintiff were addressed to institutional placement addresses. A case transfer notice dated July

8, 2025 was addressed to Plaintiff at 2026 N. Clark Street, Chicago, the address of Defendant Clayton Residential Homes, Inc. ("Clayton House").

### *B. The Settlement Call and the Streamwood Admission*

487. On April 17, 2025, in a settlement call in the 2025 Action, Defendant Doyle learned that Plaintiff was homeless, living week to week in a hotel, without funds, and in acute distress. No settlement resulted.

488. Three days later, on April 20, 2025, at 6:40 p.m., Plaintiff was admitted to a psychiatric hospital in Streamwood, Illinois ("Streamwood").

489. On or about the fifth day of the admission, Aetna case manager Chanda Mehta inserted herself into Plaintiff's case management; on the eighth day, the day of her discharge, Ms. Mehta was assigned to Plaintiff. Ms. Mehta directed Plaintiff's subsequent placements toward Clayton House.

### *C. The May 19, 2025 Police Dispatch*

490. On May 19, 2025, Plaintiff e-mailed Ms. Mehta a complaint that her civil rights were being violated.

491. Within seventy-two minutes, Ms. Mehta caused the Naperville Police Department to be dispatched to Plaintiff's residence for a "wellness check." What sent the police, at Ms. Mehta's command, was a telephone call that day in which Plaintiff yelled at her not to contact Plaintiff ever again. Plaintiff had reported no emergency and requested no assistance. The responding officers asked to search Plaintiff. She let them, to prove that she was not on drugs and had no weapons and to defuse their presence. Plaintiff believed the search was unlawful; she allowed it so that there would be proof of what happened if it were ever needed. She told them that

she was not delusional, that she was being stalked online, and that she was working up the courage to contact the Federal Bureau of Investigation or the United States Attorney, whose telephone numbers were written on yellow tabs on the mirror in her room; she pointed the numbers out to the officers. She showed them her lawsuit, and she explained, or tried to explain, that she was a trafficking victim. Plaintiff alleges that Ms. Mehta abused the wellness check, on behalf of the trafficking arm of the Peterson enterprise, through Defendant CVS Health Corporation and Defendant Aetna Better Health of Illinois (¶¶ 496–499, 513–514).

492. The dispatch is recorded in the Naperville Police Department's computer-aided dispatch log and in the officers' body-worn camera video.

***D. Clayton House***

493. On June 4, 2025, a Maximus assessment of Plaintiff found that she had "difficulty making safe decisions" and required supervised care.

494. On June 18, 2025, Plaintiff asked Ms. Mehta for help appealing her denial from the Front Door Diversion Program, a community program that would have covered rent for an apartment of her own, so that she could be reevaluated and leave the facility. Ms. Mehta replied the same morning that Plaintiff should stay at Clayton House until her benefits were approved and that making changes "so quickly" was not beneficial for her.

495. As alleged in Section III, Plaintiff was placed at Clayton House, a supervised residential facility operated under the direction of Defendant Sarah Leicher, on or about June 25, 2025, and it was there, without counsel, that the Agreement was presented to her and executed in October 2025.

496. At Clayton House, Plaintiff observed Peterson Farms products in the facility's kitchen and delivery trucks bearing the markings of JVC. A Clayton House case manager told her, "they have JVC here." When Plaintiff asked the facility's executive director who supplied its food, the answer given was Gordon Food Service.

497. The website ffl-logistics.com redirects to jvcenterprisesinc.com, the website of Defendant JVC Enterprises, LLC. Upon information and belief, Defendant FFL Logistics, LLC is registered with the Federal Motor Carrier Safety Administration as a shipper and broker, based in Commerce Township, Michigan (USDOT No. 3913515), and Defendant Peterson Brands, LLC acquired it together with King Brands, LLC in 2024.

498. Within three weeks of Plaintiff's questions about the facility's supply chain, she was pressured to leave Clayton House.

499. In October 2025, while Plaintiff's settlement negotiations with Defendant Doyle were under way, Aetna Community Health Director Heather Mackenzie visited Plaintiff at Clayton House and spoke of those negotiations. Plaintiff had not disclosed the negotiations to Ms. Mackenzie or to Aetna. The negotiations were confidential, and the only other party to them was Defendant Doyle's client.

500. Approximately two weeks after Ms. Mackenzie's visit, on November 3, 2025, Plaintiff was discharged from Clayton House without transition housing, without continued services arranged, and without her medications, into homelessness. The discharge ended the referral that had been made for her to a community-based program.

501. Plaintiff filed grievances and complaints concerning Clayton House with the Illinois Department of Public Health, which acknowledged them on October 27, 2025 and

responded on November 10, November 25, and December 16, 2025. She filed a grievance with Aetna, No. GR0000011128, which Aetna resolved by letter dated December 23, 2025.

***E. The November 4, 2025 Attempted Commitment***

502. On the night of November 4, 2025 — twelve days after the 2025 Action was dismissed, and while Plaintiff retained the ability to seek relief from that dismissal — Plaintiff was presented with orders directing that she be involuntarily hospitalized in a psychiatric facility.

503. Plaintiff refused, and she was not committed. She preserved copies of the orders. The orders identify the petitioner, the certifying examiner, and the facility designated to hold her.

504. On November 16, 2025, Plaintiff refused to sign or confirm documents relating to the sealing of the 2025 Action.

505. Had the November 4, 2025 commitment succeeded, it would have removed Plaintiff from her litigation at the moment she could still challenge the dismissal, and would have created a psychiatric hospitalization record for use against her credibility as a federal plaintiff.

***F. 2026: Lock-In, Reclassification, and Disclosure of Plaintiff's Records***

506. Plaintiff's enrollment was locked to Aetna until the open period that runs from October 1, 2026 to the plan's anniversary date of December 1, 2026, and she could not change managed care organizations before that period opened.

507. Every managed-care change notice sent to Plaintiff from July 2025 through March 2026 was addressed to Clayton House, after she had been discharged from it. As a result, Plaintiff was unable to change plans from Defendant Aetna Better Health of Illinois until the open period began on October 1, 2026. Plaintiff is now enrolled in a different plan in California, where she resides, and her Illinois enrollment still has not been canceled.

508. On March 1, 2026, the State redetermined Plaintiff's eligibility and placed her in its "Long Term Care" group, although she was not then residing in any long-term care facility. Her case was transferred on March 9, 2026 to the South Suburban Family Community Resource Center and on March 12, 2026 to the Lower North Family Community Resource Center.

509. On March 16, 2026, Plaintiff sent Aetna, by fax, a request to disenroll, a confirmation of her March 3, 2026 written revocation of every authorization to use or disclose her health information, and a notice preserving her subrogation rights.

510. On March 19, 2026, sixteen days after the revocation and three days after her fax, Aetna's Payment Integrity unit forwarded Plaintiff's information to KatchIQ, a third-party vendor, which reported that "the stated member was not located." A return fax dated April 2, 2026 confirmed the transmission.

511. Plaintiff's prescriptions were routed through a CVS pharmacy system in Pennsylvania, and fills at the pharmacy she used were delayed or blocked. On March 23, 2026, her treating clinic confirmed the Pennsylvania routing from its own system.

512. In November and December 2025, after her discharge from Clayton House, Plaintiff went without her prescribed daily medications for approximately 45 consecutive days.

513. Following adverse events in her litigation, Plaintiff received unsolicited offers from CVS and Aetna, including CVS rewards valued at approximately $350 per year, 35 percent discount codes, and preemptive approvals of Medicaid services she had not requested.

### *G. The Corporate Chain*

514. Defendant Kathleen Ann Murphy served at Aetna, Inc. from approximately 1985 to approximately 2000, in positions that included General Counsel and Chief Compliance Officer

of Aetna Financial Services, and later became a director of Defendant BlackRock, Inc., a principal shareholder of CVS.

515. Defendant Phillip J. Lerner, M.D., MPH, as a Vice President and National Medical Director of Aetna, held medical-director authority over the utilization-management and case-management functions through which the conduct alleged in this Section was carried out.

### *H. Impact on Plaintiff*

516. As a direct and proximate result of the conduct alleged in this Section, Plaintiff has suffered and continues to suffer:

(a) confinement to placements she could reach only by surrendering her location;

(b) a police response to her civil rights complaint;

(c) loss of housing, services, and community-based placement upon her discharge from Clayton House;

(d) the attempted involuntary commitment of November 4, 2025;

(e) interruption of her prescribed medications and disclosure of her health information after she revoked authorization; and

(f) severe emotional distress, including exacerbation of her C-PTSD and related conditions.

## VIII. STATEMENT OF FACTS — THE EROS NETWORK

### *A. The Eros Network and Its Corporate Structure*

517. The eros.com platform ("Eros") is a commercial sex advertising platform operated by an association of individuals and corporate entities spanning California, North Carolina, Texas, Malta, Cyprus, Nevis, Switzerland, and the United Arab Emirates, including Defendant David Azzato, Defendant Byron R. Mayo, Defendant Cassandra Toplin, also known as Cassandra Doved Simon, Defendant Greg Huling, Defendant Alan Ross Etkin, Defendant Serkei Papaian, Defendant Wiretech Services Ltd., Defendant Kuil Limited, Defendant Ericius Investments, Defendant Group Kaitu LLC, and Defendant Bolma Star Services (together, the "Eros Network Defendants").

518. The 2016 dissolution of Defendant Darkside Productions, Inc., a California corporation led by Defendants Mayo and Etkin, coincided with the offshore restructuring of the network's assets into Cyprus (Ericius Investments, Kuil Limited), Malta (Wiretech Services Ltd.), Nevis (The Cassandra Doved Simon Irrevocable Trust), and Switzerland (Defendant Azzato's Zurich operations).

519. This restructuring occurred during the period of intensified federal investigation into online sex trafficking platforms, including the prosecution of Backpage.com that resulted in the seizure of Backpage's assets and criminal convictions of its operators in 2018. The timing shows that the network's offshore migration was not routine corporate planning but a deliberate effort to evade law enforcement scrutiny and shield assets from seizure.

### B. *Offshore Financial Architecture*

520. The offshore structure used by the Eros Network Defendants serves to: (a) obscure beneficial ownership of trafficking proceeds through nominee directors, including Serkei Papaian, who serves as professional nominee for both Azzato-connected and Toplin-connected Cyprus entities; (b) frustrate law enforcement investigation across multiple international jurisdictions; (c) shield assets from civil judgment through Nevis trust structures that do not recognize foreign judgments; (d) move funds across international borders through Malta's banking infrastructure; and (e) provide deniability for network operators through complex ownership layers.

521. Upon information and belief, approximately €31 million in payments were processed through Defendant Azzato's entities via the Worldline payment processor in 2023 alone, before Defendant Visa Inc. flagged compliance concerns over potential underage listings on the platform.

### C. *Professional Enablement*

522. Defendant Etkin, a former Senior Auditor at Deloitte & Touche (1989–1995), provided specialized expertise in corporate structures and offshore financial arrangements, which was deployed in the network's corporate restructuring.

523. The pattern mirrors that of other trafficking networks. Upon information and belief, Deloitte & Touche, Defendant Etkin's former employer, served as auditor for Jeffrey Epstein's Liquid Funding Ltd., a $6.7 billion Bermuda-registered offshore vehicle that operated during Epstein's active sex trafficking period (2000–2007). Both networks used Big Four professional expertise, offshore corporate structures in tax haven jurisdictions, complex ownership

layers with nominee directors, and coordinated restructuring during periods of law enforcement scrutiny.

### *D. Plaintiff and the Eros Platform*

524. Defendant A. Peterson used Eros to find Plaintiff and to track her, and he used Tryst for the same purposes. Upon information and belief, he used TheEroticReview.com (¶ 527) as well. He told Plaintiff, in words to this effect, that he had been watching her over a period of six months before she "disappeared" (for a septorhinoplasty and six months of trauma therapy at the Michigan Center for Traumatic Stress).

525. The platform's business model gave individual traffickers an incentive to maximize the volume and visibility of their advertisements. Upon information and belief, the Eros Network Defendants earned their revenue from the platform through advertising fees, premium placement charges, and other monetization mechanisms.

526. The Eros Network Defendants knew or should have known, from the content, volume, and patterns of advertisements on their platform, that their services facilitated sex trafficking.

### *E. The Backpage — Erotic Review — Eros Ecosystem*

527. Eros did not operate in isolation. It functioned as the premium tier of an interconnected commercial sex advertising ecosystem that included Backpage.com and TheEroticReview.com ("TER"). These platforms maintained formal commercial relationships, shared advertiser bases, cross-referenced content, and processed payments through common financial channels.

528. Carl Ferrer, former Chief Executive Officer of Backpage.com, testified under oath in *United States v. Lacey*, No. CR-18-00422-PHX-DJH (D. Ariz.), that Backpage and The Erotic Review maintained a formal reciprocal link agreement under which Backpage paid The Erotic Review approximately $4,000 per month. Both platforms displayed banner advertisements for the other, and female escort advertisements on Backpage were cross-linked to provider review pages on The Erotic Review. Ferrer described The Erotic Review as the "secret sauce" of Backpage's adult section and characterized TER as "Yelp for prostitution."

529. The July 25, 2018 superseding indictment in *Lacey* named The Erotic Review and alleged that Backpage paid "tens of thousands of dollars" to TER under the reciprocal link agreement. It further alleged that Backpage's automated moderation system was programmed to strip references to "The Erotic Review" or "TER" from advertisements before publication, concealing the commercial relationship while profiting from cross-referral traffic.

530. Eros occupied the premium tier of the same ecosystem. Contemporaneous media reporting identified Backpage as the "lower end" and Eros as the "higher end" of commercial sex advertising, with providers migrating between platforms by price point and client demographics. Providers who advertised on Eros simultaneously maintained profiles on TER and cross-posted on Backpage. WHYY, the National Public Radio affiliate, identified "Backpage.com — along with more specialized sites such as Eros, an escort-advertising site" as the ecosystem targeted by the FOSTA-SESTA legislation.

530A. Plaintiff was, and still is, on TER as well. She was reviewed there like an object.

530B. TER is a central, and overlooked, part of that ecosystem. Plaintiff's first major visit from a senior executive came from a man who was bold and forward, who wanted to see her for two hours for $2,000, and who represented himself as a TER moderator, or as well connected

to TER, saying that he was a steel executive. The visit took place at the Embassy Suites by Hilton hotel in Rosemont, Illinois, near O'Hare International Airport. Plaintiff felt that she had to comply with all of his sexual demands. It was an extremely stressful experience.

531. In 2015, Defendant Visa Inc., Defendant Mastercard Incorporated, and American Express terminated payment processing for Backpage following pressure from Cook County Sheriff Tom Dart. Backpage responded by creating European shell companies to route payments through European banks. In 2023, the same Visa network flagged compliance concerns regarding the approximately €31 million in transactions processed through Defendant Azzato's entities via Worldline, identifying potential underage listings on Eros. The same card networks identified the same compliance failures on both platforms, years apart.

### *F. Congressional Investigation and Federal Enforcement*

532. The United States Senate Permanent Subcommittee on Investigations conducted a multi-year investigation into online sex trafficking facilitation, culminating in a January 2017 Staff Report titled "Backpage.com's Knowing Facilitation of Online Sex Trafficking." The report documented the methods by which Backpage's operators facilitated sex trafficking while evading law enforcement detection.

533. Upon information and belief, Defendant Azzato is an executive within the Eros network, and the network uses offshore corporate vehicles to process payments and obscure beneficial ownership.

534. The Eros network's relocation of corporate assets and payment processing to Malta, Cyprus, Nevis, and Switzerland, contemporaneous with the 2018 Backpage prosecution

and following the 2016 dissolution of Darkside Productions, was a coordinated restructuring designed to frustrate law enforcement investigation and asset seizure.

### *G. The Bolma Star Raid and Non-Prosecution*

535. The Department of Justice brought at least eleven criminal cases against trafficking platform operators between 2014 and 2020, resulting in the seizure and permanent takedown of Backpage.com, Rentboy.com, TheReviewBoard.com, MyRedbook.com, and CityVibe.com, among others. The Government Accountability Office documented this pattern in GAO-21-385, "Sex Trafficking: Online Platforms and Federal Prosecutions" (June 2021). In each comparable case, federal authorities seized the platform, arrested operators, filed charges, and disabled the website.

536. On November 7, 2017, Homeland Security Investigations ("HSI") agents raided Defendant Bolma Star Services in Youngsville, North Carolina, and seized the Eros network's entire server infrastructure. No charges were filed. No arrests were made. No domain was seized. Eros continued operating.

537. The raid occurred five months before the Federal Bureau of Investigation's April 6, 2018 seizure of Backpage.com. The government thus held Eros's complete server infrastructure — client identity data, provider identity data verified through identification documents, transaction records, and communications — before it acted against Backpage. A separate prosecution in the Southern District of New York, United States v. Paulin, No. 1:19-mj-08489 (S.D.N.Y. Sept. 11, 2019) (the "Flawless Escorts" case), confirmed that Eros was used to facilitate sex trafficking, yet no charges were brought against the platform. The Wall Street Journal reported in September 2019 that the Department of Homeland Security and the Department of Justice were investigating Eros,

Rubmaps, and EroticMonkey for trafficking, prostitution, and money laundering. That investigation has produced no prosecution.

538. In February 2018, between the Bolma Star raid and the Backpage takedown, Defendant Etkin joined Defendant Gavin Law Offices PLC, the firm of Pamela C. Gavin. Gavin Law Offices PLC has represented the Eros entities since February 2005, and Ms. Gavin served as correspondent attorney before the United States Patent and Trademark Office on the Eros marks. The firm's office is in Henrico County, Virginia (¶ 85), within the Eastern District of Virginia (28 U.S.C. § 127(a)). In the ensuing period the United States Attorney for that district was G. Zachary Terwilliger, from May 25, 2018 until January 15, 2021, and then Jessica D. Aber, from October 12, 2021 until January 20, 2025.

538A. During Ms. Aber's tenure, her office showed that it could reach conduct that was years old and a defendant who was abroad. In *United States v. Cohen*, No. 1:16-cr-114 (E.D. Va.), a case filed in May 2016 over a scheme that ran from about 2011 through December 2013, the office, working with the Human Rights and Special Prosecutions Section of the Department of Justice's Criminal Division and the Washington Field Office of Homeland Security Investigations, obtained the defendant's extradition from Israel in August 2023, his guilty plea on November 7, 2023 to conspiracy to commit offenses against the United States and conspiracy to launder money, and his sentence of two years in prison on January 19, 2024. According to the Department of Justice's announcements of August 4, 2023, November 7, 2023 and January 19, 2024, the scheme recruited Israeli citizens, obtained visitor visas for them by misrepresenting the purpose of their travel, employed them at kiosks in shopping malls in Virginia and Maryland, and paid them in cash or through stored value payment cards. Plaintiff pleads that case to show the office's capacity; she does not allege that it concerned Eros.

538B. Plaintiff has found no public record of any charge filed in the Eastern District of Virginia against Eros, Defendant Gavin Law Offices PLC, Defendant Etkin, or any other Eros Network Defendant, under either of those United States Attorneys or at any other time in the nine years since the seizure of November 7, 2017 (¶ 536). Upon information and belief, that absence did not result from any want of venue, evidence or capacity.

### *H. Sealed Federal Proceedings*

539. Upon information and belief, Defendant Huling is the subject of sealed federal proceedings, the existence of which is documented in publicly available court records referencing sealed matters involving individuals connected to online commercial sex advertising platforms. The search warrant for the Bolma Star raid has remained sealed for more than eight years.

### *I. Sovereign Capital*

540. Upon information and belief, the Eros network's financial architecture intersects with investment vehicles and sovereign wealth structures in the United Arab Emirates, where Defendant Azzato maintains substantial contacts, including entities associated with Defendant Mubadala Investment Company.

### *J. Concealment*

541. The Eros Network Defendants concealed the network's operations through the dissolution of Darkside Productions in 2016; the establishment of offshore structures in Cyprus, Malta, and Nevis; the use of professional nominee directors; and the distribution of key operators across jurisdictions to complicate service of process and enforcement of judgments.

542. The Cassandra Doved Simon Irrevocable Trust, established in Nevis and connected to Defendant Toplin, exemplifies the network's asset protection. Nevis does not recognize foreign judgments and imposes substantial procedural barriers to asset recovery.

543. Upon information and belief, the Eros Network Defendants have destroyed, altered, or concealed corporate records, communications, and financial documents, including in connection with the 2016 dissolution of Darkside Productions and the offshore migration of corporate operations.

### *K. Continuing Operation*

544. Eros continues to operate as of the filing of this Complaint and continues to host commercial sex advertisements. Plaintiff's images, personal information, and trafficking history may remain accessible through the platform or its archived content.

### *L. Individual Roles*

545. Defendant Azzato directed the network's operations, managed its offshore corporate structures, and oversaw payment processing through Malta-registered Wiretech Services Ltd. and Cyprus-registered Kuil Limited, serving as shareholder, director, legal representative, and judicial representative of Wiretech. Upon information and belief, Defendant Azzato was convicted in France in 2011 of profiting from prostitution.

546. Defendant Mayo, as founder of Defendant Darkside Productions, Inc., established the corporate structure that evolved into the offshore network, and maintained connections to Group Kaitu LLC and professional relationships with Defendants Etkin and Toplin after the 2016 dissolution. Defendant Group Kaitu LLC registered the mark EROS SHEMALES with the United

States Patent and Trademark Office, Registration No. 3,895,772, issued December 28, 2010, and, upon information and belief, holds the intellectual property of the Eros platform.

547. Upon information and belief, Defendant Toplin is the beneficiary of the Nevis trust and is connected to Cyprus-registered Ericius Investments through nominee director Serkei Papaian, the same nominee who connects Defendant Azzato's entities.

548. Upon information and belief, Defendant Huling participated in the network's operations.

549. Defendant Etkin, as President of Defendant Darkside Productions and an attorney licensed in North Carolina and Texas, provided the professional services on which the network's corporate structuring and offshore migration depended.

### *M. The Department of Homeland Security's Knowledge*

550. During her tenure as Secretary of Homeland Security, Defendant Kristi Noem held supervisory authority over HSI, the agency that conducted the November 7, 2017 raid and holds the seized Bolma Star evidence. The Department's knowledge of the Eros network's facilitation of trafficking rested on: (a) the 2017 raid and seizure; (b) the 2019 Flawless Escorts prosecution; (c) the September 2019 report that the Department and the Department of Justice were investigating Eros; (d) Defendant Azzato's 2011 French conviction (¶ 545); and (e) the 2024 LegitScript report and European Investigative Collaborations investigation documenting the Azzato shell company architecture.

551. Thirty United States Senators wrote to Defendant Noem warning that HSI agents "have been pulled off complex cases mid-investigation — cases involving child exploitation, drug trafficking, sanctions evasion." During the same period, Defendant Noem publicly touted the

distribution of the Backpage forfeiture recovery to victims (January 2026), while Eros, whose servers her agency had seized, continued to operate.

551A. During Defendant Noem's tenure as Secretary of Homeland Security, the Department sent Immigration and Customs Enforcement agents into Chicago. The operation terrorized people in Chicago, Plaintiff among them.

### *N. Discovery of the Eros Network Defendants*

552. Plaintiff did not discover, and could not reasonably have discovered, the identity of the Eros Network Defendants or their connection to her trafficking until investigation conducted after October 2025. Her complaint in the 2025 Action, filed April 1, 2025, and her amended complaint, filed August 15, 2025, named none of them.

553. The network's offshore concealment — nominee directors, multi-jurisdictional corporate layering, and secrecy-jurisdiction trusts — prevented earlier discovery, as did Plaintiff's institutionalization during the settlement period and her disability-related limitations. None of the Eros Network Defendants is a party to the Agreement.

### *O. Defendant Trump's Escort-Service Trademarks and the Trump Tower Enterprise*

553A. In April 2016, while he was a candidate for President, lawyers in China acting for Defendant Trump applied to China's Trademark Office for thirty-eight trademarks. China's Trademark Office published preliminary approvals of all thirty-eight on February 27 and March 6, 2017, the second date forty-five days after his inauguration on January 20, 2017, as the Associated Press reported on March 8, 2017.

553B. The filing lists "escort service," "body guard," and "social escort," among other services. Thirty-five of the thirty-eight marks are in Defendant Trump's own name. The other three are registered in the name of DTTM Operations LLC, a Delaware company.

553C. Dan Plane, a director of Simone IP Services, an intellectual property consultancy in Hong Kong, said he had never seen so many applications approved so expeditiously. Richard Painter, formerly chief ethics lawyer to President George W. Bush, said the volume of new approvals raised red flags.

553D. Defendant Trump thus obtained from a foreign government preliminary approval of trademarks covering escort services, in his own name and through a Delaware company. During his first term, when the November 7, 2017 raid occurred, and during his present term, the Executive Branch has held the evidence seized in that raid and, upon information and belief, has brought no prosecution of any operator of Eros. By Executive Order 14168, he withdrew federal recognition from the transgender persons whom Eros marketed under its registered mark EROS SHEMALES, as alleged in Paragraph 546.

553E. Defendant Group Kaitu LLC, which registered the Eros marks, is organized in California and Delaware, as alleged in Paragraph 104. DTTM Operations LLC, which holds Trump trademarks, is likewise a Delaware company.

553F. In April 2013, the United States Attorney for the Southern District of New York charged the leaders and members of a criminal enterprise called the Taiwanchik-Trincher Organization. Anatoly Golubchik and Vadim Trincher each pleaded guilty to conspiring to commit racketeering, and in April 2014 each was sentenced to five years in prison. According to the United States Attorney, between 2006 and April 2012 the enterprise laundered approximately $100 million in gambling proceeds through shell companies and bank accounts in Cyprus, and it

operated under the protection of Alimzhan Tokhtakhunov, who was then a fugitive. Upon information and belief, the enterprise operated from Unit 63A of Trump Tower in New York.

553G. Anatoly Machulsky, a founder of the Russian bookmaker Fonbet, sent $192,000 to Golubchik in 2010 from a personal account at the Lithuanian bank Ukio Bankas, as the Organized Crime and Corruption Reporting Project reported on June 16, 2020. Serkei Papaian served as a director or officer of Fortune Entertainment RG Limited, Fonbet's corporate vehicle, and of Ericius Investments Limited. Ericius Investments Limited shares Cyprus secretarial firms and nominee directors with the entities that operate Eros, as alleged in Paragraphs 517, 518, 545, and 547. Upon information and belief, the Eros operating entities thereby share Cyprus corporate infrastructure with entities tied to the enterprise described in Paragraph 553F.

## IX. STATEMENT OF FACTS — FINANCIAL SURVEILLANCE AND DEBANKING

### *A. March 2024: Account Credentials and the Unauthorized Inquiry*

554. On February 6, 2024, Defendant A. Peterson co-signed an automobile loan for Plaintiff through a joint Bridgecrest account, for a 2019 GMC Terrain purchased from Carvana for $26,247.40, creating a permanent link between his credit file and hers. In the Prior Agreement, six weeks later, he undertook to pay $20,899.88 to that loan, and on March 20, 2024, he paid it off for $20,757.40 (¶ 249). 2025 Action, Dkt. 39 at PageID 560, 574.

555. On March 2, 2024, Defendant A. Peterson recommended Huntington Bank to Plaintiff, telling her he had banked there "since I was 18."

556. On March 10, 2024, at 11:42 a.m., Defendant A. Peterson obtained Plaintiff's bank account number from her by text message. At 11:56 a.m. the same day, he obtained her online banking login credentials.

557. On March 12, 2024, at 10:26 a.m., Defendant A. Peterson wrote to Plaintiff that a $5,000 wire transfer "has been started." Six minutes later, at 10:32 a.m., he wrote that he needed to "take a step back" from their relationship. Plaintiff's Huntington statement records that transfer, on March 12, 2024, as an "INTERNAL WIRE TRANSFER CREDIT" of $5,000.

558. Plaintiff's message record with Defendant A. Peterson for March 10 through 14, 2024 shows 173, 84, 79, 0, and 1 messages, respectively. On March 13, 2024 — the one day of the period with no messages at all — Defendant TransUnion LLC ("TransUnion"), on behalf of Defendant Ally Bank ("Ally"), accessed Plaintiff's consumer file. Plaintiff had no account or application with Ally and did not authorize the inquiry.

559. On March 25, 2024, Defendant Huntington Bancshares Incorporated, doing business as Huntington Bank ("Huntington"), made an inquiry into Plaintiff's TransUnion file.

### *B. Debanking*

560. On November 2, 2024, Defendant JPMorgan Chase Bank, N.A. ("Chase") made a card inquiry into Plaintiff's consumer file, in the period in which Chase closed her accounts.

561. On January 15, 2025, Huntington closed Plaintiff's accounts. Defendant Lauren Davis, an officer of Huntington, serves on the Executive Committee of Defendant The Right Place, Inc., on whose board Defendant DeWaard sits.

562. The closures left Plaintiff without a bank account in the period in which she prepared and filed the 2025 Action.

### *C. Discovery of the March 13, 2024 Inquiry*

563. Plaintiff discovered the March 13, 2024 inquiry on May 9, 2026, when she obtained her consumer report and score disclosure from Defendant ChexSystems. The inquiry was not disclosed on the consumer reports otherwise available to her.

564. ChexSystems scored Plaintiff 635 of a possible 899, with inquiry-related reason codes among the factors depressing the score. A depressed ChexSystems score excludes a consumer from opening deposit accounts at participating banks.

565. After Plaintiff sought her file and the source of the inquiry, TransUnion blocked her access to her own file.

### *D. Ownership of the Inquiry Chain*

566. ChexSystems is owned by Fidelity National Information Services, Inc. ("FIS"). In a letter dated March 6, 2025, United States Senators Andy Kim and Elizabeth Warren wrote to ChexSystems that its "parent company, FIS, has estimated that 5% of applicants cannot qualify for an account at all."

567. According to its filings with the Securities and Exchange Commission, Defendant BlackRock, Inc. holds 9.6 percent of TransUnion (18,630,274 shares, Schedule 13G/A dated October 17, 2025) and 7.4 percent of FIS (38,938,367 shares, Schedule 13G/A dated April 17, 2025), and upon information and belief approximately 8.3 percent of Ally.

568. Defendant JPMorgan Chase & Co. held 54,783,378 shares of FIS as of June 2025, the second-largest position, and is a co-owner of Early Warning Services, LLC, which operates a deposit-account screening network parallel to ChexSystems.

569. Ally is the former General Motors Acceptance Corporation. Defendant DeWaard served on the General Motors monitorship team, and Varnum LLP represents Defendant General Motors LLC.

***E. The Navy Federal Cascade***

570. The $25,000 settlement payment was made to Plaintiff's account at Defendant Navy Federal Credit Union ("Navy Federal"), whose number Defendant A. Peterson later filed on the public docket, as alleged in Section III.

571. In January 2026, Plaintiff disputed a lodging-tax charge by the extended-stay hotel where she was living. Stays of more than thirty days are exempt from that tax. Navy Federal reversed the provisional credit it had extended on the dispute, driving her account negative.

572. Navy Federal then charged Plaintiff overdraft fees totaling $460 in the year to date, including $260 in thirteen $20 charges between March 10 and April 9, 2026, and froze the account at a balance of approximately negative $2,349.38.

573. On June 15, 2026, Navy Federal declined to open an account for Plaintiff because of that overdraft, then opened a new account for her the same morning and prompted her to activate a card. Plaintiff made a deposit at a branch that afternoon and received a welcome e-mail on June 16. At 3:34 a.m. Central time on June 17, 2026 — the day after Defendants' June 16 sealing motion — Navy Federal debited $2,349.38 from the new account as a "Transfer To Other" and applied it to the old, overdrawn account, bringing that account to zero and leaving Plaintiff $94.99. Plaintiff invoked the Trafficking Victims Protection Act and the Americans with Disabilities Act by telephone; both were refused.

574. The assault on Plaintiff at the same hotel on January 23–24, 2026, alleged in Section IV, preceded the cascade. Plaintiff was evicted, spent approximately one month on the street, lost her debit card, and was left without any bank account.

575. In February 2025, Defendant Russell Vought, as Acting Director of Defendant Consumer Financial Protection Bureau, ordered the Bureau's staff to stop work. On March 28, 2025, the United States District Court for the District of Columbia entered a preliminary injunction keeping the Bureau in existence while the case is decided. *National Treasury Employees Union v. Vought*, No. 1:25-cv-00381 (D.D.C.). The injunction has been stayed in part on appeal, and the appeal is pending before the full United States Court of Appeals for the District of Columbia Circuit, No. 25-5091. The Bureau is the federal agency that receives consumer complaints against banks, credit unions and consumer reporting agencies, including Defendants TransUnion LLC, Ally Bank, ChexSystems and Navy Federal Credit Union.

575A. The Bureau also issued, and is charged with enforcing, the rule that implements the Debt Bondage Repair Act, Section 6102 of the National Defense Authorization Act for Fiscal Year 2022, Pub. L. 117-81, which added Section 605C to the Fair Credit Reporting Act, 15 U.S.C. § 1681c-3. Under that section and the rule, 12 C.F.R. § 1022.142, effective July 25, 2022, a consumer reporting agency may not furnish a consumer report containing any adverse item of information that resulted from a severe form of trafficking in persons or sex trafficking, once the consumer has provided trafficking documentation.

575B. Upon information and belief, during Defendant Vought's tenure as Acting Director the Bureau dismissed or rolled back 42 enforcement actions. Plaintiff alleges that the stop-work order and those dismissals disabled the enforcement of the rights Congress gave trafficking survivors in the consumer-reporting system, and that Defendant Vought is the

centerpiece of the barring of trafficking rights and government remedies, along with Defendant Miller.

### *F. Impact on Plaintiff*

576. As a direct and proximate result of the conduct alleged in this Section, Plaintiff has suffered and continues to suffer:

(a) the unauthorized access to her consumer file and the use of her financial condition by those adverse to her;

(b) the closure of her accounts and her exclusion from the banking system;

(c) overdraft fees, a frozen account, and the loss of access to her settlement funds;

(d) homelessness following the loss of her account; and

(e) severe emotional distress, including exacerbation of her C-PTSD and related conditions.

## X. STATEMENT OF FACTS — THE EPSTEIN FINANCIAL ARCHITECTURE AND DEPARTMENT OF JUSTICE SUPPRESSION

### *A. The Estate of Jeffrey Epstein*

577. Jeffrey Edward Epstein died on August 10, 2019, at the Metropolitan Correctional Center in New York. Defendant Estate of Jeffrey Epstein (the "Epstein Estate") is administered in the United States Virgin Islands; its co-executors are Darren K. Indyke and Richard D. Kahn. The Epstein Victims' Compensation Program distributed more than $121 million to claimants, and the Estate resolved the Virgin Islands' enforcement action for $105 million.

578. Epstein was convicted of a sex offense in Palm Beach County, Florida, in 2008, following a federal non-prosecution agreement executed in September 2007 by the United States Attorney for the Southern District of Florida. He operated through shell entities including Southern Trust Company, Inc. and Financial Trust Company, Inc., both incorporated in the Virgin Islands.

***B. The Black—Epstein Payments***

579. Between 2012 and 2017, Defendant Leon Black, co-founder and former chief executive officer of Defendant Apollo Global Management, Inc. ("Apollo"), paid Epstein approximately $158 million to $170 million through Epstein-controlled Virgin Islands entities. An independent review by Dechert LLP, filed with the Securities and Exchange Commission in January 2021, reported $158 million; the Senate Finance Committee, reviewing Treasury Department records, identified approximately $170 million.

580. In March 2025, the Senate Finance Committee reported that its staff had "uncovered new evidence, including through review of federal government records, indicating that money paid by Black to Epstein was used to finance Epstein's sex trafficking operations." Defendant Black paid $62.5 million to resolve the Virgin Islands' claims against him in January 2023.

581. In a letter to Defendant Black dated March 20, 2026 and released March 23, 2026, Senator Ron Wyden described payments to Epstein at approximately thirty times the rates paid to elite advisers; $10 million routed through a charitable foundation in Epstein's name; payments to women characterized as gifts; and surveillance of women by Epstein and Brad Karp, then chairman of Paul, Weiss, through Nardello & Co.

582. Records released by the Department of Justice reflect that in November 2012, Financial Trust Company, Inc., with Epstein as its president, sold to Black Family Partners, L.P., signing through Defendant Black, its shares of Environmental Solutions Worldwide, Inc. and its entire 40 percent interest in AP SHL Investors, LLC, a co-investment vehicle of Apollo's partners. The same records reflect at least five meetings between Epstein and Marc Rowan, Apollo's current chief executive officer, between 2013 and 2016.

583. On April 29, 2026, a securities action, *Perez v. Apollo Global Management, Inc.*, No. 1:26-cv-03550 (S.D.N.Y.), was filed against Apollo, Marc Rowan, and Defendant Black under the Securities Exchange Act. On August 6, 2026, it was consolidated into *Feldman v. Apollo Global Management, Inc.*, No. 1:26-cv-01692 (S.D.N.Y.), which remains pending.

583A. Forbes estimated Defendant Black's net worth at $8.7 billion in September 2020, at $14.9 billion as of March 7, 2025, and at $13.8 billion as of October 15, 2026. Forbes estimated the net worth of Les Wexner, the founder of L Brands, who stepped down from its leadership amid controversy over his close relationship with Epstein, at $6.3 billion in August 2024 and at $10.1 billion on July 10, 2025, when it reported that he "has more than doubled his fortune."

***C. Abu Dhabi Capital and the Peterson Acquisition***

584. In July 2007, two months before Epstein's non-prosecution agreement was executed, the Abu Dhabi Investment Authority purchased approximately nine percent of Apollo for $600 million through APOC Holdings Ltd., a Cayman Islands entity. The transaction closed on August 8, 2007.

585. In February 2020 Defendant Mubadala Investment Company, a separate sovereign fund of the Government of Abu Dhabi, acquired the Peterson Farms enterprise through

MIC Capital Partners III, a $1.6 billion fund managed by Defendant Mubadala Capital in which Defendant BlackRock, Inc. is a limited partner.

585A. Defendant Mubadala Capital announced the final close of MIC Capital Partners III on August 17, 2021, with total commitments of $1.6 billion, and identified Peterson Farms as one of the fund's nine investments. Six days earlier, on August 11, 2021, it announced that a consortium led by the Secondaries and Liquidity Solutions team of Defendant BlackRock, Inc. had invested in a portfolio of assets managed by Mubadala Capital and had committed $400 million to that fund. A registration statement filed with the Securities and Exchange Commission on July 26, 2021 by Blue Whale Acquisition Corp I, whose sponsor is affiliated with Mubadala Capital, states that Defendant Adib Mattar, who heads private equity at Mubadala Capital and sits on its investment committee, "is also a member of the Board of REEF Technology, The Raine Group and Peterson Farms." Defendant A. Peterson told Plaintiff that he was upset that information about the United Arab Emirates investment and capital agreement with Peterson Farms had been publicly disclosed.

586. Michigan public money is invested beside that fund and its sponsors: Michigan Community Capital is a limited partner in MIC Capital Partners III; Michigan's public pension systems have committed approximately $2 billion to Apollo Global Management vehicles since 2013; and the Michigan State Retirement System reported an $8.7 million position in Defendant Ares Management Corporation as of the fourth quarter of 2025.

587. Mubadala and Apollo maintain a multi-billion-dollar co-investment partnership launched in 2020. In September 2024, Defendant Black registered a family office in the Abu Dhabi Global Market.

### *D. Defendants Staley and JPMorgan Chase & Co.*

588. Defendant Jes Staley, former chief executive officer of Defendant Barclays PLC and, before that, a senior executive of Defendant JPMorgan Chase & Co. ("JPMorgan"), exchanged more than one thousand e-mails with Epstein and has been barred by the United Kingdom's Financial Conduct Authority from senior management in financial services (¶ 172).

589. JPMorgan paid approximately $365 million to resolve claims by Epstein's victims and by the Virgin Islands arising from its banking relationship with Epstein.

590. By letters of March 11 and June 16, 2025, the ranking member of the Senate Committee on Finance asked the Secretary of the Treasury for the Treasury Department's records of Epstein's bank transactions, which reflect more than 4,725 wire transfers totaling $1.08 billion in and out of his JPMorgan accounts. The Treasury Department declined by letters of April 30 and July 2, 2025, and he renewed the request on September 2, 2025.

### *E. The Department of Justice*

591. On July 16, 2025, the Department of Justice terminated Maurene Comey, the Assistant United States Attorney who had prosecuted Epstein and Ghislaine Maxwell.

592. On July 24 and 25, 2025, then-Deputy Attorney General Todd Blanche interviewed Ghislaine Maxwell for approximately nine hours. On August 1, 2025, Maxwell was transferred to Federal Prison Camp Bryan.

593. During the same period, the Department's Public Integrity Section was reduced from approximately thirty-six attorneys to two.

594. On December 19, 2025, the Department released a first portion of its Epstein records. On January 30, 2026, it released more than three million additional pages and, upon

information and belief, redacted or withheld more than 200,000 pages on deliberative-process, work-product, and attorney-client grounds.

595. Defendant Pamela Bondi was removed as Attorney General on April 2, 2026, and Defendant Blanche became Acting Attorney General; the Senate confirmed him as Attorney General on August 8, 2026.

596. Upon information and belief, Defendant Howard Lutnick, Secretary of Commerce and former chief executive officer of Defendant Cantor Fitzgerald, L.P., appears in more than 250 documents in the Department's Epstein records and visited Epstein's private island. Upon information and belief, at his confirmation Defendant Lutnick described his ties to Epstein to Congress as "meaningless," and reporting published May 15, 2026 from the Department's released records identified continuing financial interests of his connected to those records.

596A. The flight logs kept by Epstein's pilot David Rodgers, admitted as trial exhibits in *United States v. Maxwell*, No. 20-cr-330 (S.D.N.Y.), record Defendant Trump as a passenger on Epstein's aircraft on approximately seven flights between 1993 and 1997, among them flights on October 11 and October 17, 1993, May 15, 1994, August 13, 1995, and January 5, 1997.

596B. Epstein's contact book, compiled by his staff, contains entries for Defendant Trump with multiple telephone numbers.

596C. On September 8, 2025, the Committee on Oversight and Government Reform of the House of Representatives released a book compiled for Epstein's fiftieth birthday in 2003, titled "The First Fifty Years." It contains a letter attributed to Defendant Trump, signed "Donald," that closes: "may every day be another wonderful secret." Defendant Trump disputes the letter's authenticity.

596D. On November 12, 2025, the Committee released records produced by Epstein's estate. They include an April 2, 2011 e-mail from Epstein to Ghislaine Maxwell stating "that dog that hasn't barked is trump," and a 2019 e-mail from Epstein to the author Michael Wolff stating that Defendant Trump "knew about the girls."

596E. A Federal Bureau of Investigation summary of its 2019 interview of Michael Reiter, the former Chief of the Palm Beach Police Department, recounts that Defendant Trump telephoned him in 2006 and said that he had once been around Epstein when teenagers were present and "got the hell out of there."

596F. The acts of the Department of Justice alleged in Paragraphs 591 through 595 took place during Defendant Trump's present term, within the Executive Branch he heads. The Epstein records at issue include records that name him, as alleged in Paragraphs 596A through 596E.

596G. The Secretary of the Treasury has not produced to the Senate Committee on Finance the Suspicious Activity Reports concerning Epstein's accounts that the Committee's ranking member requested by letters of March 11, June 16, and September 2, 2025.

597. As alleged in Section V, Plaintiff's own reports of her trafficking to the Department of Justice, including to its Civil Rights Division and to the United States Attorney for this District, produced no investigation.

598. On August 3, 2016, Donald Trump Jr. met at Trump Tower with Erik Prince, Joel Zamel and George Nader, and Defendant Stephen Miller was in Donald Trump Jr.'s office, as The New York Times reported on May 19, 2018.

599. On January 22, 2026, Defendant Jared Kushner and Steve Witkoff met at the Kremlin with Vladimir Putin, in a meeting in which Kirill Dmitriev took part, as the Russian state news agency TASS reported.

### *F. Discovery*

600. Plaintiff discovered the connection between the Black—Epstein payments, the Abu Dhabi capital behind Apollo, and the acquisition of the Peterson Farms enterprise in March 2026, and filed notice of it in the 2025 Action on April 8, 2026. 2025 Action, Dkt. 74. Plaintiff did not participate in the Epstein Victims' Compensation Program.

## XI. STATEMENT OF FACTS — PLATFORM WEAPONIZATION

### *A. Airbnb*

601. As alleged in Section III, Defendant A. Peterson housed Plaintiff in 2024 through Defendant Airbnb, Inc. ("Airbnb"). Using his "Airbnb for Work" business account and the e-mail address aaron@petersonfarmsinc.com, on the corporate domain associated with Defendant Peterson Farms Fresh, Inc., he acted as an authorized travel booker on Plaintiff's own Airbnb account under Airbnb's "Travel for Work" program, and he paid with his personal and work credit cards.

602. Through that account, Defendant A. Peterson represented to hosts that Plaintiff was a consultant on a business assignment, booked a six-month reservation for her in Grand Rapids, Michigan, for $12,186, and then moved her, by approximately March 1, 2024, to an Airbnb condominium in Grand Haven, Michigan, which she was required to leave by approximately April 1, 2024.

603. Because Defendant A. Peterson made the reservations as the authorized travel booker on her account, he — not Plaintiff — controlled the bookings, their duration, their termination, and the communications with hosts. Airbnb's platform recorded Plaintiff's location at each property and made it available to him.

604. The sexual assault of March 6, 2024, alleged in Section III, occurred at the Grand Haven property booked through his booker access to Plaintiff's Airbnb account.

605. Through Airbnb's "Travel for Work" program, Defendant A. Peterson represented that Plaintiff was his hired consultant, there for work. Airbnb's platform accepted that description of Plaintiff without any contact with her. On or about March 29, 2024, after Plaintiff confronted Defendant A. Peterson about the assault, he migrated the e-mail address on her Airbnb account and cut off her access to that housing and to the reservation itself, and Airbnb's platform permitted it.

### *B. Meta: "People You May Know"*

606. Defendant Meta Platforms, Inc. ("Meta") operates Facebook and Instagram. Their "People You May Know" and "Suggested for you" features generate suggestions based in part on accounts that have recently viewed the user's profile or are otherwise connected to the user's data.

607. The surveillance of Plaintiff's Facebook and Instagram accounts by Mark V. Peterson and Defendant Pini, disclosed to her through those features, is alleged in Section IV and incorporated here.

608. In or about August 2024, Plaintiff moved to DuPage County, Illinois, and registered her new residential address. Within approximately one month, persons who, according to their Facebook profiles, were connected to the Michigan motor vehicle agency began appearing

in her "People You May Know" suggestions, and she observed the patterns of physical surveillance at her residence.

609. Upon information and belief, Plaintiff's new residential address was obtained from motor vehicle records and used to locate and surveil her. Plaintiff left the DuPage County address approximately one month after moving there because of the surveillance.

### *C. Meta: Activity Received From Other Businesses, and Advertising Restrictions*

610. In June 2026, in the same period in which she began being tracked to Walmart (¶ 611), Plaintiff discovered in her Meta account settings that businesses had been sending Meta her activity. On June 14, 2026, between 8:12 and 8:19 a.m. Central time, she captured in screenshots the "Activity detail" page that Meta's Accounts Center showed for each of five businesses under "Your activity off Meta technologies." Each page stated that the business "has shared this activity with us using Meta Business Tools." The pages read: Walmart.com, "Received 6/7/2026," "8 interactions were shared with us"; Sequencing.com, "Received 6/8/2026," "102 interactions were shared with us"; Bolster Group, "Received 6/11/2026," "2 interactions were shared with us"; Experian, "Received 4/26/2026," "2 interactions were shared with us"; and Lyft, "Received 3/20/2026," "1 interaction was shared with us." On the Walmart.com page, Plaintiff used Meta's "Give feedback about this activity" option, and Meta displayed "Feedback sent." At 8:35 a.m. that morning, she captured Meta's own explanation: "When you visit a website or use an app, businesses or organizations can send information about your activity to us by using our business tools." The screenshots are attached as Exhibit 4.

611. The tracking, its discovery, and the events Plaintiff observed in Waukegan were compressed into a short period of about two weeks in June 2026. Meta received Walmart.com's activity on June 7, 2026, Sequencing.com's on June 8, 2026, and Bolster Group's on June 11,

2026, and Plaintiff captured the pages on June 14, 2026. During the same period Plaintiff was present in Waukegan, Illinois, near the Navy base, where she saw a federal van drive in quickly and observed suspicious actions by a worker.

612. The pages Plaintiff captured state how many interactions each business shared with Meta, but not what those interactions were. For Walmart.com, the page states only that "8 interactions were shared with us." At 8:35 a.m., Plaintiff also captured Meta's own definition of this activity: "Your activity off Meta technologies includes information that businesses and organizations send to us about your interactions with them. For example, your interactions could be visiting their website or using their app." On information and belief, Meta retains what Walmart.com shared about each of the eight interactions, and Plaintiff will seek it from Meta in discovery.

613. Plaintiff's June 14, 2026 captures are Meta's own records, displayed to Plaintiff in her Meta account settings. They differ in kind from the algorithmic suggestions alleged above (¶¶ 327–332), which show other people viewing Plaintiff's profiles. These pages show Meta itself receiving Plaintiff's activity from other businesses through Meta Business Tools, and they name each business, the date Meta received the activity, and the number of interactions shared.

614. On June 14, 2026, Plaintiff used the controls Meta provides. At 8:15 and 8:16 a.m., in Meta's form "Give feedback about this activity," she selected "Misusing my information." At 8:16 a.m., Meta told her, "You are disconnecting future activity from Experian," and stated: "We'll still receive activity from Experian. It may be used for measurement purposes and to make improvements to our ads systems, but it will be disconnected from your account." At 8:17 a.m., Meta displayed "Activity disconnected." At 8:33 a.m., Meta's "Manage future activity" page described "Connect future activity" with the words "This is your current experience," and Plaintiff

selected "Disconnect future activity." Meta again stated: "We'll still receive activity from apps and websites. It may be used for measurement purposes and to make improvements to our ads systems, but it will be disconnected from your account." At 8:37 a.m., Meta's "Activity from other businesses" page marked "Allow us to use this activity to show you content that's more relevant" as "Your current experience" and stated: "Businesses and organizations may still send us your activity, and we may anonymize it or use it to improve our products as described in our Privacy Policy."

615. Meta received the activity: each page states that the business "has shared this activity with us using Meta Business Tools." Meta's page "How is your activity used?" states: "We use your activity to show you things you might be interested in, like events you might want to go to. We also use your activity to show you relevant ads that introduce you to new products and services." Meta's page "How is your activity secured?" states: "We prohibit businesses or organizations to share sensitive information with us, such as health and financial information, your date of birth and passwords. We also require that businesses and organizations provide notice to people before using our business tools." Bolster Group, which shared two interactions, describes itself on its Facebook page as "Entertainment and culture marketing specialists" and lists an Australian telephone number. Two of the businesses work with the very categories of information Meta prohibits businesses from sharing: Sequencing.com, a DNA-testing company that sells health reports, shared 102 interactions, and Experian, a credit-reporting company, shared two; on information and belief, those interactions concern Plaintiff's health and financial information.

615A. Approximately five months before the filing of this Complaint, Experian signed Plaintiff up for a paid account without her permission, and it has been trying to bill her ever since.

616. Meta made Plaintiff specific promises about her data. On June 14, 2026, on its page "How is your activity secured?", Meta told Plaintiff: "We don't sell your information to anyone. We prohibit businesses or organizations to share sensitive information with us, such as health and financial information, your date of birth and passwords. We also require that businesses and organizations provide notice to people before using our business tools." These statements are part of the terms on which Meta holds Plaintiff's data.

617. Meta barred Plaintiff's organization from advertising and restricted Plaintiff's own account. The Facebook page of Interstate Citizenry Legal Innovation Hub ("ICLIH"), Plaintiff's organization, submitted a sponsored post announcing that Plaintiff had filed a formal complaint with the Department of Homeland Security. On April 7, 2026, Meta's ad center listed the ad's status as "Rejected" under the heading "Ad Can't Run: Edit Ad or Confirm Identity" and stated: "Your ad may have been rejected because it mentions politicians or is about sensitive social issues that could influence public opinion, how people vote and may impact the outcome of an election or pending legislation." On April 8, 2026, ICLIH's Facebook page displayed "Your Advertising Access is Restricted" and "You're not allowed to run ads." Two minutes later, Meta's account overview marked Plaintiff's own Facebook account "Account restricted."

## XII. CLASS ACTION ALLEGATIONS

### *A. The Proposed Class*

618. Plaintiff brings the claims identified below on behalf of herself and, pursuant to Federal Rule of Civil Procedure 23, on behalf of a proposed class defined as: all persons who were trafficked through the eros.com platform, or any area-specific site operated by the Eros Network, from November 7, 2017 through the date of class certification (the "Class"). November 7, 2017 is

the date on which Homeland Security Investigations executed a raid on Defendant Bolma Star Services in Youngsville, North Carolina, establishing governmental knowledge of the platform's facilitation of trafficking.

619. Excluded from the Class are Defendants, their officers, directors, employees, and immediate family members; any entity in which a Defendant has a controlling interest; and the judicial officers to whom this action is assigned and their immediate families.

620. Plaintiff reserves the right to amend the Class definition, and to propose subclasses, as discovery and the requirements of Rule 23 warrant.

***B. Rule 23(a)***

621. Numerosity. The Class is so numerous that joinder of all members is impracticable. Upon information and belief, the Class numbers in the thousands. The Eros Network has hosted hundreds of thousands of commercial sex advertisements across more than one hundred area-specific sites worldwide, and former employees have stated that everyone at the company knew it was selling sex.

622. Commonality. Questions of law and fact common to the Class include: (a) whether the Eros Network's continued operation after November 7, 2017 constitutes participation in a venture within the meaning of 18 U.S.C. § 1595(a); (b) whether the financial-infrastructure Defendants knowingly benefitted from that venture; (c) whether the non-prosecution of the Eros Network by the federal Defendants, and the transfer of enforcement resources away from platform-facilitated trafficking, constitutes conduct in furtherance of the enterprise alleged herein; (d) whether the Eros Network migrated its operations to the affiliated entities named in Tier 8A to

evade enforcement; and (e) the measure of damages recoverable by trafficking survivors from a platform and its financial facilitators.

623. Typicality. Plaintiff's claims are typical of the claims of the Class. They arise from the same platform facilitation, the same institutional protection, and the same non-prosecution that enabled harm to every Class member, and they rest on the same legal theories.

624. Adequacy. Plaintiff's interests are aligned with, and not antagonistic to, the interests of the Class. Plaintiff acknowledges that a litigant proceeding without counsel is generally not an adequate class representative. *Howard v. Pollard*, 814 F.3d 476, 478 (7th Cir. 2015) (per curiam). Plaintiff therefore does not seek to serve as class representative while unrepresented, does not move for certification at this time, and pleads these allegations to preserve the Class's claims. Plaintiff has sought and continues to seek counsel to represent the Class, and will move under Rule 23(g) for the appointment of class counsel before any motion for certification is presented.

***C. Rule 23(b)***

625. Certification is appropriate under Rule 23(b)(3). The common questions identified above predominate over any questions affecting only individual members, and class treatment is superior to other available methods for the fair and efficient adjudication of this controversy. The alternative, individual litigation by each trafficking survivor against an offshore enterprise protected by institutional non-prosecution, would impose insurmountable barriers on individual victims while permitting the enterprise to continue operating.

626. Certification is alternatively appropriate under Rule 23(b)(2) as to the declaratory and injunctive relief sought against the federal and platform Defendants, who have acted or refused to act on grounds that apply generally to the Class.

### *D. The Backpage Remission Model*

627. The Backpage Victim Remission Program, through which the United States is returning more than $200 million in forfeited Backpage assets to trafficking survivors, establishes that trafficking-platform victims are an identifiable and compensable class; that platform-level forfeiture and distribution is an administrable remedy; and that the United States recognizes the causal nexus between platform facilitation and victim harm. Plaintiff submitted a petition to the Backpage Victim Remission Program on March 31, 2026; on September 21, 2026, the Program confirmed that her petition remains in processing.

### *E. Reservation*

628. Plaintiff pleads every claim in this Complaint in her individual capacity in full. The class allegations in this Section are in addition to, and do not diminish, Plaintiff's individual claims, which stand regardless of whether a class is certified.

## XIII. CAUSES OF ACTION

### COUNT I — TRAFFICKING VICTIMS PROTECTION ACT: BENEFICIARY LIABILITY (18 U.S.C. §§ 1589(b), 1591(a)(2), 1595(a))

*(Against Defendants Peterson Farms Fresh, Inc., Peterson Brands, LLC, Lakewood Organics, LLC, and JVC Logistics, LLC, the Eros Network Defendants, Defendant Airbnb, Inc., and Defendant Estate of Jeffrey Epstein)*

629. Plaintiff incorporates the factual allegations of Section III, Section IV, Section VII, Section VIII, Section X, and Section XI.

630. Each Defendant named in this Count knowingly benefited, or attempted or conspired to benefit, financially and by receiving things of value, from participation in a venture that it knew or should have known engaged in forced labor and sex trafficking, including of Plaintiff: the Peterson entities through the corporate accounts, domains, and funds used to house and control her; the Eros Network Defendants through the revenue of the platform Defendant A. Peterson used to find and track her (¶¶ 524–525); Airbnb through booking revenue from the corporate account that controlled her housing; and the Epstein Estate through the payments alleged in Section X.

631. At the pleading stage, an allegation of a continuous business relationship between a defendant and the trafficking venture supports the inference that the defendant participated in the venture and facilitated its success; the defendant need not have taken part in the sex trafficking itself. *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544 (7th Cir. 2023). Each Defendant named in this Count maintained such a relationship.

632. To the extent any Defendant named in this Count claims the benefit of the release in Section 8 of the Agreement, Plaintiff alleges that the Agreement, including Section 8, is void as against public policy for the reasons stated in Count XV, and that its invalidity is an issue this Count requires the Court to decide.

633. Plaintiff is entitled under 18 U.S.C. § 1595(a) to recover damages, punitive damages, and her costs from each Defendant named in this Count.

**COUNT II — TRAFFICKING VICTIMS PROTECTION ACT: OBSTRUCTION**

**(18 U.S.C. §§ 1591(d), 1595(a))**

*(Against Defendants A. Peterson, Varnum LLP, Doyle, Youngdahl, Droppers, Missad, Tabet DiVito & Rothstein LLC, Grant, and Andreasen)*

634. Plaintiff incorporates the factual allegations of Section III, Section VI, and Section VII.

635. Defendants named in this Count obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1591, including by: (a) procuring an Agreement requiring Plaintiff to destroy, within two days and while the 2025 Action remained pending, all information relating to Defendant A. Peterson, and barring disclosure to law enforcement absent a written opinion of counsel and prior notice to him; (b) sealing her sworn account of the Agreement's formation while placing their characterization of her health on the public docket; and (c) bringing two actions in nine days, in forums the Agreement forbids, to enjoin her published reporting of the trafficking.

636. The obstruction alleged in subparagraph (a) of ¶ 635 consisted in procuring terms — Sections 1, 4, and 7 of the Agreement — that are void as against public policy because they condition payment on the destruction of evidence of federal crimes and bar their report to law enforcement (Count XV). Whether those terms are enforceable is an issue this Count requires the Court to decide: a term the law would enforce is not an obstruction of the enforcement of 18 U.S.C. § 1591; a term it will not enforce, procured for that purpose, is.

637. Defendants named in this Count further obstructed enforcement of 18 U.S.C. § 1591 by seeking, in the Federal Action, an injunction reaching Plaintiff's outreach to other

victims and her reporting on counsel, on the strength of a misstatement of the June 22, 2026 order, and by obtaining the sealing of Plaintiff's sworn account while leaving their own characterization of her on the public docket.

638. Plaintiff is a victim of these violations and is entitled under 18 U.S.C. § 1595(a) to recover damages, punitive damages, and her costs.

## **COUNT III — RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §§ 1962(c), 1964(c))**

*(Against Defendant A. Peterson, Defendants Peterson Farms Fresh, LLC, Peterson Farms Fresh, Inc., Peterson Farms, Inc., and Peterson Brands, LLC, and the Eros Network Defendants)*

639. Plaintiff incorporates the factual allegations of Section III, Section IV, Section VI, Section VIII, and Section IX.

640. Defendants named in this Count, together with others, constitute an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), whose activities affect interstate and foreign commerce: the trafficker, the corporate entities through which he housed, paid, and controlled his victims, the platform he used to find and track Plaintiff, and the counsel who secured and enforced their silence.

641. Each Defendant named in this Count conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and (5), consisting of related and continuous acts of: forced labor and sex trafficking (18 U.S.C. §§ 1589, 1591); tampering with a witness and victim, including by procuring the destruction of evidence and restricting her communication with law enforcement

(18 U.S.C. § 1512(b)); wire fraud, including the extraction of Plaintiff's banking credentials and the misrepresentations made to secure her housing (18 U.S.C. § 1343); and laundering of the proceeds of trafficking (18 U.S.C. § 1956).

642. Defendants and their counsel have done everything possible to avoid discovery and accountability, seeking suppression rather than the truth. Plaintiff alleges, as acts indictable under 18 U.S.C. § 1512(b)(2)(B) and (b)(3), and so racketeering activity under 18 U.S.C. § 1961(1)(B), that Defendant A. Peterson and the Peterson Entities, through counsel, corruptly persuaded or attempted to persuade her, by the Agreement effective October 10, 2025, to destroy within two days, while the 2025 Action was pending in this Court, the evidence of the trafficking, as a condition of her payment (Sections 1, 4), and to make no disclosure to law enforcement without a written opinion of counsel and prior notice to him (Section 7). The March 2024 Prior Agreement had made a like demand: destruction of texts and recordings within three days (Section 2).

643. Plaintiff further alleges that procuring that destruction requirement while the 2025 Action was pending was an act indictable under 18 U.S.C. § 1503, a corrupt endeavor to impede the due administration of justice in that action. The same suppression continued: on June 16, 2026, during her Rule 60(b) motion, these Defendants moved to seal her sworn account while filing their characterization of her health publicly (2025 Action, Dkt. 75); on July 20, 2026, Defendant A. Peterson noticed dismissal of the Federal Action a day before his deadline to substantiate jurisdiction (Federal Action, Dkts. 12, 17); and on July 22, 2026, he sued in Cook County to enjoin her reporting.

644. By reason of these violations, Plaintiff was injured in her business and property, including through the loss of the value of her claims in the 2025 Action, the loss of her bank

accounts and funds, fees and charges, and the loss of her housing and belongings, and is entitled under 18 U.S.C. § 1964(c) to threefold damages and her costs. Losses to business or property are recoverable under 18 U.S.C. § 1964(c) even when they follow from a personal injury. *Medical Marijuana, Inc. v. Horn*, 604 U.S. 593 (2025).

## COUNT IV — RICO CONSPIRACY (18 U.S.C. §§ 1962(d), 1964(c))

*(Against Defendants named in Count III, and Defendants Earl Peterson, Linda Peterson, Mark V. Peterson, Gabriela Peterson, Schlukebar, Raffaelli, Oceana County Freezer Storage, LLC, Peterson Technologies, LLC, JVC Enterprises, LLC, FFL Logistics, LLC, PFI Leverage Lender, LLC, Country Pure Foods, King Brands, LLC, Tropical Paradise, Cherry Technologies, Worldwide Trophy Adventures, LLC, PFI Holdco, LLC, PFI Upper Midco, LLC, PFI Lower Midco, LLC, Peterson Family Holdings, LLC, MIC CP Peterson Aggregator LP, AC Fresh Buyer, LLC, Oceana Acres LLC, GDS Holdings LLC, Northern Jet Management, Inc., PFC Holdings LLC, Mubadala Investment Company, MIC Capital Partners III, Mubadala Capital, BlackRock, Inc., Fink, Apollo Global Management, Inc., Leon Black, Mattar, Azam, MGX, Abu Dhabi Investment Authority, Leonard Green & Partners, L.P., Suer, Varnum LLP, Doyle, DeWaard, Chasteen, Roskam, Levan, Beswick, Kirkland & Ellis LLP, Covington & Burling LLP, Gavin Law Offices PLC, TKO Group Holdings, Inc., Endeavor Group Holdings, Inc., William Morris Endeavor Entertainment, LLC, Vince McMahon, Ares Management Corporation, Ressler, Arougheti, Miller, Johnson, Snell & Cummiskey, P.L.C., Kroninger, Agosta, Hackett, Darkside Productions, Inc., Intercorp Limited, SHL Group Limited, BBH Media Limited, CFS Sagl, DaslurServices AG, Shabel Services GmbH, Indigo Netherlands B.V., Capital Financial Services S.A., Oceana County Development Corporation, Burdette, Oceana County Economic Alliance, The Right Place, Inc., Thelen, Bumstead, VanderWall, Shelby Township, Hammoud, Michigan Bankers Association, Vanderberg, Washington, General Motors LLC, Murphy, JPMorgan Chase & Co., Dimon, Visa Inc., Mastercard Incorporated, Huntington Bancshares Incorporated, Lauren Davis, Constellis Holdings, LLC, Omniplex World Services Corporation, JPMorgan Chase Bank, N.A., Estate of Jeffrey Epstein, Jes Staley, Barclays PLC, Cantor Fitzgerald, L.P., Elysium Management LLC, Scimitar, Substack Inc., and Fortress Investment*

*Group LLC, and, in their individual capacities, Defendants Kristi Noem, Pamela Bondi, Linda McMahon, Russell Vought, Stephen Miller, Howard Lutnick, Benjamin Black, and Jared Kushner)*

645. Plaintiff incorporates the factual allegations of Section I, Section III, Section IV, Section V, Section VI, Section VII, Section VIII, Section IX, and Section X.

646. Each Defendant named in this Count knowingly agreed that a member of the conspiracy would conduct the affairs of the enterprise alleged in Count III through a pattern of racketeering activity, and agreed to facilitate that conduct, in violation of 18 U.S.C. § 1962(d). The facts alleged against each Defendant named in this Count include those stated in the paragraph of Section I that identifies that Defendant and in the paragraphs cited there.

647. Plaintiff was injured in her business and property by overt acts in furtherance of the conspiracy and is entitled under 18 U.S.C. § 1964(c) to threefold damages and her costs.

**COUNT V — CONSPIRACY TO DETER A PARTY FROM TESTIFYING FREELY, FULLY, AND TRUTHFULLY, AND TO INJURE HER FOR HAVING TESTIFIED (42 U.S.C. § 1985(2), FIRST CLAUSE)**

*(Against Defendants A. Peterson and Varnum LLP)*

648. Plaintiff incorporates the factual allegations of Section III and Section VI.

649. Plaintiff was a party and a witness in a court of the United States: the 2025 Action, No. 1:25-cv-03513, filed in this Court on April 1, 2025, in which she testified by sworn declarations, including those filed with her Rule 60(b) motion of February 27, 2026 and the supplemental declarations and notices she filed through April 2026 (2025 Action, Dkts. 62–69, 72 –74).

650. Defendant A. Peterson and Defendant Varnum LLP, acting through Defendants Doyle and Youngdahl, conspired to deter Plaintiff, by intimidation and threat, from testifying freely, fully, and truthfully in the 2025 Action, and to injure her in her person and property on account of her having attended that court and testified. The June 2024 threat letter (¶ 264) preceded the 2025 Action and is alleged as the first use of their method, not as an act under this Count.

651. In furtherance of the conspiracy, while the 2025 Action was pending, the conspirators procured the Agreement effective October 10, 2025 (¶¶ 274–281). Section 1 conditions the $25,000 payment on Plaintiff's compliance with Sections 2, 4, and 5. Section 2 requires a joint motion to seal the record and a stipulation of dismissal with prejudice within two days. Section 4 requires each party to "permanently destroy," within "two (2) days following the execution of this Agreement," all "Confidential Information," which "includes phone calls, videos, text messages, emails, photos or other recordings or videos related to, or referencing, Disclosing Party or the Parties," wherever stored. Section 7 permits disclosure only "to the extent that it is required by law," "as advised in writing by Receiving Party's counsel," and only after written notice to the other party and an opportunity for him to challenge the disclosure; it makes no exception for a report to law enforcement. The Agreement was presented to Plaintiff at Clayton House as a twenty-four-hour exploding offer while she was under twenty-four-hour supervised care and without counsel (¶ 275). Payment conditioned on the destruction of her evidence and on her silence toward law enforcement and this Court was a threat and an intimidation directed at her testimony.

652. In November 2025, Defendant Doyle e-mailed Plaintiff a revised sealing motion and told her that she was "obligated" to sign it (¶ 291).

653. After Plaintiff attended this Court and testified by her Rule 60(b) motion and the declarations that followed, the conspirators, on June 16, 2026, moved to seal her sworn account — more than one thousand pages — while placing her diagnoses, her clinical records, and a false accusation of a crime on the public docket, and recited her "renewed activity in this case" as the occasion for the motion (2025 Action, Dkt. 75; ¶¶ 288–292, 442–445).

654. On July 13, 2026, three weeks after the sealing order, Defendant A. Peterson, through Defendant Varnum LLP, sued Plaintiff in this Court to enforce the Agreement against her reporting, designating the action as related to the 2025 Action (Federal Action, Dkt. 2), filing her unredacted bank account number on the public docket, filing five certificates of "personal service" at an address counsel had reason to know was not hers, and seeking an injunction reaching her outreach to other victims and her reporting on counsel (¶¶ 293–294, 447–462). On July 20, 2026, one day before the deadline to substantiate this Court's jurisdiction, he dismissed that action without substantiating it, and on July 22, 2026 he refiled a substantially identical complaint in the Circuit Court of Cook County, a forum the Agreement forbids (¶¶ 456, 463–465). These acts were taken on account of Plaintiff's having attended this Court and testified in the 2025 Action; they were not genuine efforts to obtain judicial relief but instruments of the intimidation and retaliation alleged in this Count, and they continue.

655. Defendant Varnum LLP's acts were its own and went beyond legal representation: upon information and belief it drafted the destruction and disclosure terms of the Prior Agreement and of the Agreement (¶¶ 249, 274–281); it told Plaintiff she was "obligated" to sign a motion sealing her own sworn record; it signed and filed the June 16, 2026 motion; it filed the certificates of "personal service" at an address it had reason to know was not Plaintiff's; and it sued in forums the Agreement forbids.

656. As a direct and proximate result of overt acts in furtherance of the conspiracy, Plaintiff was injured in her person and property, including the burden and expense of defending two actions filed in nine days while displaced and without stable housing; the exposure of her diagnoses, her clinical records, and her bank account number on public dockets; the sealing of her own sworn account while Defendants' characterization of her remained public; and the exposure of the Cook County Action and its allegations to her readership through the means of service Defendants sought (¶ 483). Plaintiff is entitled under 42 U.S.C. § 1985(3) to recover her damages, including punitive damages, against any one or more of the conspirators, and her costs.

## COUNT VI — 42 U.S.C. § 1983: FIRST AMENDMENT RETALIATION AND FOURTEENTH AMENDMENT

*(Against Defendants Battle, Bingel, and Lerner in their individual capacities; Defendants City of Grand Rapids and Grand Rapids Police Department; Defendant Kent County Prosecutor's Office, for prospective relief only; Defendant Aetna Better Health of Illinois; and Defendants Nessel, Becker, Whitmer, Palepu, LaJoye-Young, and Rokita in their official capacities for prospective relief)*

657. Plaintiff incorporates the factual allegations of Section I, Section IV, Section V, Section VI, and Section VII.

658. Acting under color of state law, Defendants named in this Count retaliated against Plaintiff for protected speech and petitioning — her reports of trafficking and public corruption, her records requests, her civil rights complaint, and her federal action — by abandoning her investigation, obstructing and conditioning her records requests, dispatching police in response to her civil rights complaint and her demand not to be contacted, and conditioning her services on the

surrender of her location, and deprived her of the equal protection of the laws as a trafficking victim.

659. Aetna Better Health of Illinois acted under color of state law as the State's delegate in administering Plaintiff's Medicaid benefits and through joint action with state officers, and Defendant Lerner, as the medical director with authority over the functions through which Aetna Better Health of Illinois acted, took part in that conduct.

660. The conduct of the Grand Rapids Police Department alleged in Section V was taken pursuant to the policy, custom, and decisions of final policymakers of Defendant City of Grand Rapids. Defendants Grand Rapids Police Department and Kent County Prosecutor's Office, and the Michigan Department of Attorney General, are the offices through which Defendants Battle and Bingel, Defendant Becker, and Defendant Nessel acted. The declaratory and prospective injunctive relief sought in this Count concerning the Michigan Department of Attorney General, the Michigan Human Trafficking Commission, the Michigan Department of Treasury, the Michigan Economic Development Corporation, and the Indiana Department of Homeland Security, none of which is a party, is sought only against Defendants Nessel, Palepu, Whitmer, and Rokita in their official capacities.

661. Plaintiff is entitled to damages, punitive damages against the individual Defendants, and declaratory and prospective injunctive relief against the official-capacity Defendants.

## COUNT VII — ADMINISTRATIVE PROCEDURE ACT (5 U.S.C. §§ 702, 706)

*(Against Defendants United States Department of Homeland Security, United States Immigration and Customs Enforcement, United States Department of Justice, United States Department of Commerce, and Consumer Financial Protection Bureau, and Defendants Mullin, Blanche, and Pini in their official capacities)*

662. Plaintiff incorporates the factual allegations of Section I, Section IV, Section V, Section VIII, Section IX, and Section X.

663. The monitoring of Plaintiff by Department of Homeland Security personnel, and the Departments' treatment of her reports of trafficking, are agency action contrary to her constitutional rights within the meaning of 5 U.S.C. § 706(2)(B). Plaintiff seeks declaratory relief and an order that the Departments cease monitoring her and preserve all records concerning her, the Bolma Star Services investigation, and her reports.

663A. The stop-work order alleged in ¶ 575 was an express, agency-wide policy under which Defendant Consumer Financial Protection Bureau ceased to perform its statutory functions, including the enforcement of 15 U.S.C. § 1681c-3 and 12 C.F.R. § 1022.142 (¶ 575A). That policy was an abdication of the Bureau's statutory responsibilities and is agency action not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A). Plaintiff is a trafficking survivor whose access to banking was cut off through the consumer-reporting system, as alleged in Section IX. Plaintiff seeks declaratory relief and an order that the Bureau preserve all records concerning the stop-work order, the enforcement actions alleged in ¶ 575B, and the enforcement of 12 C.F.R. § 1022.142.

663B. As to Defendant United States Department of Commerce, Plaintiff seeks relief other than money damages: an order that it preserve all records of the United States Patent and Trademark Office concerning the marks alleged in ¶¶ 114 and 546.

## COUNT VIII — TITLE II OF THE AMERICANS WITH DISABILITIES ACT AND SECTION 504 OF THE REHABILITATION ACT (42 U.S.C. § 12132; 29 U.S.C. § 794)

*(Title II against Defendants State of Illinois and Illinois Department of Healthcare and Family Services; Section 504 against those Defendants and Defendants Aetna Better Health of Illinois, CVS Health Corporation, and Clayton Residential Homes, Inc.)*

664. Plaintiff incorporates the factual allegations of Section VII.

665. Plaintiff is a qualified individual with disabilities. By reason of her disabilities, Defendants named in this Count excluded her from participation in, denied her the benefits of, and subjected her to discrimination in their services, programs, and activities, including by unjustified isolation in institutional placements, conditioning services on disclosure of her location, responding to her civil rights complaint and her demand not to be contacted with police, attempting her involuntary commitment, discharging her into homelessness without her medications, delaying and blocking her prescription fills, and locking her into a managed care organization that has disclosed her health information after revocation.

666. Each Defendant named in the Section 504 claim receives federal financial assistance. Plaintiff is entitled to declaratory and injunctive relief, including placement in the most integrated setting appropriate to her needs, and to damages.

**COUNT IX — FAIR CREDIT REPORTING ACT (15 U.S.C. §§ 1681b(f), 1681e(a), 1681g, 1681n, 1681o)**

*(Against Defendants TransUnion LLC, Ally Bank, and ChexSystems)*

667. Plaintiff incorporates the factual allegations of Section IX.

668. Ally obtained and used Plaintiff's consumer report on March 13, 2024 without a permissible purpose; TransUnion furnished it without a permissible purpose and has refused Plaintiff disclosure of her file; and ChexSystems has reported and scored the unauthorized inquiry against her. Each acted willfully or, at minimum, negligently.

669. Plaintiff discovered the violation on May 9, 2026, and is entitled to actual damages, statutory damages, punitive damages, and her costs under 15 U.S.C. §§ 1681n and 1681o.

**COUNT X — ELECTRONIC FUND TRANSFER ACT AND REGULATION E (15 U.S.C. §§ 1693f, 1693m; 12 C.F.R. § 1005.11)**

*(Against Defendant Navy Federal Credit Union)*

670. Plaintiff incorporates the factual allegations of Section IX.E.

671. Plaintiff is a consumer, Navy Federal is a financial institution, and the account Navy Federal opened for Plaintiff on June 15, 2026 is an account, within the meaning of 15 U.S.C. § 1693a.

672. At 3:34 a.m. Central time on June 17, 2026, two days after the first deposit to that account, Navy Federal electronically debited $2,349.38 from it as a "Transfer To Other." Plaintiff

did not request or authorize the transfer and received no notice before it. Navy Federal's staff told her that "the system" had made the transfer and that an attempted reversal had "failed."

673. On June 17, 2026, Plaintiff notified Navy Federal of the error by telephone and through its online claim portal, identifying her account, the transfer, its amount, and why it was in error. The portal stated that a provisional credit would issue within ten days if she was eligible. Plaintiff also submitted a written complaint through Navy Federal's website, which went unanswered.

674. Navy Federal did not report the results of an investigation to Plaintiff within the time Regulation E allows, did not provisionally credit her account, and did not give her a written explanation of its findings.

675. Navy Federal thereby violated 15 U.S.C. § 1693f and 12 C.F.R. § 1005.11.

676. Plaintiff is entitled to her actual damages, statutory damages, costs and fees under 15 U.S.C. § 1693m(a), and to treble damages under 15 U.S.C. § 1693f(e), because Navy Federal did not provisionally recredit her account and did not investigate in good faith.

**COUNT XI — ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/2, 505/10a)**

*(Against Defendant Navy Federal Credit Union)*

677. Plaintiff incorporates the factual allegations of Section IX.E.

678. Plaintiff is a consumer, and Navy Federal's opening and handling of her account was conduct in trade or commerce, within the meaning of 815 ILCS 505/1. Plaintiff resided in Illinois when these events occurred.

679. On the morning of June 15, 2026, Navy Federal declined to open an account for Plaintiff because of the overdraft on her earlier account. At 10:53 a.m. the same morning it e-mailed her that a new account "has been established," and at 12:20 p.m. it e-mailed her: "Start Using Your Digital Debit Card Now." Navy Federal did not tell her that money she deposited in the new account would be taken to pay the negative balance on the old one.

680. Relying on those communications, Plaintiff deposited about $2,400 at a Navy Federal branch that afternoon.

681. At 3:34 a.m. Central time on June 17, 2026, Navy Federal took $2,349.38 of that deposit, the amount of the old negative balance, and left her $94.99.

682. Navy Federal's conduct was deceptive, because it concealed a material fact intending that Plaintiff rely on the concealment, and unfair, because it took nearly all the money of a disabled trafficking survivor who had no other bank account, and refused her requests under the Trafficking Victims Protection Act and the Americans with Disabilities Act.

683. Plaintiff suffered actual damage as a direct result and seeks actual damages, punitive damages, and injunctive relief under 815 ILCS 505/10a.

## COUNT XII — DRIVER'S PRIVACY PROTECTION ACT (18 U.S.C. § 2724)

*(Against Defendants Does 1 through 100)*

684. Plaintiff incorporates the factual allegations of Section XI.

685. Defendants Does 1 through 100 knowingly obtained, disclosed, and used personal information from Plaintiff's motor vehicle records, including her residential address, for a purpose not permitted under 18 U.S.C. § 2721(b): to locate and surveil her. Plaintiff is entitled to actual

damages, but not less than liquidated damages in the amount of $2,500, to punitive damages, and to her costs under 18 U.S.C. § 2724(b).

**COUNT XIII — WIRETAP ACT, ILLINOIS EAVESDROPPING ACT, AND INTRUSION UPON SECLUSION (18 U.S.C. §§ 2511(1)(a), 2520; 720 ILCS 5/14-2(a)(3), 5/14-6)**

*(Against Defendant Meta Platforms, Inc.)*

686. Plaintiff incorporates the factual allegations of Section XI.C.

687. Meta's own records, displayed to Plaintiff in her Meta account settings, state that five businesses sent Meta her activity through Meta Business Tools: Walmart.com, Sequencing.com, Bolster Group, Experian, and Lyft (¶¶ 610, 613). Meta describes that activity as "information that businesses and organizations send to us about your interactions with them," such as "visiting their website or using their app" (¶ 612).

688. On information and belief, those interactions were electronic communications between Plaintiff and those businesses, and what Meta received included their contents: Meta retains what Walmart.com shared about each of its eight interactions (¶ 612), and the interactions shared by Sequencing.com and Experian concern Plaintiff's health and financial information (¶ 615).

689. Meta was not a party to those communications. Plaintiff did not authorize Meta to receive them. She discovered that Meta was receiving them when she found Meta's own record of it in her account settings in June 2026 (¶ 610).

690. Wiretap Act. By means of Meta Business Tools, Meta intentionally intercepted, and procured those businesses to intercept, Plaintiff's electronic communications, in violation of 18 U.S.C. § 2511(1)(a).

691. Illinois Eavesdropping Act. Meta knowingly and intentionally intercepted and recorded, in a surreptitious manner, private electronic communications to which it was not a party, without the consent of all parties to them, in violation of 720 ILCS 5/14-2(a)(3). Plaintiff was present in Waukegan, Illinois, during the period in June 2026 in which Meta received that activity (¶ 611).

692. Intrusion upon seclusion. Meta intentionally intruded, without authorization, into Plaintiff's private affairs, including, on information and belief, her health and financial information (¶ 615). The intrusion would be highly offensive to a reasonable person. Meta itself states that it "prohibit[s] businesses or organizations to share sensitive information with us, such as health and financial information" (¶ 615). When Plaintiff used Meta's own controls to disconnect the activity, Meta told her: "We'll still receive activity from apps and websites." (¶ 614).

693. Plaintiff was injured by this conduct.

694. Plaintiff discovered Meta's conduct in June 2026 (¶ 610), and this Count is brought within two years of that discovery. 18 U.S.C. § 2520(e).

695. Plaintiff is entitled under 18 U.S.C. § 2520(b) and (c)(2) to equitable and declaratory relief; to her actual damages and any profits Meta made as a result of the violation, or to statutory damages of the greater of $100 a day for each day of violation or $10,000; to punitive damages; and to her litigation costs. She is entitled under 720 ILCS 5/14-6 to an injunction

prohibiting further eavesdropping, to her actual damages, and to punitive damages, and she is entitled to damages for the intrusion.

## COUNT XIV — BREACH OF CONTRACT AND PROMISSORY ESTOPPEL

*(Against Defendant Meta Platforms, Inc.)*

696. Plaintiff incorporates the factual allegations of Section XI.C.

697. Plaintiff holds an account with Meta (¶¶ 610, 617). Meta made Plaintiff the promises about her data quoted in ¶ 616, and those statements are part of the terms on which Meta holds Plaintiff's data.

698. Meta did not keep those promises. Meta received Plaintiff's activity from Sequencing.com, a DNA-testing company that sells health reports, and from Experian, a credit-reporting company. On information and belief, that activity concerns Plaintiff's health and financial information, which Meta states it prohibits businesses from sharing with it (¶ 615).

699. On April 7, 2026, Meta's ad center listed as "Rejected" the sponsored post of Plaintiff's organization, and on April 8, 2026, Meta restricted the organization's advertising access and marked Plaintiff's own Facebook account "Account restricted" (¶ 617). To the extent Meta's terms entitled Plaintiff to the use of her account and of Meta's advertising services, those restrictions breached them.

700. In the alternative under Fed. R. Civ. P. 8(d)(2), if Meta's statements are not terms of a contract, they were clear promises on which Meta should reasonably have expected Plaintiff to rely.

701. Plaintiff was damaged thereby and seeks her damages.

## COUNT XV — DECLARATORY JUDGMENT: THE AGREEMENT AND THE PRIOR AGREEMENT ARE VOID AND UNENFORCEABLE (28 U.S.C. § 2201)

*(Against Defendants A. Peterson, Peterson Farms Fresh, LLC, and Peterson Farms, Inc.)*

702. Plaintiff incorporates the factual allegations of Section III and Section VI.

703. An actual controversy exists: Defendant A. Peterson has sued in two forums to enforce the Agreement against Plaintiff's published reporting of her trafficking. The controversy reaches the Prior Agreement, which the Agreement recites that it restates and amends (¶ 251), and whose forum clause his counsel invoked against Plaintiff in the 2025 Action (¶ 271).

704. The Agreement's validity is also an element of Counts I, II, XVII, and XXV, each of which seeks damages and stands independently of this Count. The declaration sought here is in aid of those claims and of Plaintiff's defense of the Cook County Action; it is not a freestanding request.

705. The Agreement is void and unenforceable on its face as contrary to public policy, because: (a) Section 4 requires the destruction, within two days, of evidence of the trafficking while the 2025 Action remained pending; (b) Section 5(e) bars even true statements; (c) Section 7 bars disclosure to law enforcement absent a written opinion of counsel and prior notice to the trafficker, with no exception for reporting crimes; and (d) Section 2 recites the parties' agreement that good cause exists to seal the public record of a trafficking action. Section 1 conditions the entire settlement payment on compliance with Sections 2, 4, and 5.

706. The Prior Agreement is void and unenforceable as contrary to public policy for the same reason. Its Section 2 required the destruction, within three days, of texts and recordings that were evidence of the trafficking. Defendant A. Peterson himself proposed that term on March

17, 2024, as a "Mutual NDA, including destruction of all electronic communication, video, etc." (¶ 248).

707. The Confidentiality Obligations of the Prior Agreement (¶ 252) and its non-disparagement term are also not judicially enforceable under the Speak Out Act, 42 U.S.C. § 19403(a). They are nondisclosure and nondisparagement clauses agreed to in March 2024, before the dispute arose, and this is a sexual assault dispute in which the conduct is alleged to have violated federal and state law (¶¶ 231, 239, 247). In the alternative, the same is true of the confidentiality and non-disparagement terms of the Agreement, Sections 3 and 5(e), which restate and amend those of the Prior Agreement (¶ 251).

708. In the alternative under Fed. R. Civ. P. 8(d)(2), the Agreement and the Prior Agreement are voidable for duress or fraud. The Agreement was presented to Plaintiff at Clayton House as a twenty-four-hour exploding offer, and she signed it while confined under twenty-four-hour supervised care, without any attorney, without housing or income, and while her medications were being withheld, after she had warned Defendants' counsel on September 22, 2025 what the payment would cost her (¶¶ 274–277). Plaintiff signed the Prior Agreement without counsel, while she was living in housing that Defendant A. Peterson controlled and paid for, and on promises about her housing that he made outside the agreement and did not keep (¶¶ 242, 249, 253, 261).

709. Defendant A. Peterson has waived Section 13 of the Agreement by bringing his two actions in forums it does not permit. His counsel had themselves invoked the Kent County forum clause of the Prior Agreement against Plaintiff in the 2025 Action, and his injunction brief in the Federal Action invoked Section 13's choice of Michigan law while suing outside the forums Section 13 permits.

710. Plaintiff seeks a declaration that the Agreement and the Prior Agreement are void and unenforceable, or in the alternative that Sections 2, 4, 5(e), and 7 of the Agreement are void and unenforceable; that the nondisclosure and nondisparagement clauses of the Prior Agreement and of the Agreement are not judicially enforceable under 42 U.S.C. § 19403(a); in the further alternative, that the Agreement and the Prior Agreement are set aside for duress or fraud on the conditions stated in ¶ 711; and that Section 13 has been waived.

711. In the alternative, if the Court sets the Agreement aside for duress or fraud rather than declaring it void, Plaintiff offers to return the $25,000 she received under it, and asks that any judgment setting the Agreement aside be conditioned on that return or that the $25,000 be credited against any recovery she obtains. On the same alternative ground, if the Court sets the Prior Agreement aside, Plaintiff offers to return the consideration she received under it — the $120,757.40 paid under Sections 3(b) and 3(c), the rent provided under Section 3(d) through March 31, 2024, and the housing payments made under Section 3(e), to the extent each was paid — on the same conditions. Plaintiff's first position is that the Agreement and the Prior Agreement are void as against public policy, a ground that does not depend on returning anything; she makes this offer only in the alternative under Rule 8(d)(2), and neither the offer nor her receipt of any payment affirms or ratifies either agreement.

## **COUNT XVI — BREACH OF CONTRACT (PLEADED IN THE ALTERNATIVE)**

*(Against Defendants A. Peterson, Peterson Farms Fresh, LLC, and Peterson Farms, Inc.)*

712. Plaintiff incorporates the factual allegations of Section III and Section VI.

713. To the extent any provision of the Agreement is enforceable, Defendants named in this Count breached Section 1 by failing to make the settlement payment within three days of

the Effective Date (October 10, 2025, the date on all four signature lines; the payment was not sent until October 14, 2025; see ¶ 280); breached Sections 3 and 5(e) by filing Plaintiff's diagnoses, clinical records, and a false accusation of a crime on the public docket on June 16, 2026, and by filing her bank account number on the public docket on July 13, 2026, and by obtaining the sealing of her sworn account while their June 16, 2026 characterization of her, which they did not ask to seal, remained on the public docket (2025 Action, Dkt. 75). Defendants named in this Count also breached Section 13 by filing the Federal Action and by filing and maintaining the Cook County Action outside the forums it designates. They received written notice of the Section 3 and Section 13 defaults on October 16, 2026 and, by letter of November 4, 2026, refused to cure them (¶¶ 298–300). Plaintiff was damaged thereby.

## COUNT XVII — ABUSE OF PROCESS

*(Against Defendants A. Peterson, Varnum LLP, Doyle, Youngdahl, Tabet DiVito & Rothstein LLC, Grant, and Andreasen)*

714. Plaintiff incorporates the factual allegations of Section VI.

715. Defendants named in this Count used legal process for an ulterior purpose — to enforce an Agreement that is void as against public policy (Count XV) and to silence Plaintiff's reporting of trafficking — and committed acts not proper in the regular prosecution of proceedings, including filing five certificates of "personal service" at an address counsel had reason to know was not Plaintiff's; misrepresenting to this Court the content of the June 22, 2026 order; invoking Section 13's choice of Michigan law while suing in a forum Section 13 forbids; seeking an injunction reaching Plaintiff's outreach to other victims and her reporting on counsel; and

abandoning the Federal Action on the eve of its jurisdictional deadline to refile in a forum the Agreement forbids. Plaintiff was damaged thereby.

## COUNT XVIII — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*(Against Defendants A. Peterson, Varnum LLP, Doyle, Aetna Better Health of Illinois, Usyak, and Leicher, and, in the alternative, Defendant Pini in his individual capacity)*

716. Plaintiff incorporates the factual allegations of Section III, Section IV, Section VI, and Section VII.

717. The conduct of Defendants named in this Count — including the trafficking of Plaintiff, the sexual assault of Plaintiff on January 23–24, 2026, Defendant Usyak's continued pursuit of Plaintiff with money and messages after that assault, the public filing of her diagnoses and a false accusation of a crime against a known trafficking victim, the discharge of Plaintiff from Clayton House into homelessness without her medications, and the police dispatch and attempted commitment following her civil rights complaint — was extreme and outrageous, was intended to cause or recklessly disregarded the high probability of causing severe emotional distress, and caused Plaintiff severe emotional distress.

717A. In the alternative to Counts VII and XX, and to the extent Defendant Pini's surveillance of Plaintiff on and before May 17, 2025 (¶¶ 348–359) was outside the scope of his federal employment, that conduct — the surveillance of a trafficking victim's social media by an employee of the Department's anti-trafficking program — was extreme and outrageous, was intended to cause or recklessly disregarded the high probability of causing severe emotional distress, and caused Plaintiff severe emotional distress, including the panic attack alleged in ¶ 359.

## COUNT XIX — CIVIL CONSPIRACY

*(Against Defendants named in Counts II, III, and XVII, other than Droppers)*

718. Plaintiff incorporates the factual allegations of Section III, Section VI, and Section VIII. Defendants named in this Count combined and agreed to accomplish, by concerted action, the unlawful purposes alleged in Counts II, III, and XVII, and committed overt acts in furtherance of the agreement, injuring Plaintiff.

## COUNT XX — EQUAL PROTECTION UNDER THE FIFTH AMENDMENT: EXECUTIVE ORDER 14168 (28 U.S.C. § 2201; 5 U.S.C. § 702)

*(Against Defendants Trump, Mullin, Blanche, Kennedy, and Pini, in their official capacities, and Defendant United States Department of Health and Human Services)*

719. Plaintiff incorporates the factual allegations of Section IV.

720. On January 20, 2025, Defendant Trump signed Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." The Order defines "female" and "male" by the reproductive cell to which a person belongs at conception; directs every agency of the United States to recognize only that classification; directs agencies to remove recognition of gender identity from their policies, documents, and forms; rescinds prior executive orders that protected persons on the basis of sexual orientation and gender identity; and assigns the Attorney General a role in directing agencies' implementation of it.

721. Agencies of the United States implemented the Order. The Department of Homeland Security dismantled protections specific to lesbian, gay, bisexual, transgender, and queer ("LGBTQ") persons in its detention and custodial settings. The Department of Housing and

Urban Development ceased enforcing prohibitions on gender-identity discrimination in the housing programs and shelters on which trafficking survivors depend for emergency housing. The Department of Health and Human Services eliminated the LGBTQ option on the 988 Suicide and Crisis Lifeline.

722. Plaintiff is a victim of trafficking within the meaning of 18 U.S.C. § 1595 and identifies as LGBTQ; she is intersex and is perceived as transgender (¶ 253B). Congress extended the protections of the Trafficking Victims Protection Act to every victim of trafficking, without regard to sexual orientation or gender identity. The Order and its implementation withdraw federal protective recognition from LGBTQ trafficking victims that other trafficking victims retain, on the basis of identity rather than of victimization. That classification bears no rational relationship to any legitimate governmental interest as applied to trafficking victims, whose LGBTQ identity increases their vulnerability to exploitation, and it is not substantially related to any important governmental interest.

723. The classification was applied to Plaintiff. In May 2025, Defendant Mark Pini, an employee of the Department of Homeland Security assigned to the Blue Campaign, the Department's anti-trafficking program, surveilled Plaintiff, an LGBTQ trafficking victim, as alleged in Section IV, within the framework the Order created, in which LGBTQ identity had ceased to be a basis for federal protection.

724. Defendants Mullin and Blanche, as the officers charged with implementing the Order within the Department of Homeland Security and the Department of Justice, continue to implement it, and the injury to Plaintiff is ongoing. Defendant Kennedy, as Secretary of Health and Human Services, is the officer responsible for the implementation of the Order by Defendant United States Department of Health and Human Services alleged in ¶ 721.

725. Plaintiff is entitled to a declaration that Executive Order 14168, as applied to victims of trafficking, violates the equal protection guarantee of the Fifth Amendment to the Constitution of the United States, and to an injunction barring Defendants Mullin, Blanche, and Kennedy, and Defendant United States Department of Health and Human Services, from implementing the Order in any manner that affords LGBTQ trafficking victims less protection than other trafficking victims, requiring the Department of Homeland Security to restore LGBTQ-inclusive protective protocols in the Blue Campaign and its other services for trafficking victims, and barring identity-based surveillance of trafficking victims by employees of the United States.

***COUNTS UNDER MICHIGAN LAW***

726. Counts XXI through XXIX arise under Michigan law, which governs the conduct alleged in Michigan; Defendant A. Peterson has himself invoked Michigan law under Section 13 of the Agreement (¶ 709). Neither the Agreement nor the Prior Agreement bars these Counts, because both are void as against public policy, as alleged in Count XV. To the extent any Defendant asserts the October 23, 2025 dismissal of the 2025 Action as a bar, Plaintiff alleges that the dismissal was entered on the stipulation the Agreement required (¶¶ 439–440) and reserves her right to relief from it under Fed. R. Civ. P. 60(d).

## COUNT XXI — MICHIGAN HUMAN TRAFFICKING VICTIMS COMPENSATION ACT (MCL 752.983; MCL 750.462d(b))

*(Against Defendant Peterson Farms Fresh, Inc.)*

727. Plaintiff incorporates the factual allegations of Section III and ¶ 524. This Count arises under Michigan law and is within the Court's supplemental jurisdiction (¶ 187).

728. Under the Human Trafficking Victims Compensation Act, a person who violates MCL 750.462a to 750.462h is liable to the victim of the violation for economic and noneconomic damages that result from the violation, whether or not the victim suffered physical injury, whether or not the damages were foreseeable, and whether or not the violator was charged or convicted. MCL 752.983(1)–(4).

729. From late 2023 through about April 1, 2024, in Michigan, Defendant A. Peterson knowingly recruited, enticed, harbored, transported, provided, and obtained Plaintiff, knowing that she would be subjected to forced labor or services, in violation of MCL 750.462b and MCL 750.462d(a). The services were an ongoing relationship in which Plaintiff performed activities for his benefit, including commercial sexual activity (MCL 750.462a(c), (l); ¶¶ 226, 247). He obtained and maintained them by fraud, including a false offer of marriage (MCL 750.462a(h); ¶¶ 215, 236), and by coercion: a scheme intended to make Plaintiff believe that refusing him would cost her housing and financial support (MCL 750.462a(b)(i); ¶¶ 213, 216–226, 228–229, 247).

730. Defendant A. Peterson, together with the Peterson corporate entities whose accounts, domains, bank accounts, and resources he used for that scheme, formed an enterprise that engaged in acts proscribed under chapter LXVIIA of the Michigan Penal Code (¶¶ 301–302).

731. Defendant Peterson Farms Fresh, Inc. knowingly benefited financially, and received things of value, from participation in that enterprise, in violation of MCL 750.462d(b). The evidence of that participation: Plaintiff's Grand Rapids housing was booked by Defendant A. Peterson as an authorized travel booker on her Airbnb account, using the @petersonfarmsinc.com domain associated with Peterson Farms Fresh, Inc. and his work credit cards (¶¶ 220, 301(a)–(b)); the Grand Haven residence where Defendant A. Peterson assaulted Plaintiff on March 6, 2024,

was booked and controlled the same way (¶ 239); and the Peterson corporate entities received a financial benefit from Plaintiff's labor while she was maintained in a trafficking situation (¶ 302).

732. Upon information and belief, this Defendant acted knowingly. Its accounts and resources were used for the scheme at the direction of Defendant A. Peterson, and his knowledge is imputed to it (¶ 303).

733. Plaintiff is the victim of these violations. As a result of them, she suffered the economic and noneconomic damages alleged in ¶¶ 308–309, including mental anguish, humiliation, the costs of medical and psychological care, and loss of income.

734. Plaintiff seeks compensatory damages, exemplary damages to the extent Michigan law allows, and all other relief the Act permits.

**COUNT XXII — SEXUAL BATTERY (MICHIGAN LAW; CRIMINAL SEXUAL CONDUCT, MCL 600.5805(6))**

*(Against Defendant A. Peterson)*

735. Plaintiff incorporates the factual allegations of Section III and ¶¶ 386 and 393. This Count arises under Michigan law and is within the Court's supplemental jurisdiction (¶ 187).

736. In February 2024, at the Grand Rapids Airbnb residence where he had housed her (¶¶ 221, 231, 386), and on March 6, 2024, at the Airbnb residence on Miller Avenue, Room 211, Grand Haven (¶ 239), Defendant A. Peterson willfully subjected Plaintiff to harmful and offensive sexual contact and sexual penetration, without her consent.

737. That conduct was criminal sexual conduct. Defendant A. Peterson used force or coercion to accomplish sexual penetration and caused Plaintiff personal injury, including mental

anguish (MCL 750.520b(1)(f); MCL 750.520a(n); MCL 750.520d(1)(b)). In the alternative, he knew or had reason to know that Plaintiff was, at those times, temporarily incapable of appraising the nature of her conduct. That incapacity came from her disabilities, which were known to him (¶ 208), her dissociation, and the trance his presence induced (¶ 243) (MCL 750.520d(1)(c); MCL 750.520a(j)).

738. The Grand Rapids assault was reported to the Grand Rapids Police Department (Case No. 24-063052) and submitted to the Kent County Prosecutor's Office for review as criminal sexual conduct in the first degree under MCL 750.520b(1)(f) (¶¶ 231, 393). Video from her former service animal's pet camera documents it (¶ 386). No criminal prosecution is required for this Count. MCL 600.5805(6).

739. As a result, Plaintiff sustained physical injury, severe emotional distress, and the other damages alleged in ¶¶ 308–309, all sustained because of criminal sexual conduct.

740. Plaintiff seeks compensatory and exemplary damages.

## COUNT XXIII — ELLIOTT-LARSEN CIVIL RIGHTS ACT: SEXUAL HARASSMENT IN HOUSING (MCL 37.2502(1)(b), 37.2103(k), 37.2801)

*(Against Defendants A. Peterson, Peterson Farms Fresh, LLC, and Peterson Farms Fresh, Inc.)*

741. Plaintiff incorporates the factual allegations of Section III. This Count arises under Michigan law and is within the Court's supplemental jurisdiction (¶ 187).

742. Defendants named in this Count engaged in real estate transactions, namely the rental of real property (MCL 37.2501(b)). Defendant A. Peterson, as an authorized travel booker on Plaintiff's Airbnb account, using the corporate e-mail address and work credit cards of the Peterson corporate entities, rented the residence at 1556 Michigan St NE #4, Grand Rapids, for

Plaintiff to occupy from January 24, 2024. From about March 1, 2024, he rented the Miller Avenue residence in Grand Haven. The housing was managed, paid for, and controlled through his booker access and the Peterson Farms work credit cards (¶¶ 219–222, 239).

743. Defendants discriminated against Plaintiff because of sex in the terms, conditions, and privileges of those real estate transactions, and in the furnishing of facilities and services in connection with them (MCL 37.2502(1)(b)). Defendant A. Peterson made Plaintiff's submission to his sexual demands a term or condition of obtaining and keeping that housing (MCL 37.2103(k)(i)). His "investment" in her rose with her sexual submission (¶ 226), and he compelled her to submit to his sexual demands at any time and place of his choosing, on pain of losing her housing and financial support (¶ 247).

744. His conduct also substantially interfered with Plaintiff's housing and created an intimidating, hostile, and offensive housing environment (MCL 37.2103(k)(iii)), including his sexual assaults of Plaintiff in that housing in February 2024 and on March 6, 2024 (¶¶ 231, 239), and the repeated moves he forced on her (¶¶ 221, 257).

745. Defendants Peterson Farms Fresh, LLC and Peterson Farms Fresh, Inc. are liable for that discrimination. The rentals were made through their accounts and paid for and controlled through their resources, by Defendant A. Peterson acting for them (¶¶ 220, 222, 239, 301, 303).

746. Plaintiff brings this civil action under MCL 37.2801(1). As a result of Defendants' discrimination, she suffered humiliation, severe emotional distress, housing instability, repeated forced relocations, and the other damages alleged in ¶¶ 308–309. She seeks compensatory damages and exemplary damages to the extent Michigan law allows.

## COUNT XXIV — FRAUD (MICHIGAN LAW)

*(Against Defendant A. Peterson)*

747. Plaintiff incorporates the factual allegations of Section III. This Count arises under Michigan law and is within the Court's supplemental jurisdiction (¶ 187).

748. Defendant A. Peterson made material representations of fact to Plaintiff that were false. (a) In February 2024, he represented that he was getting a divorce from Jennifer Lamb Peterson (¶ 215). On February 18, 2024, he wrote, "So my timeframe has always been late spring to file," and that he needed "to work on becoming unmarried again." No divorce proceedings had been initiated; Ottawa County Family Services confirmed in December 2024 that no divorce was pending (¶ 215). (b) On March 21, 2024, after Plaintiff had chosen a residence in California, he represented that the booking could not be made because "the Airbnb system errored out on me 4 times" (¶ 255). Upon information and belief, he made each statement knowing that it was false, or recklessly without knowledge of its truth, intending that Plaintiff act on it.

749. Plaintiff relied on those statements. Relying on the first, she remained in the housing he controlled and in the arrangement he directed (¶¶ 221–222, 242, 247). Relying on the second, she gave up her relocation to California and moved to the Fox Lake rental he paid for, where she remained under his constructive confinement (¶¶ 254–259).

750. As a result, Plaintiff suffered injury, including the continued loss of control over her housing and movement, repeated forced relocations, severe emotional distress, and the other damages alleged in ¶¶ 308–309.

751. Plaintiff seeks compensatory and exemplary damages.

## COUNT XXV — ABUSE OF PROCESS (MICHIGAN LAW, IN THE ALTERNATIVE TO COUNT XVII)

*(Against Defendants A. Peterson, Varnum LLP, Doyle, and Youngdahl)*

752. Plaintiff incorporates the factual allegations of Section VI. This Count arises under Michigan law and is within the Court's supplemental jurisdiction (¶ 187). It is pleaded in the alternative to Count XVII under Fed. R. Civ. P. 8(d)(2), because Defendant A. Peterson has invoked Michigan law under Section 13 of the Agreement (¶ 709).

753. Defendants named in this Count used legal process for an ulterior purpose: to enforce an Agreement that is void as against public policy (Count XV), and to silence Plaintiff's reporting of her trafficking.

754. They committed acts in the use of process that were not proper in the regular prosecution of the proceedings: (a) Five certificates of "personal service" at an address counsel had reason to know was not Plaintiff's, filed before and after counsel asked her by e-mail whether she would accept service (¶¶ 458–462). (b) The misstatement to this Court of what the June 22, 2026 order held (¶ 450). (c) A notice of dismissal filed one day before the deadline to substantiate jurisdiction, followed the next day by a substantially identical action in a forum the Agreement does not permit (¶¶ 296, 456). (d) Through Defendant A. Peterson's Cook County counsel, an order for service by posting on social media, which made the act of serving Plaintiff an announcement of the action to her readership (¶¶ 467–471).

755. Plaintiff was damaged thereby, including the burden and expense of defending two actions brought to enforce the Agreement and the exposure of her bank account number on the public docket (¶¶ 293, 308).

756. Plaintiff seeks compensatory and exemplary damages.

**COUNT XXVI — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (MICHIGAN LAW)**

*(Against Defendants A. Peterson, Varnum LLP, and Doyle)*

757. Plaintiff incorporates the factual allegations of Section III and ¶¶ 476–479. This Count arises under Michigan law and is within the Court's supplemental jurisdiction (¶ 187).

758. Defendant A. Peterson's conduct toward Plaintiff in Michigan was extreme and outrageous. Knowing her disabilities (¶ 208), he led her, from the middle of November 2023 until the middle of February 2024, to sever ties with her trauma therapist, her college education, her former best friend, her two service animals, and potential legal counsel (¶ 246). He made her housing and financial security depend on her submission to his sexual demands (¶ 247). He sexually assaulted her in the housing he controlled (¶¶ 231, 239). He then abruptly discarded her in Grand Haven in March 2024 (¶ 241).

759. The conduct of Defendants Varnum LLP and Doyle was also extreme and outrageous. On June 16, 2026, on the public docket of this Court, they identified Plaintiff's diagnoses by name, quoted her clinical records, characterized her mental health in disparaging terms, and falsely accused her, a known trafficking victim, of benefits fraud, while arguing in the same filing that her health information required protection from public view (¶¶ 288–291). Defendant A. Peterson, through an alias account, monitored Plaintiff's reporting on his conduct and ended that subscription within eighty-one minutes of being named (¶¶ 476–479).

760. Defendants intended to cause, or recklessly disregarded the high probability of causing, severe emotional distress. They caused Plaintiff severe emotional distress, including the exacerbation of her C-PTSD and related conditions (¶ 308).

761. Plaintiff seeks compensatory and exemplary damages.

## **COUNT XXVII — CIVIL CONSPIRACY (MICHIGAN LAW)**

*(Against Defendants Peterson Farms Fresh, Inc., A. Peterson, Varnum LLP, Doyle, and Youngdahl)*

762. Plaintiff incorporates the factual allegations of Sections III and VI. This Count arises under Michigan law and is within the Court's supplemental jurisdiction (¶ 187).

763. Defendant Peterson Farms Fresh, Inc. combined with Defendant A. Peterson to accomplish, by concerted action, the unlawful purposes alleged in Count XXI, and committed the acts alleged there in furtherance of that agreement.

764. Defendants A. Peterson, Varnum LLP, Doyle, and Youngdahl combined to accomplish, by concerted action, the abuse of process alleged in Count XXV, and committed the acts alleged there in furtherance of that agreement. Defendant A. Peterson is named in this Count only for the purposes alleged in Count XXV.

765. Plaintiff was injured by those acts, as alleged in Counts XXI and XXV. She seeks compensatory and exemplary damages.

## COUNT XXVIII — PROMISSORY ESTOPPEL (MICHIGAN LAW, IN THE ALTERNATIVE)

*(Against Defendant A. Peterson)*

766. Plaintiff incorporates the factual allegations of Section III. This Count arises under Michigan law and is within the Court's supplemental jurisdiction (¶ 187). It is pleaded in the alternative under Fed. R. Civ. P. 8(d)(2).

767. Defendant A. Peterson made Plaintiff clear and definite promises about her housing, outside the Prior Agreement. On March 17, 2024, he wrote, "I will help and assist in the housing search." On March 21, 2024, he wrote, "The Airbnb is as agreed upon between us." On April 12, 2024, he wrote, "Yes, I can handle the rent at Nathan's place for the 6 months" (¶ 261). He himself treated these promises as separate from the Prior Agreement. On March 19, 2024, he told her that his promise of another Airbnb rental "won't be in the agreement" (¶ 249). On May 3, 2024, he wrote that he would "follow the terms of our NDA and our side agreement for the Airbnb in Fox Lake" (¶ 261).

768. He should reasonably have expected those promises to induce action of a definite and substantial character, and they did. Relying on them, Plaintiff moved to the Fox Lake rental and established her residence there: her Illinois driver's license, automobile insurance, voter registration, and post office box each bore the Fox Lake address (¶ 256).

769. Defendant A. Peterson did not keep his promise to help her find a house (¶ 261). In June 2024, Plaintiff was forced out of the Fox Lake rental, and in or about August 2024 she moved to DuPage County (¶ 262), and she suffered the housing instability alleged in ¶ 308.

770. Injustice can be avoided only by enforcing the promises. Plaintiff seeks damages measured by her reliance and by the value of the promised housing assistance.

## COUNT XXIX — MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT: DENIAL OF A PUBLIC SERVICE (MCL 37.1302(a), 37.1606)

*(Against Defendant City of Grand Rapids)*

771. Plaintiff incorporates the factual allegations of Section V. This Count arises under Michigan law and is within the Court's supplemental jurisdiction (¶ 187). It is pleaded in the alternative to the coordination alleged in ¶ 437(c), under Fed. R. Civ. P. 8(d)(2).

772. The Grand Rapids Police Department, a department of Defendant City of Grand Rapids, is a public service (MCL 37.1301(b)). Plaintiff is an individual with disabilities (¶ 208).

773. Defendant City of Grand Rapids, through its Police Department, denied Plaintiff the full and equal enjoyment of its services because of disabilities unrelated to her ability to use and benefit from them (MCL 37.1302(a)). Detective Battle responded to Plaintiff at least five times over eight weeks, from March 19 through May 12, 2025 (¶ 403). On May 25, 2025, Plaintiff disclosed to him her release from a mental hospital on April 28, 2025, her entry into a residential mental health nursing home, her dissociation when describing the assaults, her reapplication for SSI benefits, and that she was "even more severely disabled" (¶ 400(b), (g), (h)). After that e-mail he never responded again, did not request the video evidence she offered, and took no action on the further crimes she reported (¶ 401).

774. The disabilities Plaintiff disclosed were unrelated to her ability to use and benefit from the investigation of her own report: in the same e-mail she offered the Department more evidence and her full cooperation (¶ 400(c)–(f)).

775. Plaintiff brings this civil action under MCL 37.1606(1). As a result of the denial, she suffered the injuries alleged in ¶ 438, including the reasonable fear that the law enforcement system will not protect her. She seeks compensatory damages, and exemplary damages to the extent Michigan law allows.

**COUNT XXX — NEGLIGENCE AND WILLFUL AND WANTON CONDUCT**

*(Against Defendants Enterprise Holdings, Inc. and Enterprise Leasing Company of Chicago, LLC)*

776. Plaintiff incorporates ¶¶ 182A and 208. This Count arises under state law and is within the Court's supplemental jurisdiction (¶ 187). It concerns what Enterprise did to Plaintiff while she was moving from Illinois to California to escape Defendant A. Peterson and the conduct alleged in this Complaint. If the Court finds this Count misjoined, Plaintiff asks that it be severed rather than dismissed (¶ 207A).

777. Plaintiff rented vehicles from Enterprise's Waukegan branch continuously from June 20, 2026. On July 17, 2026, she rented a 2026 Chevrolet Silverado truck under Rental Agreement No. 48BLHS. Before August 2026 she had never paid Enterprise late.

778. In mid-August 2026, on her way west, Plaintiff and her service animal were caught in a flood near a national park in Utah. She lost about $5,000 in property, lost telephone service for an extended period, and drove for more than three days without it. Her payment card was locked, and a payment that Enterprise attempted did not go through. On August 18, 2026, the manager of the Waukegan branch wrote to her that the rental was overdue by $434.71 and that without payment she would "not have permissive use of the vehicle."

779. On August 20, 2026, Plaintiff wrote to the managers of the Waukegan branch. She told them of the flood and her losses. She told them, by name, of the disabilities alleged in ¶ 208, and that she travels with her service animal, Luna. She told them that she was a victim of trafficking in federal litigation, that the other side was tracking her and sending process servers to find her, and that she could not give up the truck at once because she would be left "vulnerable and exposed." She asked them not to treat her conduct as "criminal, defiant or inconsiderate," and she asked for any accommodation available under the Americans with Disabilities Act.

780. On August 21, 2026, Plaintiff asked Enterprise to run her payment at 10:30 a.m. Central time the next day, when she would unlock her card for one hour, and told it that she was working to return the truck by Monday afternoon. Enterprise did not take the payment.

781. On August 24, 2026, Enterprise's Area Rental Manager answered that the account was $831 behind, that Enterprise was "not in a position to provide financial accommodations or extensions beyond the terms of the rental agreement," and that it needed either payment in full or Plaintiff's "current location and availability so that we can arrange for the vehicle to be recovered."

782. On August 27, 2026, the same manager wrote that the contract was $630.26 behind and that Enterprise would "escalate the matter" if it was not resolved that day. That afternoon a Senior Risk Management Coordinator of Enterprise's Chicago Group wrote that Plaintiff did "not have permissive use of the vehicle" and asked for its location. On the morning of August 28, 2026, the coordinator wrote that Enterprise's escalation "may include contacting law enforcement," and added, in capital letters: "DO NOT DRIVE THE RENTAL VEHICLE UNDER ANY CIRCUMSTANCE."

783. Plaintiff answered within the hour. She wrote that she had offered to satisfy everything and had asked for until 3:00 p.m. to return the truck herself, with a $200 good-faith

payment; that she was disabled, with her service animal, "in the wilderness," sick, and struggling to get a connection; and that "any escalation after all my efforts will seriously injure us."

784. Enterprise's Risk Manager replied the same day. He wrote that Enterprise was "unable to accept partial or 'good faith' payments"; that, "[i]n an effort to accommodate your request for an exception related to your disability," Enterprise had offered to retrieve the truck, for which it needed "the vehicle's location"; that Plaintiff was "not authorized to continue operating the vehicle, including for purposes of returning it"; and that a certified demand letter set out the "potential legal implications" of keeping it, including under 720 ILCS 5/16-3, a provision of the Illinois Criminal Code.

785. Plaintiff then gave Enterprise what it demanded. At 3:17 p.m. Central time on August 28, 2026, she sent the coordinates of the truck, told Enterprise that she had not used it for four days and that it was nearly out of fuel, and wrote that she had "fulfilled your request." Twenty-one minutes later the Risk Manager answered that he had asked Enterprise's "California team" to "dispatch a tow to those coordinates."

786. Plaintiff was then camped with her service animal in the mountains of California, at an elevation of about 7,000 feet. The truck was her only transportation.

787. On September 1, 2026, the Risk Manager wrote that his team had gone out for the truck and could not take it because the keys were not with it. Plaintiff answered that the keys had been on the branch above the door for days. Enterprise took the truck and left Plaintiff and her service animal on the mountain.

788. Plaintiff was stranded. On the night of September 1, 2026, the temperature fell to 41 degrees. It took her about two weeks, and miles of walking, to get off the mountain, and she lost about eighty percent of the property she still had. At the lowest point she had about $60.

789. The day after Plaintiff sent Enterprise the coordinates, two or more people on dirt bikes searched the place where the truck stood and came within about a quarter of a mile of her concealed campsite. She heard one of them yell, “there’s nobody here.” She and her service animal took high ground and held their position for more than eight hours.

790. Enterprise knew, because Plaintiff had told it in writing, that she was a person with disabilities, that her service animal was with her, that she was in the wilderness and sick, and that escalation would seriously injure them. It knew where the truck was, because it had demanded the location and she had given it. Enterprise owed Plaintiff a duty to use reasonable care not to put her in peril by the way it enforced its agreement. It breached that duty: it refused the same-day return she offered, forbade her to drive the truck even to return it, threatened her with the police and with a criminal statute, and then removed the truck from the mountain and left her there.

791. Enterprise acted with conscious disregard for Plaintiff’s safety, and it called the recovery of its own truck an accommodation of her disability. As a direct result, Plaintiff suffered exposure, physical pain, fear, and severe emotional distress, and the loss of her property. She seeks compensatory damages, and punitive damages for Enterprise’s willful and wanton conduct.

## COUNT XXXI — TITLE III OF THE AMERICANS WITH DISABILITIES ACT

## (42 U.S.C. §§ 12182, 12188)

*(Against Defendants Enterprise Holdings, Inc. and Enterprise Leasing Company of Chicago, LLC)*

792. Plaintiff incorporates ¶¶ 776 through 791. Plaintiff is an individual with disabilities (¶ 208). Enterprise's rental branches are places of public accommodation, 42 U.S.C. § 12181(7)(E), and Enterprise owns and operates them.

793. Plaintiff asked Enterprise in writing for an accommodation because of her disabilities (¶ 779). A reasonable modification of Enterprise's practices was available: to let her return the truck herself that afternoon, as she offered (¶ 783). Enterprise refused it, forbade her to drive the truck at all, and named as its accommodation the step that served only itself (¶ 784). 42 U.S.C. § 12182(a), (b)(2)(A)(ii).

794. On November 6, 2026, an affiliate of Enterprise demanded $729.37 from Plaintiff on the same agreement and wrote that further steps "could affect your rental privileges" with Enterprise Rent-A-Car, Alamo Rent A Car, and National Car Rental. Plaintiff has no vehicle of her own and intends to rent vehicles again. She seeks an injunction under 42 U.S.C. § 12188(a) requiring Enterprise to adopt a written procedure for requests for reasonable modifications by renters with disabilities and to apply it to her, and her costs.

## COUNT XXXII — ILLINOIS TRAFFICKING VICTIMS PROTECTION ACT (740 ILCS 128/15; 720 ILCS 5/10-9(b), (d))

*(Against Defendant Peterson Farms Fresh, Inc.)*

795. Plaintiff incorporates the factual allegations of Section III. This Count arises under Illinois law and is within the Court's supplemental jurisdiction (¶ 187).

796. Under the Illinois Trafficking Victims Protection Act, a victim of involuntary servitude or human trafficking may bring a civil action against a person or entity who knowingly subjects, attempts to subject, or engages in a conspiracy to subject the victim to involuntary servitude or human trafficking. 740 ILCS 128/15(a), (b-1). "Involuntary servitude" and "human trafficking" mean violations or attempted violations of subsections (b) and (d) of Section 10-9 of the Criminal Code of 2012. 740 ILCS 128/10.

797. The trafficking alleged in Section III was carried out in Illinois as well as in Michigan. From February 26 through February 28, 2024, Defendant A. Peterson transported Plaintiff to the Viceroy Chicago hotel in Chicago, Cook County, Illinois, in this District (¶¶ 227, 232). He used trickery, coercion, enticement, and deception to involve her in commercial sexual activity there (¶ 236), and he sexually assaulted her there (¶¶ 233, 238, 243).

798. In the spring of 2024, after the Prior Agreement, Defendant A. Peterson arranged Plaintiff's departure from Michigan (¶ 254) and paid for the rental in Fox Lake, Lake County, Illinois, in this District, where she lived until June 2024 (¶¶ 256, 261–262). Throughout her time at Fox Lake, Plaintiff remained under his active constructive confinement (¶ 259). He paid for her housing and controlled its terms through side agreements that kept changing (¶ 261), after forcing her to move more than four times in six months (¶ 257).

799. By these acts in Illinois, Defendant A. Peterson knowingly subjected Plaintiff to services, including commercial sexual activity, that he obtained and maintained through means the statute names: he caused her physical harm (¶¶ 233, 238); he exerted financial control over her (¶¶ 226, 229–230, 242); and he used a scheme, plan, or pattern intended to cause her to believe that, if she did not perform those services, she would suffer serious harm, namely the loss of her housing and her financial support (¶¶ 226, 247). 720 ILCS 5/10-9(b)(1), (5), (6). He also knowingly transported and harbored her in Illinois, intending or knowing that she would be subjected to involuntary servitude. 720 ILCS 5/10-9(d)(1).

800. Defendant A. Peterson and the Peterson corporate entities whose accounts, domains, and resources he used formed a venture (¶¶ 301–302), and that venture engaged in the acts of involuntary servitude alleged in ¶¶ 797 through 799.

801. Defendant Peterson Farms Fresh, Inc. is a company that knowingly benefited, financially and by receiving things of value, from participation in that venture. It thereby committed trafficking in persons, 720 ILCS 5/10-9(d), and engaged in a conspiracy to subject Plaintiff to involuntary servitude and human trafficking, 740 ILCS 128/15(b-1). The evidence of its participation is alleged in ¶¶ 301, 302, and 731.

802. Upon information and belief, this Defendant acted knowingly. Its accounts and resources were used for the scheme at the direction of Defendant A. Peterson, and his knowledge is imputed to it (¶ 303).

803. Under the Act, it is not a defense that the victim consented, or that she was paid or otherwise compensated. 740 ILCS 128/25(a). No person may avoid liability under the Act by an indemnification, hold harmless agreement, or similar agreement that purports to show the victim's consent. 740 ILCS 128/45. To the extent this Defendant claims the benefit of the release in Section

8 of the Agreement, Plaintiff alleges that the Agreement, including Section 8, is void as against public policy for the reasons stated in Count XV.

804. Plaintiff is the victim of these violations. As a result of them, she suffered the damages alleged in ¶¶ 308 and 309, including physical injuries, severe emotional distress, housing instability, repeated forced relocations, and financial harm.

805. Plaintiff seeks all relief the Act provides to make her whole: compensatory damages, punitive damages, damages in the amount of the gross revenues this Defendant received from, or related to, the involuntary servitude and human trafficking, declaratory and injunctive relief, and her costs. 740 ILCS 128/20.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Rebekah K Brewis respectfully requests that the Court enter judgment in her favor and against Defendants, jointly and severally where the law permits, and award the following relief:

(a) a declaration that the Agreement and the Prior Agreement are void and unenforceable, or in the alternative that Sections 2, 4, 5(e), and 7 of the Agreement are void and unenforceable, that the nondisclosure and nondisparagement clauses of both agreements are not judicially enforceable under 42 U.S.C. § 19403(a), or in the further alternative an order setting the Agreement and the Prior Agreement aside for duress or fraud on the conditions stated in Count XV, and that Defendant A. Peterson has waived Section 13;

(b) an injunction barring Defendant A. Peterson, Peterson Farms Fresh, LLC, and Peterson Farms, Inc. from enforcing Sections 2, 4, 5(e), and 7 of the Agreement

and the Confidentiality Obligations of the Prior Agreement against Plaintiff's reports to law enforcement, her testimony, and her publication of truthful information, to the extent consistent with 28 U.S.C. § 2283;

(c) compensatory damages in an amount to be determined at trial;

(d) punitive damages under 18 U.S.C. § 1595(a), 42 U.S.C. § 1983, 15 U.S.C. § 1681n, 18 U.S.C. §§ 2520(b)(2) and 2724(b), 815 ILCS 505/10a, 720 ILCS 5/14-6, 740 ILCS 128/20, and state law;

(e) threefold damages under 18 U.S.C. § 1964(c) and 15 U.S.C. § 1693f(e);

(f) statutory and liquidated damages under 15 U.S.C. § 1681n, 15 U.S.C. § 1693m(a), and 18 U.S.C. §§ 2520(c)(2) and 2724(b);

(g) compensatory and punitive damages under 42 U.S.C. § 1985(3) against the Defendants named in Count V;

(h) exemplary damages on Counts XXI through XXVII and Count XXIX, to the extent Michigan law allows;

(i) an order requiring the Eros Network Defendants to remove all content depicting or identifying Plaintiff from eros.com and any archive under their control;

(j) injunctive relief under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, including services in the most integrated setting appropriate to Plaintiff's needs, release from her managed care enrollment, and an end to conditioning services on disclosure of her location;

(k) an order requiring TransUnion LLC and ChexSystems to delete the March 13, 2024 inquiry, correct Plaintiff's files and scores, and disclose her complete file;

(l) the injunctive relief against Defendant Navy Federal Credit Union sought in Count XI under 815 ILCS 505/10a;

(m) an injunction under 18 U.S.C. § 2520(b)(1) and 720 ILCS 5/14-6 prohibiting Defendant Meta Platforms, Inc. from further intercepting Plaintiff's electronic communications;

(n) a declaration and order under 5 U.S.C. § 706 that the Department of Homeland Security and the Department of Justice cease monitoring Plaintiff and preserve all records concerning her, her reports, and the Bolma Star Services investigation, and that the Consumer Financial Protection Bureau and the Department of Commerce preserve the records identified in ¶¶ 663A and 663B;

(o) a declaration that Executive Order 14168, as applied to victims of trafficking, violates the equal protection guarantee of the Fifth Amendment, and the injunctive relief against Defendants Mullin, Blanche, and Kennedy and Defendant United States Department of Health and Human Services sought in Count XX;

(p) disgorgement of the benefits each Defendant received from the ventures alleged in Count I;

(q) an order preserving all evidence relating to Plaintiff in Defendants' possession, custody, or control;

(r) upon the appearance of counsel for Plaintiff and a motion under Federal Rule of Civil Procedure 23(g), certification of the class alleged in Section XII;

(s) pre-judgment and post-judgment interest;

(t) costs, and reasonable attorney's fees if counsel appears for Plaintiff, under 18 U.S.C. §§ 1595(a) and 1964(c), 42 U.S.C. § 1988, 15 U.S.C. §§ 1681n, 1681o, and 1693m(a), 18 U.S.C. §§ 2520(b)(3) and 2724(b), and 740 ILCS 128/20;

(u) declaratory and prospective injunctive relief under 42 U.S.C. § 1983 against Defendants Nessel, Becker, Whitmer, Palepu, LaJoye-Young, and Rokita in their official capacities and against Defendant Kent County Prosecutor's Office, as sought in Count VI;

(v) injunctive relief under 42 U.S.C. § 12188(a) against Defendants Enterprise Holdings, Inc. and Enterprise Leasing Company of Chicago, LLC, as sought in Count XXXI; and

(w) such further relief as the Court deems just.

## XV. JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

## VERIFICATION

I, Rebekah K Brewis, am the Plaintiff in this action. I have read the foregoing Complaint. The factual allegations concerning my own experiences and acts are true of my own personal knowledge. The remaining factual allegations rest on the records, filings, and published reports identified in the Complaint, or are made upon information and belief, and I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 12, 2026.

/s/ Rebekah K Brewis

Respectfully submitted,

/s/ Rebekah K Brewis, *Pro Se*

1001 Wilshire Boulevard, PMB 2107

Los Angeles, California 90017

Telephone: (224) 347-4404

Email: owner@aeroswift.org

Dated: November 12, 2026